UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
UNITED STATES OF AMERICA,

v. 22 Cr. 00618 (JPC)

MICHAEL GIAN WILLIAM HABIB,

Defendant.

Conference
------------------------------x

New York, N.Y.
August 21, 2024
10:00 a.m.

Before:

HON. JOHN P. CRONAN,

District Judge

APPEARANCES

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
BY: MATTHEW SHAHABIAN
THOMAS BURNETT
Assistant United States Attorneys

WOODWARD & REIZENSTEIN
Attorneys for Defendant
BY: PHILIP REIZENSTEIN

(Case called)

MR. SHAHABIAN: Good morning, your Honor. Matt Shahabian and Tom Burnett appearing for the government. And with us at counsel table is Jennifer Richards, a legal intern in our office.

THE COURT: Good morning, Mr. Shahabian, Mr. Burnett, and Ms. Richards.

MR. REIZENSTEIN: Good morning. Philip Reizenstein on behalf of Michael Habib. He is present in court.

THE COURT: Good morning, Mr. Reizenstein and Mr. Habib.

We were originally scheduled this morning to have a Fatico hearing and possibly a sentencing for Mr. Habib. That's been adjourned until October , but I did want to keep today's appearance because of an application I received from Mr. Reizenstein, I guess it's a motion, filed on August titled "Defendant Habib's Motion to Enforce Plea Agreement and Objections to Government's Sentencing Submission."

To the extent there is a motion that I need to address -- and I am not sure if there is -- I wanted to have this appearance to make sure I understand the application the defense is making, and also make sure I understand what arguments the government is making as to sentencing and, in particular, the guidelines range that is being advocated at this point.

So let me start with Mr. Reizenstein, since it is your motion. A motion like this has some pretty serious accusations; basically claiming the government is breaching an agreement that it reached. I can't say I am particularly familiar with this type of motion. So I first want to make sure I understand what relief you are seeking.

What are you asking me to do?

MR. REIZENSTEIN: Thank you, Judge. May it please the Court. As preliminary remarks, it's certainly new ground for me as well. I don't think in 38 or 39 years I filed a motion like this, but hopefully it's well researched.

So as my understanding for the Second Circuit, there are two potential forms of relief would the Court find that there is a breach of the plea agreement, and the first would be to vacate the plea agreement and return us to a status prior to that. And we have indicated in our memorandum, we are not seeking that, meaning, to go to trial. And the second would be then to enforce the plea agreement. And I realize that when we asked the Court to enforce the plea agreement, we are on -- it's a subtle argument because the plea agreement has a contemplation of guidelines that the presentence report then did affirm what the government and the defense believed were going to be the guidelines. And clearly, every time a client, a defendant, takes a plea in federal court, and certainly before you, it's clear that while there is a plea agreement,

the Court may accept the guidelines, go above it, or go below it, and that is still the case, and we acknowledge that.

We do, however, believe that the government should be precluded from making the argument that they are making, that the guidelines are not sufficient for the reasons that they stated. And to briefly summarize that, it's our position that well over 95 percent of the government's argument as to the reasons why the plea agreement and the guidelines are not sufficient is information that was well known to the government prior to the plea in December of last year.

THE COURT: Well, even assuming that's the case -- and I am not sure it is -- a lot of the information the government has obtained came from a second cell phone of your client that was extracted after his plea. But why don't we assume that they had information at the time of the plea agreement. You are asking that the government must abide by the plea agreement and seek a guideline sentence. The plea agreement doesn't obligate the government to seek a guideline sentence. It allows either party to seek a variance from the guidelines. In fact, you filed a sentencing submission that asked for 120 months, which is a considerable variance.

Did you violate the plea agreement?

MR. REIZENSTEIN: No. And with regard to that, I do understand what the Court's argument is, and I don't disagree with it, but the plea agreement is specific that the reasons

either party could seek to go above or below the guidelines was 3553(a) factors.

THE COURT: What 3553 -- what factors are they not relying on here?

MR. REIZENSTEIN: Oh, no, I don't say for one moment in my argument that they haven't relied on the factors. I say that the factors they are relying on is still information that was known to the government beforehand, so it created a situation where we reasonably expected to have a guideline sentence, and all of a sudden we are, sort of, in a "Gotcha!" situation.

Now, there is, I think, one specific violation of the plea agreement, and that regards the cocaine of the Kansas City deal. And, you know, I think we could have a more detailed argument about it because it occurred to me when I made this argument, the Kansas City shipment was cocaine and methamphetamine, and they are, sort of, arguing for an increased sentence based on both of those drugs, when they are really, sort of, precluded from doing it on the cocaine.

But to address your argument, it's our position that the 3553(a) factors that they are relying on are -- is based on information that was known to the government. And so, for example, I know one of our arguments was they are using a 3553(a) factor to, sort of, create a leadership role, and that is something that the presentence report and guidelines did not

encompass, and this is, sort of, not a chance for them to have a double dipping. The case law, as I read it from the Second Circuit, says that while, maybe, technically these arguments are something that a court may consider, there really is a strong preference for people understanding what they are walking into, what a client is walking into when he signs a plea agreement. And let me just address one further remark, and then I will conclude.

While I understand the Court has read the government's submission, and them saying, Well, we got this information from the second cell phone, we disagree that -- while the government may have gotten information from a second cell phone, we have two questions. First of all, When did they get it? And second, Is that information new? We don't think it is because for that information to be new, one must accept the argument that what was in that cell phone is not something they got from debriefing the informant.

They are saying that what's in that cell phone alerted them to my client's involvement in the Kansas City shipment, and based on all my experience and ten years as a prosecutor, I find it difficult to accept the proposition that they used an informant on the Kansas City shipment and didn't sit down and say to him, Tell us what Michael Habib's role is.

THE COURT: And I guess there was the situation, too, with Mr. Habib vouching for the confidential source at one

point in connection with that shipment as well.

MR. REIZENSTEIN: In the initial discovery there is a significant amount of my client's role in this. And to be honest with you, my position, sort of, with the government has always been, I understand you have a New Jersey case; I understand you have a Kansas City case; I kind of feel like almost all of the discovery you have sent me really highlights his involvement in the Kansas City case.

The New Jersey case has some very small text messages during the day of the seizure from my client -- which is certainly enough to walk him into a conspiracy -- about, you know, What's happened? Get your guys ready. Have the shipment ready to go. And then there is a seizure, and my client asks some questions. So there certainly was sufficient evidence to charge him and for my client to enter a plea. But in my considered opinion, there was significantly more evidence in the Kansas City case, which is why we entered into a plea agreement to bargain that away and accepted a very high minimum mandatory than any other defendant in this case, and significant guidelines.

THE COURT: If that is the case, what, essentially, you are saying is that you reached a plea deal with the government that might have held some compromises to arrive at the guidelines range. And as discussed with Mr. Habib, at sentencing I have my own independent obligation to calculate

the guidelines range here and determine the offense level.

Aren't you conceding that the Kansas City shipment should go into the offense level here, regardless of what the government may or may not be allowed to argue to me?

MR. REIZENSTEIN: I am not conceding that the Kansas City shipment should go into the offense level, but I am certainly conceding that it's information that's before the Court under relevant conduct. It is something you can consider. And again, my position is nuanced because I am not coming before the Court and saying the Court is precluded from sentencing Mr. Habib anywhere from zero to the statutory maximum. We recognize that's a possibility. We always have. It's very clear.

THE COURT: So let me also ask you. The plea agreement does have language that allows the government to seek obstruction, if appropriate, and deny acceptance of responsibility. Why is that not appropriate here, given the objections to the presentence report that seem to be very strongly contradicted by the proof here?

MR. REIZENSTEIN: I don't concede that there is obstruction and that there is lack of acceptance. I do concede the fact that that is a factor that needs to be resolved before the Court at the sentencing hearing. And that is not part of my -- and if it was, I apologize, but it's not part of my objections. My objections are based on, I guess, to coin a

very old phrase, what did they know, when did they know it, and did that mislead Mr. Habib entering into this plea agreement, which is why we seek an evidentiary hearing on that issue.

THE COURT: Well, that's actually another point I wanted to get clarity on as to what you are requesting here.

The evidentiary hearing that I expected would be today, and moved back over, would involve issues raised in the government's submission as to Mr. Habib's conduct, contact with people in connection with the other information contained in the government's letter. Are you suggesting that you want an evidentiary hearing on when the government knew of Mr. Habib's involvement in the Kansas City shipment?

MR. REIZENSTEIN: The simple answer is yes. To circle back to my earlier argument to you and our view of that second cell phone, we believe that -- and I think I will be serving a Touhy request on the government for production of a witness. But we believe that our questioning of witnesses regarding what was extracted from that cell phone, and then being able to say to that witness, Well, that's information that you knew prior to this, that's information that you knew prior to the plea agreement being proffered as well as signed, sheds light on our contention that Mr. Habib was misled at the time he signed this plea agreement as to what the government's position was going to be.

Their sentencing submission -- I don't use this

pejoratively, but I can't think of another adjective -- is littered with things like "Wolfpack," this, sort of, almost Hollywood James Bond, moving a hitman across a border, and a plane crash. All of this was well known to the government beforehand. All of this was what we bargained for when we signed the plea agreement, as well as Kansas City, for that matter.

THE COURT: If the government is not seeking a different guidelines range -- and that's a question I want to ask Mr. Shahabian -- but if they are not seeking a different guidelines range, they are just arguing that all of these other considerations must come into play under Section 3553(a), how could that possibly be a violation of the agreement, regardless of when they learned that information?

MR. REIZENSTEIN: Because it's our view that if their position was, This is what the guidelines are, but this is your client's conduct and, therefore, this is going to be our request based on what we already knew, then we would have viewed the plea agreement differently, as opposed to them framing their application to this Court as mostly, This is new information that we learned, and we are just shocked about it, and we feel compelled, therefore, in the interest of justice to say that 30 years is sufficient but not more than necessary for a sentence in this case. It just can't, in our opinion, hold water that this new information all of a sudden is compelling

them to do this.

While I phrase this not as an attack on counsel at all, I phrase this as saying, it appears to us that this was going to be their position all along. And if this was going to be their position all along, We know this information about your client, we feel it's exceptionally serious, we want you to understand that regardless of what you do, our application to the Court is going to be double the guidelines, then I could have advised my client about the choices he has to make.

THE COURT: Well, you are asking for a sentence that's well below the guidelines and about half the high end of the guideline. You are under no obligation to tell the government at the time of the plea that you anticipated doing the same. I mean, what's good for the goose is good for the gander. You make the argument for well below a guideline sentence, which you are completely allowed to do. They are doing the same thing based on 3553(a) factors that weigh strongly against your client if they are right as to the facts in dispute. I just don't understand how there can possibly be a violation here.

MR. REIZENSTEIN: I hear what the Court is saying, and I guess my response is for the Department of Justice. I don't really -- I must respectfully disagree that what's good for the goose is good for the gander in that regard because of the power that they hold, and the rights that my client bargains away, and what I have read from the Second Circuit about saying

that people need to understand when they bargain these rights away what the government is going to do.

THE COURT: You rely on the *Wilson* case, and that case is very different from what we have here. There, the plea agreement specifically said that the government would not seek a upward departure unless new information came out. And that was problematic, I believe, when the government did. Here, the government is not seeking an upward departure. And on top of that, the guidelines specifically gave them the authority to seek an upward variance. It seems like *Wilson* couldn't be more inapposite here.

MR. REIZENSTEIN: Well, I think I recognize in my pleadings to the Court that there were differences between *Wilson* and this case. But, to me, what I found compelling was their quote that I put in my plea agreement, is that the facts had been well known to the government at the time it negotiated Walker's plea. The government advocated for an increased sentence that changed Walker's exposure dramatically so that we may well question whether, quote, "he could reasonably have understood the risks of the agreement."

And when I sat down with my client and I talked about what was happening, I had no other ability to say to him other than, "Neither you nor I reasonably anticipated the risks," knowing that the government knew about almost everything that they have said to the Court, and the behavior of my client, and

prior conduct.

THE COURT: Thank you.

Let me hear from the government. I guess, maybe, my first question is, the sentencing submission, I believe, on page 11 from the government was, the facts described previously could justify two adjustments to the guidelines; one being the drug level, the other being obstruction. And that relates to that, possibly, no acceptance. I would like some clarity on the word "could."

Are you seeking a different range than what is contained in the plea agreement, putting aside Section 3553(a) factors, aside from 3553(a)(4), I believe?

MR. SHAHABIAN: No, your Honor, we are not seeking a different guidelines calculation. And I recognize there's some ambiguity in our sentencing submission, so I will use this opportunity to clarify on the record that we are seeking an upward variance under the Section 3553(a) factors. We are not seeking a guidelines adjustment, even though the plea agreement would authorize seeking a guidelines adjustment for obstruction or for lack of acceptance.

The government's position is all of these are adequately considered in our request for an upward variance, given the course of conduct by the defendant in this case and his lack of remorse. We think those are relevant Section 3553(a) arguments, and that's why we frame this in our

submission repeatedly, and to be clear on the record here, as a request for an upward variance.

And given that, as the Court noted, this was expressly contemplated by the plea agreement at all times. The Court noted that both parties had the right to seek an upward or downward variance, and both parties have availed themselves of that right. The Court confirmed that Mr. Habib understood that the guidelines agreement was not binding on the Court, and that both -- you know, the statutory maximum sentence was the possible maximum sentence he could receive; not that the government had agreed to advocate within the guidelines range, as is the case in other cases, in other districts that use plea agreements like that. But that's not standard in this district, and that's not the plea agreement that we entered into here.

In addition, I just note that Mr. Reizenstein mentioned, for example, arguments about leadership and how that factors into Section 3553(a). There are two relevant parts here, and I think this ties into all of his arguments. First, the plea agreement on page 3 expressly says nothing in the agreement limits the rights of the parties to present to the probation office or the Court any facts relevant to sentencing.

So regardless of the stipulated guidelines range, the government was, of course, free to present any facts to this Court that it believes relevant to the Court's determination of

the 3553(a) factors. And the Second Circuit has recognized, for example, in *United States v. Tokhtakhounov* -- I don't have the full cite. It's 607 Fed. Appx., pages 11 to 12. So this was a summary order from the Second Circuit, and they address the very argument Mr. Reizenstein made, where the AUSA argued that the defendants were leaders of a criminal enterprise as a 3553(a) factor, where the plea agreement did not include a leadership enhancement, and the Second Circuit affirmed that there was no breach of the plea agreement when the arguments were framed entirely as an upward variance argument because the government argued that the guidelines as applied in that case understated the seriousness of the offense, given the leadership roles, but sticking to the guidelines range as contemplated in the plea agreement is consistent with the plea agreement.

And so the Second Circuit has rejected the argument that Mr. Reizenstein is making that it is inconsistent with the plea agreement to present facts that are relevant to Section 3553(a) factors that could conceivably also apply to a guidelines range adjustment that the government isn't seeking or advocating for. And that's what we are doing here.

THE COURT: Was that *Tokhtakhounov*, you said?

MR. SHAHABIAN: Yes.

THE COURT: Do you want to say anything about whether -- the overriding point that with respect to Kansas

City, at least, the government had this information at the time of the plea and should have alerted the defense to it?

MR. SHAHABIAN: What I would say is, I don't think any evidentiary hearing is warranted. The defense is, of course, free to submit a Touhy request to the government. But the government explained its position in the sentencing submission on page 4, and we did so in the context of providing the Court with information about relative culpability vis-a-vis Mr. Virk and Mr. Cheema against Mr. Habib.

And so the second paragraph on page 4, the government stated, "At the time of Habib's plea, however, without additional evidence of Habib's role in the Kansas City seizure, the government had some concerns over its ability to prove that Habib knew in advance that he was procuring drivers from CS-1 for a narcotics shipment specifically," and that is why those quantities were not included in his stipulated guidelines range. Again, that was information we provided to explain the culpability against his co-conspirators as the Court makes its Section 3553(a) findings.

The question isn't what we knew or what we believed the defendant did and when we knew that. It's what we thought we could prove at a Fatico hearing, if necessary, and what kind of evidence we would present at that hearing to support whatever claims we were going to make. And that quantum of evidence changed when the government extracted the second phone

from Mr. Habib -- that was seized from Mr. Habib after his plea. And so it's not what we knew and when we knew it. It's our confidence in our ability to prove the allegations and when we had the evidence sufficient to do that.

And so that's why we set forth the sequence of events for the Court's understanding both of the plea agreement, of relative culpability, and how the facts changed after the defendant's plea and, of course, how that all bears on the government's contention that the defendant attempted to obstruct justice both at his plea colloquy and in his submissions to probation and this Court in disclaiming any knowledge or any greater role in the narcotics trafficking.

THE COURT: And there is also a mention in your submission about allegations of efforts to help some Canadian hitmen escape at some point, I think, in spring of 2022. When did the government learn --

MR. SHAHABIAN: That was known prior to the signing of the plea agreement. The government included that information as relevant conduct under Section 3553(a). It didn't appear to qualify for any guidelines enhancements that were relevant, and so it wasn't included in the guidelines range, but the evidence supporting that allegation was produced to the defense in discovery before the plea agreement. We have pointed defense counsel to it in preparing for the Fatico hearing, and we think it's relevant evidence that supports our request for an upward

variance that the guidelines seriously understate the significance of the defendant's conduct, given this additional evidence that's part and parcel of the conspiracy.

THE COURT: Mr. Reizenstein, let me just go back to you and see. Given Mr. Shahabian's clarification that the government is not seeking a different guidelines range than what is contained in the plea agreement -- I believe 168 to 210 -- just an upward variance, does that alter anything as to your motion?

MR. REIZENSTEIN: No, that's always been clear to us. And may I?

THE COURT: Please, go ahead.

MR. REIZENSTEIN: And it's just going to be a sentence.

What I would say doesn't make sense, as opposed to doesn't ring true -- because I think there is a significant difference, and I am just saying it doesn't make sense here -- is that their reliance, again, on the second phone as the information, again, belies the fact that the confidential informant cooperated, we don't know exactly when, but sometime around the Kansas City shipment, because we know the confidential informant cooperated with the government to raise the -- for the New Jersey case, which is why we are here. So besides debriefing him, Mr. Habib's second phone would have had conversations with him, which they would have gotten from the

confidential informant's phone in March when the Kansas City shipment was done.

So our point is that maybe there is a -- I don't know the adjective I am reaching for -- but some sort of legal technical difference between what the government says is confirmation to us and, therefore, proof of our ability to prosecute or not that the second phone gave us, as opposed to what did they really learn from the confidential informant and his phone and his debriefing. And our position is, okay, for prosecutorial discretion, maybe it wasn't enough to bring a case, but it was more than enough for what's going to occur at sentencing and, therefore, belies their argument that now they bring this forward because it's new.

THE COURT: Do you want to say anything further on that point, Mr. Shahabian, why the debriefings of the CS wouldn't have been enough?

MR. SHAHABIAN: I would go back to what I said about it's not what we knew and when we knew it; it's our ability to reliably prove the contentions we would propound on this Court here. And as the Court knows, we are not intending to call witnesses at the Fatico hearing. We were intending to rely on documentary evidence such as that recovered from the cell phones.

We have produced any text messages in the government's possession, including those provided by the confidential

source. As the Court can tell from our submission of what was found on that second Habib phone, many of those messages do not include the confidential source. So we first learned about them when we extracted the phone and recovered additional messages, including the defendant, his codefendant, Cheema. And that was new evidence that was not previously available to the government. And as soon as we had it, we produced it.

So I just want to make clear on the record, any discovery that we had relevant to this information was produced to the defense when we obtained it. It's not like we had information that we sat on and we didn't produce it.

THE COURT: Was the information from the CS not enough? Presumably, the CS also had the messages as well.

MR. SHAHABIAN: The CS had some messages, which we produced to the defense, and we had concerns about whether those messages alone were sufficient to show that the defendant knew that what he was procuring in terms of drivers for this shipment was a narcotics shipment, because it doesn't say narcotics specifically in those text messages. So that's getting into the nitty-gritty of the government's proof. But that was the quantum of proof at the time we struck the plea agreement, and given that quantum of proof, we had some concerns about being able to prove that that was sufficient to show knowledge of the purpose of the shipment. That quantum changed when we then received a phone that had many additional

messages showing the defendant knowingly engaging in narcotics trafficking.

And just to go back to one thing to clarify for the record. Again, we are seeking a variance. We think all of this evidence is relevant to the seriousness of the offense. It's relevant to showing the course of conduct by the defendant, and it's relevant to responding to his arguments in his submission that, in the government's view, dramatically understate his role in the conspiracy, in narcotics trafficking and, therefore, it's relevant for us to put this before the Court to make that determination in evaluating the seriousness of the conduct under the Section 3553(a) factors.

THE COURT: I understand why the stuff about the Canadian hitmen may not fall under the guidelines, but in terms of what you just said, isn't that essentially asking me to apply a leadership enhancement as a factor under Section 3553(a), but not necessarily under the guidelines?

MR. SHAHABIAN: We are not seeking an enhancement. I think this is consistent with -- I can't pronounce the very long name of the case I cited to the Court, but certainly the guidelines have a very specific definition of leadership and how it applies to the charged crime. And the government is not seeking a leadership enhancement under the guidelines, but it is, in terms of relative culpability under Section 3553(a) and the seriousness of the offense conduct, relevant to evaluate

the defendant's role in the conspiracy. And in the government's view, that's not just the New Jersey seizure or the Kansas City seizure; it's the overall criminal organization that the defendant was a part of and that his codefendants, including Mr. Cheema and Mr. Burgos, participated in.

It also is relevant to the Court's consideration of that relative culpability, given the government's different ask for sentencing for those defendants to put into context, for example, the above-guideline sentence the government is seeking for Mr. Cheema and why the government is seeking a higher sentence for Mr. Habib relative to Mr. Cheema.

THE COURT: Mr. Reizenstein.

MR. REIZENSTEIN: I am not going to go back and forth on this. I think you heard our arguments. I have one brief request, which is the opportunity to review the case no one can pronounce, and, if necessary, to file with the Court at least one page of our view of -- in relation to the question you just asked the government.

THE COURT: Absolutely. I am not going to rule on the motion today. I will do that, most likely, on the record on October 7 before we start the Fatico hearing. So certainly, submit whatever you wish. Certainly, you are welcome to do more than one page. I don't have page limits in sentencing cases. So I trust that you won't write more than you need to, but don't feel constrained.

MR. REIZENSTEIN: Okay.

THE COURT: So on October 7, I may or may not, after the hearing, proceed to sentencing. That probably would depend on the views of -- I may ask whether or not you wish to make supplemental submissions after the Fatico hearing. But we will go forward with the evidentiary hearing at 10:00 a.m. on October 7.

In terms of the government's evidence at that hearing, Mr. Shahabian, do you have a sense as to what the proof will be looking like then?

MR. SHAHABIAN: I have some sense. The parties are still in discussions about what facts are going to be contested at the hearing, and so how much the government would need to -- for example, if we will need to call cell phone examiners to explain the circumstances of what phones were seized and what was extracted. But if much of that is set aside, the core of the proof is going to be evidence recovered from cell phones and iCloud accounts, as well as recordings, transcripts of those recordings, as well as law enforcement reports and documenting various incidents in this case.

If that is where the parties end up, that it's primarily going to be exhibits, is the Court's preference to have an actual witness to narrate the exhibits, or is it fine for counsel to advocate based on the exhibits themselves?

THE COURT: As long as the exhibits come into evidence

in some form, I am fine with counsel advocating for it. In that scenario, it may make sense then to receive submissions after the hearing as well if you think it might be easier to consolidate it that way, or you can make oral arguments at the hearing as well. You know, as long as the exhibits are in evidence and counsel, of course, is not testifying as to anything, but just making arguments based on what they say, I think that will be fine with me.

In terms of disclosing, it sounds like there may not be any live witnesses, but in terms of disclosing any witness, 3500 or the equivalent for Fatico and exhibits, when does the government plan to do that?

MR. SHAHABIAN: I would request some time to discuss it with counsel. I think we will certainly do it reasonably in advance of the hearing so that they have time to use it. It would be law enforcement, 3500 and Giglio if we are calling witnesses. So I don't anticipate more than a week or so, but I would certainly want some time to discuss it with Mr. Reizenstein.

THE COURT: And I believe this should be up, but I recently updated my individual practices in criminal cases for trials, at least, such that unless I order otherwise, I don't need physical exhibits, but provide them electronically via flash drive with an exhibit list that describes each exhibit. That's at Rule 7(d) of my individual rules for criminal cases.

That applies to trials, but we should apply that here as well.

MR. SHAHABIAN: Understood, your Honor.

THE COURT: Mr. Reizenstein, anything further?

Maybe I should ask you. You can, obviously, change your mind about this, but at this point, do you expect to call any witnesses yourself at the Fatico hearing on October 7?

MR. REIZENSTEIN: Most likely not, but it is our strong preference that the government call witnesses. I will be speaking with them about that. I am going to serve a request on them regarding that. I will arrange when I leave here today to have a conference with them. It will probably have to be early next week, and then we will inform the Court. And I will let you know that we believe we are also now on notice of your Rule 7(d) regarding our exhibits as well.

THE COURT: Great. Is there anything else we should take up?

MR. SHAHABIAN: One thing just to note. To the extent that -- I understand the Court's not ruling on the defendant's pending motion today, but if the defendant is continuing to seek an evidentiary hearing on, you know, what the government knew and when we knew it, and will be serving Touhy requests to that effect, I think the government would request a ruling on that prior to the Fatico hearing that's scheduled.

THE COURT: So maybe I should be clear on that. As to the Fatico hearing, that is not to cover those issues; when the

government knew and what it knew. At least right now, my initial reaction is, I am not sure I see why that would be relevant to the motion, given the government's statement that it is not seeking a different stipulated range. If, though, after I look into it some more I decide that that is an issue I need to resolve, we will schedule a separate time for that. But for purposes of this hearing, it involves the issues as to Mr. Habib's conduct to the extent they go to Section 3553(a) factors.

Mr. Reizenstein.

MR. REIZENSTEIN: And, I guess, just so my position is clear on the record, for expediency with the Court, we may well have significant agreements with the government's submission in terms of what will be before the Court, not waiving our objections to the use of that information, for reasons we have previously made --

THE COURT: I understand.

MR. REIZENSTEIN: -- so that there is never a point where an appellate court looks at it and says, Well, they raised this issue, but then they agreed to have the issue before the Court. Well, we have objected. We are hearing what you are saying, but we are certainly not going to make them jump through the kinds of evidentiary hoops that will just take a whole lot of time for you to look at documents you are going to look at as you want to look at them.

THE COURT: Understood. Thank you. I think the record should be clear that you are not waiving any objection as to what I should or should not be considering.

MR. REIZENSTEIN: Right. And it will be on the basis of what we have said in our memorandum, not that they can't prove a foundation, for example. And since you are ruling that you want to -- or you may well rule you want to consider it, we are certainly not going to say, Well, we can't agree; they have to prove foundation. We are not going to do that, but we are preserving our objections.

THE COURT: I understand your argument to be more as to what the government should be allowed to argue, not as much what I can consider. Is that --

MR. REIZENSTEIN: I do agree, because we started our submission by saying we certainly recognize the role of this Court and any court in any sentencing to make a decision outside the guidelines for reasons you deem appropriate. So that, I think, may be also what covers us. Sure.

THE COURT: Well, thank you all. It was helpful for me today. And I will see everyone again October 7 at 10:00 a.m. Obviously, if anything comes up before then, let me know.

Let me make sure Mr. Reizenstein doesn't have anything else. He is talking to Mr. Habib.

Mr. Reizenstein, is everything okay? Is there

anything further?

MR. REIZENSTEIN: Not on behalf of the defense. Thank you, sir.

THE COURT: Thank you.

(Adjourned)