UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

v. 22 CR 618 (JPC)

MICHAEL GIAN WILLIAM HABIB,

Defendant.

------------------------------x Fatico Hearing

New York, N.Y.
October 7, 2024
10:15 a.m.

Before:

HON. JOHN P. CRONAN,

District Judge

APPEARANCES

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
MATTHEW R. SHAHABIAN
THOMAS S. BURNETT
JANE CHONG
Assistant United States Attorneys

WOODWARD & REIZENSTEIN
Attorneys for Defendant
PHILIP L. REIZENSTEIN

ALSO PRESENT:
Gabriela Salerno, Paralegal Specialist, USAO
Special Agent Kelly Cunningham, FBI
Vivianne Guevara, Mitigation Specialist for Defense

THE DEPUTY CLERK: United States v. Habib, case number 22 Cr. 618.

Can counsel, starting with the government, please state your name for the record.

MR. SHAHABIAN: Good morning, your Honor. Matt Shahabian appearing for the government. With me at counsel table is Special Agent Kelly Cunningham from the FBI, AUSAs Thomas Burnett and Jane Chong, and Paralegal Specialist Gabriela Salerno.

THE COURT: Good morning, Mr. Shahabian, Mr. Burnett, Ms. Chong, Ms. Salerno, and Special Agent Cunningham.

MR. REZENSTEIN: Good morning, Judge. Philip Rezenstein on behalf of Michael Habib. He is present.

Present at counsel table is Vivianne Guevara. She has worked with the defense in preparation for sentencing in mitigation.

THE COURT: Good morning, Mr. Rezenstein, Mr. Habib, and Ms. Guevara.

Before we turn to the evidentiary hearing, I did want to talk a little bit more about the pending motion by the defendant, which is titled a motion to enforce the plea agreement and objections to the government's sentencing submission. And I heard some argument from the parties on this back on August 21.

Mr. Rezenstein, just so I can make sure I understand

and I'm clear on your request, I want to ask you to clarify for me again two things. One is what exactly you believe to be the breach or breaches of the plea agreement, and second, what remedy or remedies are you seeking here?

MR. REZENSTEIN: Thank you, Judge. The second question is easier to answer. I think I answered that before. And in my pleading, and to be clear, also in subsequent discussions with Mr. Habib as to the potential remedy could be the Court allowing him to move to vacate his plea, were the Court to decide the government had breached the plea agreement and essentially return us to where we were pending trial.

And I will tell the Court we had discussed that beforehand, we have discussed it in detail since then. And at least as of this morning, we are not asking for that remedy.

So, the remedy that we're asking for is for the government to honor the terms of the plea agreement.

Now, let me be clear. The Court insightfully asked me at the prior argument, doesn't the plea agreement allow for the parties to move for sentences outside of the guidelines under 3553(a) factors, and I said it did, and you said, well, you have certainly done so. Why can the government not do so. And I think I said, and I wasn't trying to be flippant, well, they are the Department of Justice and they should be held to a different standard.

To elaborate on that, my point is they have, at least

to me, based their sentencing arguments on two points or two prongs. And the first is somewhat in response to the allocution of Mr. Habib, his plea of guilty, my objections to the PSR. And with regard to that, my objection to the PSR are myself arguing and advocating for my client. And I don't think that that is a sufficient reason for that. And to the extent I can justify my arguments by the time we're at sentencing, I will do so.

But to me, the more significant point is that the government has hinged their request on what they claim to be new information. Information that was obtained after the plea agreement, from phones from Mr. Habib, that apparently brought them such levels of, I don't know, shock or surprise or just a feeling that the only way they could do their job is to seek 30 years after reading that information.

And my brief response to the Court in my papers and at the time was, that doesn't hold water, they must have known this when they debriefed to the confidential informant at the time of the Kansas City seizure. They must have access to his phone and they had access to other co-defendants' phones. Taking the government at their word, they didn't get into my client's phone until after his plea. They had access to Mr. Virk's phone and Mr. Cheema's phone at least in November of 2023, and therefore this information that they claim is new and forces them to make this recommendation, we say it's not new.

If it's not new, then it wasn't contemplated by the defense that the government was going to do this when we signed the plea agreement.

So the remedy we are asking for is that their sentencing recommendation, which is not binding on the Court and we recognize that, be within the guidelines. As every judge makes clear and certainly this Court did, you are constrained only by the rules of evidence, your conscience, what Congress has told you to consider, in this case the 10-year mandatory, too.

THE COURT: So putting aside the question of whether Mr. Habib should have been responsible for the drug weight with the Kansas City shipment, do you have any reason to support or to believe that some of the other stuff in the government's submission, such as Mr. Habib's alleged association with the Wolfpack Alliance, that he worked to try to smuggle two wanted hitmen out of Canada, that there were threats made to the C.S. while Mr. Habib was trying to obtain information about the C.S. and his wife, subsequent to the Kansas City seizure. Whether any of that information was known to the government prior to the plea?

MR. REZENSTEIN: It is my contention that all of that -- well, let me be clear. Wolfpack Alliance, yes. Hitmen, let's use the generic term hitmen, we know what we're talking about, yes. Threats to the confidential source, yes.

And as I said, as to Kansas City, which I think perhaps maybe is the main contention between the parties, yes, because they knew the weights of Kansas City obviously, it was seized. And they have as -- and now this is my prior argument, they had access to the confidential source, and the phones of the confidential source, and at least other co-defendants that were in chat groups with Mr. Habib.

So, while they certainly may have gotten new information from Mr. Habib's phone, I take them at their word for that, I believe they had significant information tying him to Kansas City and those drug weights.

THE COURT: Now, if I remember correctly, at I think our argument in August, the government did clarify that it is not advocating for a guidelines range different than the plea agreement. Why is that not the remedy you would be entitled to here?

MR. REZENSTEIN: I'm not sure I understand the Court's question. I believe they are asking for a sentence of 30 years.

THE COURT: Correct. But based on consideration of all the Section 3553(a) factors. They seem to be standing by their view that the sentencing guidelines results in the range in the plea agreement which I believe was 180 to 210.

MR. REZENSTEIN: So, yes, in terms of legal niceties they are not saying that the guidelines should be different.

But what I'm saying is that because their sentencing recommendation is significantly different, I believe double or close to it from what the guidelines are, and they're basing that recommendation on what they claim to be new information, that then to really just speak very plainly here, this was something I'm of the opinion they knew at the time the plea agreement was signed, they had every intention of doing so at the time the plea agreement was signed.

If we look at the factors they've listed, which let's say there's four: Wolfpack, Canadian hitmen, threats to confidential informant, and Kansas City. Arguably they have maybe obtained a small amount more of information from Kansas City after Mr. Habib's phone, but they had more than enough, so then, why shouldn't that have been communicated? These are going to be the guidelines, and just to make sure your client understands, which the case law talks about, because he needs to understand the position that he's in. Not maybe we'll do this, but we're going to be arguing for 30 years so get prepared and decide what you want to do, counsel.

I think that's the way it should have been done and that's my complaint.

THE COURT: In terms of the impact on the guidelines, though, would any of that have impacted the guidelines, aside from the two-level increase for the drug weight if the Kansas City shipment were taken into account?

MR. REZENSTEIN: May I have a moment?

THE COURT: You may.

MR. REZENSTEIN: Judge, I do agree that based on my knowledge of these matters, the impact to the guidelines would have been the additional two levels for the Kansas City weight. But to understand why we're here complaining, when they put in the plea agreement that he is not going to be charged with that, but then to seek to sentence him on it at a range nearly double, puts me in the position of saying to my client, you know, we didn't think this was going to happen. They're giving you -- I don't want to use -- I don't want to sound flippant, but a pass on Kansas City in exchange for giving up valuable rights. You do this and we'll give you this. There is a bargaining back and forth. Here is your guidelines, it won't be two points more.

And then we get this submission which was surprising.

THE COURT: So I do want to hear from Mr. Shahabian on all of this. But, I guess what I'm wondering, Mr. Rezenstein, is if, again, putting aside the two-level increase for the Kansas City shipment. If the government knew of all these other factors, their belief that Mr. Habib had involvement with the hitmen, their belief that there is the other conduct involving threats to the C.S., why would the government have been under any obligation to advise you of that at the time of the plea, particularly in light of the language in the plea

agreement allowing the government to seek an upward variance? Given that would have not impacted the guidelines range.

MR. REZENSTEIN: Because while it doesn't impact the guideline range, it impacts my client's life. And as courts have talked about, these plea agreements -- and I don't have the cases in front of me, but these plea agreements are exchanges for matters in which both sides need to be reasonably apprised of what they're giving up and what they're getting for in exchange.

And to include some sort of very plain language about 3553(a), I think it was incumbent upon the government to say if your client gives up his right to trial and gives up these valuable rights, these are going to be guidelines. And let us make it very clear to you, we don't think that's going to be sufficient, because of the factors that we know about, and we want you to understand and advise your client that if he pleads guilty, he should not expect the government to seek a guideline range. He should expect the government to seek something double the guideline range. And therefore, we would have entered this agreement fully understanding and knowing, now, what was their intention, and what we were bargaining for and what we were getting.

THE COURT: And I certainly understand why as defense counsel to Mr. Habib and certainly why Mr. Habib would have wanted that at the plea discussions stage. But are you aware

of any authority supporting that? Where we're talking about -- we're not talking about necessarily the guidelines range.

MR. REZENSTEIN: I need to now check my pleadings. Because I believe I did include some citations there, but I need to find it and I can kind of see it in my mind.

So, I cited in my memorandum to the Court on page 10 the case of *United States v. Wilson*, 920 F.3d 155 (2d Cir. 2019). I included a citation on page 163, now. Understandably, and admittedly, this is about where the government advocates for a higher sentence that's contained in the plea, based -- I'm reading from this now -- based on information that the government knew about at the time the plea was negotiated. And the Court writes, this is not an unfamiliar issue in the circuit and it string cites some cases. The issue stems from our suggestion *United States v. Pimentel*, 932 F.2d 1029 (2d Cir. 1991) it would be good practice for government to provide pleading defendants with the likely range of sentences that their plea will authorize under the guidelines known as a *Pimentel* estimate, in order to reduce blindsided defendants' claims of unfair surprise.

Now, maybe the government walked the line and felt that they did what they needed to do. They provided us with a pre-plea sentencing estimate, and I have not complained that our discussions about the guidelines resulted in a surprise. But, the import of what the Court is saying is that in these

types of negotiations, someone in Mr. Habib's position should not be blindsided.

I wrote on page 11 of my presentation, this is not a *Pimentel* estimate violation of anticipated guidelines. This is worse. This is the use of facts known to the government pre-plea, and then I wrote, Wolfpack Alliance, threats to C.S., participation in Kansas City, and that misled Habib's reasonable expectation as to his true position, and the government's true position at sentencing. And then I included a cite from I believe *Wilson*, a defendant's reasonable expectation may be breached where the government's deviation produces serious unfairness for the defendant.

And my point to the Court is, we are not in a deviation of a year or two. We are at a deviation of three times the minimum mandatory of 10 years. And just for argument's purposes, twice what the guidelines are.

And while I acknowledge they included a 3553(a) catchall or escape valve, they did it based on information that was mostly known to them, that produced for Mr. Habib what we believe to be a serious unfairness because no one can argue that expecting 160, 170 months, and it goes to 360, is not being blindsided and surprised.

THE COURT: Thank you very much.

And so let me hear from Mr. Shahabian. Obviously you should feel free to respond to anything that Mr. Rezenstein

just said. But, I do want to hear also your response as to when the government knew of certain information in the sentencing submission and to what extent that matters.

MR. SHAHABIAN: Yes, your Honor. I can start with that, if that's where the Court would like me to start.

So as the Court noted, the information about the defendant's membership in the Wolfpack Alliance, the threats against the confidential source, his role in assisting hitmen and attempt to escape justice, that was all known to the government prior to the plea. It was disclosed in discovery to the defense prior to the plea. It's in the exhibits that we've marked for the Fatico hearing and that we'll go through some of that today.

And as the Court noted, the government was free to seek an above-guideline sentence under the express terms of the plea agreement. Based on that, those facts, to the extent they're relevant under the 3553(a) factors, and as the Court noted, the hitmen, the Wolfpack Alliance membership, these are not the kinds of facts that, while the government believe are important for sentencing under 3553(a), they don't factor into the guidelines calculation. There aren't additional enhancements that were available for those facts that were omitted. It is simply additional facts that the government and the plea agreement expressly noted both the government and the defendant were free to bring any facts they believed relevant

to sentencing to the attention of probation and to the Court.

And I won't get into the history of plea negotiations here. I just note that the plea agreement is clear that there are no promises made outside of the bounds of the plea agreement. Those promises are a stipulated guidelines range and the freedom for either party to seek a variance above or below the guidelines range.

The Court confirmed that for the defendant during the plea colloquy that his maximum sentence was life, that the guidelines range was not binding on the Court, it was simply advisory, and that he faced a sentence of up to life imprisonment. So there is no surprise here on what the government can -- what the defendant faced when he voluntarily entered into the plea agreement.

In this back and forth we've asked the defendant if he wants to move to withdraw the plea because he didn't understand that that was a potential. He's declined to move to withdraw the plea. And so instead what defense counsel is doing is hinging on what was known to the government at the time and what was learned later.

So I'll spend a little bit on this, because it really only matters for one thing, as I think the Court has noted, is the Kansas City shipment.

THE COURT: Let me ask you. I take it the reason the threats to the C.S. would not have resulted in an obstruction

enhancement is because that enhancement requires willfully obstructing justice. And if someone doesn't know someone is cooperating with law enforcement, that doesn't apply.

Is that your thinking?

MR. SHAHABIAN: That's correct. There is an enhancement in the plea agreement that we included for threats of violence in connection with the offense conduct. That actually captured the threats against the C.S. And so, to the extent enhancements apply, we included them.

It is not because he was cooperating with law enforcement that he threatened. But there is an enhancement under 2(d) for threats of violence in connection with narcotics trafficking. We included that in the plea agreement.

THE COURT: Understood. Let me pause you for a second and just check with Mr. Rezenstein.

I take all of your arguments you've made so far, but do you disagree with Mr. Shahabian's representation that information regarding the Wolfpack Alliance and Mr. Habib's possible association with them regarding the hitmen and regarding the threats to the C.S., all that were produced during discovery. Did you disagree with that?

MR. REZENSTEIN: No. I will have a response, but I do agree that's true. I think we each have a different spin on how it affects matters, but I do agree.

THE COURT: Thank you.

MR. SHAHABIAN: And I'll just stop there for a second. Even to the extent of the threats against the C.S. alone, and there is a two-point enhancement in the guidelines range, but of course the government is free, as the plea agreement allows, to argue that the nature of the threats warrant an above guideline sentence, and that's certainly one of the facts we pointed to in seeking a variance. We're not limited to the guidelines enhancement in making the appropriate recommendation under the 3553(a) factors. So that's just how plea agreements in this district work. It's squarely how it's presented in the terms of the plea agreement. And nothing the government has done in its submission is inconsistent with that.

So, let me just turn then to the Kansas City load. And the only reason that the government noted in its submission the new information obtained from Mr. Habib's phone post-plea, and this ties into the obstruction arguments, that, again, we are not seeking a guidelines enhancement, although the plea agreement would allow for an obstruction enhancement, we're totally fitting this under a 3553(a) variance argument.

And so that's where the Kansas City information and the timing of it becomes important. Because the government offered a plea agreement to a stipulated guidelines range that did not include that drug quantity. In part, and, again, I think I mentioned this in August, it is not what the government knows or thinks it knows or can infer. It's what we felt

comfortable proving to this Court at a Fatico, based on the evidence we had readily available. Based on that, the Kansas City load was not included in Mr. Habib's drug quantity.

Then at the plea colloquy, we got this fanciful story about actually it was the confidential source who organized everything in Kansas City and New Jersey, and I made a mistake vouching for him, and that's why I'm pleading guilty.

Subsequent to that, we obtained the information from the defendant's phone that showed his additional involvement in narcotics trafficking beyond just the Kansas City and New Jersey shipments. Part of the reason the Kansas City load was not included is it would have been difficult for the government to prove knowledge that the shipments included narcotics at the time, since that's the first shipment.

But with the additional evidence of multiple discussions of narcotics trafficking, including chats that did not involve the confidential source at all, that to the government showed the defendant's lying to the Court at his plea colloquy; the lying continued in the sentencing submission season. A lie that warranted, in the government's view, an upward variance for an attempted obstruction of justice, and why we thought it was important for the Court to understand the sequence of what the parties had available at the time of the plea was entered and what came to light after the plea that showed the defendant's lie.

So, that's the only reason the new information is being brought to the Court's attention. It is not like a *Wilson* scenario where we're attempting to fit it into an exception in the plea agreement. At all times the parties are free to present all relevant arguments, all relevant facts to the Court in support of the 3553(a) arguments. Here, the availability of new information from the defendant's phone post-plea goes to the government's 3553(a) argument that he warrants an upward variance for attempting to obstruct this Court and to obstruct probation by shifting blame for the narcotics trafficking away from himself. That's the only reason it factors in. It doesn't factor into the stipulated guidelines range.

As the government acknowledged at the August hearing and I am acknowledging here today, we are not seeking adjustments to the guidelines range. The government acknowledges the stipulated guidelines range is 168 to 210 months. But we are seeking an upward variance for a variety of factors, based on the nature and circumstances of the offense, the history and circumstances of this defendant, the seriousness of his conduct, the need for just punishment, the need to promote respect for the law, the need to promote deterrence, including deterring defendants from trying to obstruct this Court, and to protect the public from the defendant.

What the defendant's argument is really is that once a party strikes a plea agreement, the government can't keep investigating, they can't find additional facts that are relevant for sentencing and bring them to the Court's attention or bring them to probation's attention. It can't note discrepancies based on what the defense is arguing, based on subsequently obtained information. And that's just not what this circuit's law provides for; it is not what the plea agreement provides for.

If the defendant didn't understand what he was signing when he signed it, the remedy would be to move to withdraw his plea. He hasn't made that argument. He is not seeking that remedy. So the motion should be denied.

THE COURT: Let me ask you about something you just touched on towards the end. This is one of the things I'm struggling with a bit here.

Page 3 of the plea agreement contains relatively standard language about neither party seeking a downward or upward departure from the stipulated range. And that's not what is at issue here.

But the last paragraph, I mean the last sentence, rather, of the paragraph reads, "Nor will either party in any way suggest that the probation office or the Court consider such a departure or adjustment under the guidelines."

So this says I think pretty explicitly that neither

party will in any way suggest that I impose an adjustment.

Going to the sentencing submission, on the top of page 11, the submission reads, "The government notes that the above-described facts could justify two adjustments to the guidelines sentencing enhancement. First, a higher drug quantity finding above 450 kilograms based on the additional evidence from the second Habib phone could result in a two-level enhancement pursuant to USSG Section 2D1.1(c)(1); second, a two-level enhancement for obstruction of justice could be added pursuant to USSG Section 3C1.1, because the defendant provided "materially false information to a probation officer in respect to a presentence report or other investigation for the Court." And then it cites application note 4(h) as well as 4(f). And then the page ends at the bottom, "Applying those enhancements would result in a total offense level of 42, with a resulting guidelines range of 360 months to life imprisonment."

Maybe the language about obstruction might be okay under the plea agreement carve-out for allowing the government to seek obstruction based on new information learned.

But I am having trouble understanding how the first two sentences on the top of page 11 and the final sentence do not at a minimum "suggest that I consider a two-point guidelines enhancement based on a higher drug weight." There is a specific citation to the provision that

would apply.

MR. SHAHABIAN: Yes, your Honor. And I think the Court raised this at the August hearing after the government's submission about whether the government was in fact advocating for seeking an adjustment to the guidelines range.

And I want to be very clear. We are not. And to the extent that language in the sentencing submission was uncareful and potentially advocates for a different guidelines range, we ask that the Court disregard it. We are not asking for an adjustment to the guidelines range.

What is driving the government's sentencing recommendation is the defendant's obstruction with respect to his role in the Kansas City and New Jersey loads, and, more generally, drug trafficking. We are not advocating for any changes to the stipulated guidelines range. We believe the Court should impose the stipulated guidelines range. Notwithstanding, as the Court noted, we could even seek an enhancement for obstruction.

So, I apologize for the uncareful language in the sentencing submission. As the Court noted, that would make a two-point difference in the guidelines range and that's certainly not what's driving the government's recommendation for a significantly above guideline sentence here.

THE COURT: The Second Circuit has looked at a similar type situation, there is a case *United States v. Vaval*, 404

F.3d 144 (2d Cir. 2005), and the circuit explained it is difficult to draw a principled distinction between the government actually moving for an upward departure and stating that it technically could move for a departure and then adding arguments that would support such a departure.

Now, this is not necessarily a departure, but an adjustment. But, it seems like a similar situation here.

The Sixth Circuit also very recently or recently, I should say, found a breach of a plea agreement where the government similarly had agreed not to the suggest in any way that a variance was appropriate. That was *United States v. Warren* 8F.4th 444 (6th Cir. 2021).

Here, of course, we're dealing with a suggestion in the submission for an adjustment. But the language in the plea agreement for Mr. Habib is somewhat similar to that in *Warren*. Again, it provided that the government would in no way or would not in any way suggest a departure to the guidelines.

So I guess what I'm struggling with is if this language that I mentioned and on page 11 of the sentencing submission were a breach of the plea agreement, what the remedy is, and whether the government disavowing the language is sufficient.

I guess one question is, is there any reason why it wouldn't be appropriate to strike the sentencing submission and order a new submission from the government following today's

hearing? Presumably I think I was going to expect to request post-hearing briefing today. Why would that not be appropriate here?

MR. SHAHABIAN: The government has no objection to the Court striking the sentencing submission, and we can refile a revised submission consistent with what the Court is concerned with, making clear we are not advocating for any sentencing adjustment -- any guidelines adjustment.

THE COURT: Mr. Rezenstein, let me hear further from you then. I believe you indicated there was some matter you wanted to respond to and also with respect to the last point.

MR. REZENSTEIN: Well, it's clear to the defense the government -- that the Court has thought about this issue deeply and significantly, for which we're very grateful.

I think from a helicopter point of view, it is what they did know that we complain about. Not what they claim they learned later, which we accept their recitation to the Court. And that from a helicopter point of view, I feel comfortable in saying that their submission and their advocacy based on what we knew they knew and how we negotiated with them was such that we were expecting potentially a recommendation for a high-end guideline sentence, because of the information that they knew, which we were prepared to argue against. But, to seek a doubling of that and a tripling of the minimum mandatory was well beyond what I conveyed to my client and he understood.

And I do think, based on what the Court has said, I do need -- I agree the sentencing submission should be struck, I think it needs to be redone. And I need a moment again with my client, because some matters again have arisen that maybe I need to discuss with him again what potentially his options are. I can do that at counsel table.

THE COURT: If you're comfortable doing it at counsel table. If you wish to go to the back, you can do that as well.

MR. REZENSTEIN: I tend to speak loud. I was born in Brooklyn, so maybe I should go in the back.

THE COURT: Why don't we do that. Then we'll resume.

MR. REZENSTEIN: Thank you, Judge.

(Recess)

THE COURT: Mr. Shahabian.

MR. SHAHABIAN: Yes, your Honor. Before we return to Mr. Rezenstein, if I can go back to our colloquy about *Vaval* and add one thing. So understanding the Court's concern, and the government again is not opposed to striking the sentencing submission, we are disavowing any change to the stipulated guidelines range. I would note that this case is closer to *United States v. Amico*, rather than *Vaval*, which is --

THE COURT: I have *Amico*

MR. SHAHABIAN: And so, similar to *Amico*, what we have here is a situation where the defendant opened the door to the government's response to correct the record by making an

argument at the plea colloquy which he reiterated to probation and in his sentencing submission that he was not truly a member of the drug trafficking conspiracy, but made the mistake of vouching for the confidential source, who in fact was the person who owned the drug loads.  That necessitated the government to correct the record.

And that's what the government attempted to do in its sentencing submission.  The argument for an upward variance is not based on any potential adjustments to the guidelines range. I think that's clear from the submission, from the evidence we intend to walk through in the Fatico.  So, similar to *Amico*, if there was a breach -- which the government does not concede -- the government has cured it by promptly disavowing any seeking of an adjustment to the guideline range.  The Court can make clear it is not considering any adjustments to the guidelines range or not considering any suggestion from the government that it calculate the guidelines range separately, and in addition to *Amico*, the Second Circuit has repeatedly acknowledged cases of de minimus breaches of a plea agreement. And again here, where this is not a case where the defendant's appropriate sentence is driven by the particular number of drugs for which he's attributable for, I think the government's submission is clear, he is a member of an international criminal organization in which he has a significant role, including the drugs for which he is being held responsible for.

But whether the Kansas City numbers are included or not are frankly beside the point of what the government is seeking here in requesting a 30-year sentence.

So, for those reasons, we don't think there is a breach. We think if there was potentially one, we've cured it, and the Court can acknowledge that on the record. And any incurable breach would have been de minimus otherwise.

THE COURT: Thank you. Mr. Rezenstein.

MR. REZENSTEIN: Judge, we first have discussed this matter and are accepting the Court's recommendation or direction to the government to resubmit their sentencing memorandum.

We have much diversion of views regarding the rest of the government's argument, but I just seize on one point which will sound very familiar to what I'm saying. The last thing Mr. Shahabian said was the defendant's a member of an international organization for which he has a significant role.

If that's what they were intending to do and argue with their sentencing, when we had a negotiation with my client, that's what they should have alerted us to, and that is the main point of my complaint.

MR. SHAHABIAN: If I can respond to that. If that's the complaint, that's not a breach of the plea agreement. Nothing in the parties' plea agreement requires the government to set forth all of its arguments under 3553(a). We expressly

reserve the right to. The defense was on notice from the first discovery production in this case of our views of his role and his conduct outside of the 400 kilos to New Jersey. It is just not the case that the parties strike plea agreements where the government effectively gives them their sentencing submission ahead of time.

THE COURT: So, here's what I'll do for now. Initially I will strike docket 177, which is the government's sentencing submission. I'll strike that from the record. We'll have a Fatico hearing in a few minutes. After the hearing, I likely will ask for a subsequent submission, in which both parties can make any arguments they wish to make as to sentencing.

With respect to the motion that still is pending, again, that is at docket 205, the motion to force a plea agreement and objections to the government's sentencing submission, I'll allow the government to file a written response to that motion. I know we've had extensive argument on it, but I want to provide the parties with an opportunity to further elaborate on their views.

I'll have the government's opposition to that motion due in two weeks. Mr. Rezenstein, I'll allow you, your client, if you wish to file a reply in further support, two weeks after that. So that would be October 21 for the government opposition, and November 4 for the defense reply.

That briefing should address what we've been talking about, whether or not there was a breach of the plea agreement for the various reasons that Mr. Rezenstein has mentioned, and also any views that the parties want to share as to the remedy, if any, for a breach of the plea agreement.

Does that make sense to both parties? Mr. Shahabian, does that make sense to the government?

MR. SHAHABIAN: Yes, your Honor.

THE COURT: Mr. Rezenstein?

MR. REZENSTEIN: Yes, sir, and that's acceptable. Thank you.

THE COURT: Does everyone agree we can now move on to the evidentiary hearing today?

MR. SHAHABIAN: Yes, your Honor.

MR. REZENSTEIN: Yes, Judge.

THE COURT: So, we'll start the hearing. We'll see how far we get when the lunch hour arrives. I expect we'll go until about 12:30 and then figure out at what point later today to resume.

Let me ask the government, can you give me a preview as to the scope of today's hearing, both what topics you intend to cover and also how you plan to present the evidence.

MR. SHAHABIAN: Yes, your Honor. As the government noted in at our August hearing, we don't intend to call any witnesses to the hearing. We've provided the Court and defense

counsel with a copy of the exhibits we intend to offer in support of the factual contentions in our sentencing submission and in the PSR.

The government in terms of today's proceeding, the government's going to move to offer all of the exhibits, we've prepared a PowerPoint presentation that summarizes that evidence, and breaks it down into the category from the sentencing submissions, such as the defendant's role in the New Jersey narcotics seized, Kansas City, hitmen, etc. and a summary of the key evidence supporting the government's factual contentions for each bucket of factual categories.

It is a long PowerPoint deck, it is about 230 slides, and I'm hopeful I won't need to go through all of it. I'm happy to do this however the Court would like. I could go through the whole presentation, and when the Court believes it has enough information on a particular topic, stop and move to the next topic. If the Court has questions, we're happy to answer the Court's questions. If the Court rather proceed topic by topic and allow the defense to respond, happy to do it that way as well.

THE COURT: Sure.

Mr. Rezenstein, do you have any view? Maybe first I should ask, is there any objection to me receiving into evidence anything in this PowerPoint?

MR. REZENSTEIN: No, Judge. Just to be clear, the

government and I have had discussions for months now on how this would proceed. And I've tried to make it clear to them that we were not being obstructionist, to the extent there is no objection as to foundation, where these documents came from, that they weren't seized from phones, that in that sense, they are admissible.

We certainly had objections as to both relevance, import, context, and that the government's view of what something said is not always going to be necessarily the defendant's view.

So to the extent that the Court needs to make a decision under *Fatico* and its subsequent cases, that's what we envision our role here today to be.

To answer the first question, no, there is no objection to the physical evidence coming before the Court. As to if you consider it and how you consider it, yes, we have something to say. Now is not the moment.

Number 2, I was thinking and did discuss with Mr. Shahabian and his colleagues how we should proceed today. I don't know if you can see behind the screen. They presented me with documents a while ago under the theory of this is where we think we're going. And I said, listen, thank you, and I'll never say if you add more, take more back.

On Wednesday or Thursday they said this is my final submission, which I've reviewed with my client. They are now

going to summarize it. I think I feel most comfortable listening to their entire presentation and preparing a response to it, either at Fatico or sentencing. I'm not really sure yet how that should proceed.

But that's my initial thought process. If I have a thought that changes while we proceed, I'll let the Court know.

THE COURT: Sounds good. So why don't we start with the government then presenting their PowerPoint. And we'll see at the conclusion, Mr. Rezenstein, how you wish to proceed.

MR. SHAHABIAN: Just so the record is clear, your Honor, at this time the government would offer the exhibits listed in the exhibit list we've submitted to the Court. And both parties, which is Government Exhibits 101 through 112, 201 through 208, 301 through 302, 401 through 405, 501 through 513, 601 through 606, 701 through 710, 801 through 804, and 901. That includes all sub-exhibits. The transcripts are not being admitted for their truth, just as an aid for the Court.

THE COURT: Just to confirm, no objection, Mr. Rezenstein?

MR. REZENSTEIN: That's correct. There is an issue with one transcript, but I can discuss that with the government at some other point. We don't need to do that now.

THE COURT: So, I will receive those exhibits into evidence. Again that's Exhibits 101 through 112, 201 through 208, 301 and 302, 401 through 405, 501 through 513, 601 through

606, 701 through 710, 801 through 804, and 901, including all the sub-exhibits, and the transcripts, again, are not being admitted for their truth but as an aid for my consideration.

MR. SHAHABIAN: And the government would also offer this PowerPoint, which we'll call Government Exhibit A as a demonstrative aid.

THE COURT: So Exhibit A will be received as a demonstrative, unless there is any objection from the defense.

MR. REZENSTEIN: No objection.

THE COURT: Thank you.

(Government's Exhibits 101 through 112, 201 through 208, 301 and 302, 401 through 405, 501 through 513, 601 through 606, 701 through 710, 801 through 804, and 901, including all sub-exhibits, received in evidence)

MR. SHAHABIAN: Your Honor, as I mentioned, we've broken up the sentencing submission and the parties' discussion of the various topics in the submissions into subcategories. There are nine here.

It is the defendant's role in coordinating the narcotics sent to New Jersey, post-seizure discussions between the defendant and the confidential source, his role in the narcotics seized in Kansas City, evidence of his additional narcotics trafficking, his role in threats against the confidential source, his leadership role in the Wolfpack Alliance, his efforts to smuggle the hitmen out of Canada,

additional evidence of his obstruction, as well as a short module on the contraband phone. Roughly tracks the order the government's sentencing submission. And I'll walk through it topic by topic.

MR. REZENSTEIN: I'm sorry. Two things. May I approach the government for a second.

THE COURT: Yes.

(Counsel conferring)

MR. REZENSTEIN: I just asked him to allow me to see some things here real quick, Judge, and I acknowledge the government has provided me a copy of their slides one by one so we're ready. Thank you.

MR. SHAHABIAN: So, starting with New Jersey. This is the 400 kilos of cocaine seized for which the defendant pled guilty.

So, in the defendant's objections to the presentence report, and that was filed as Exhibit A to the government's sentencing brief, the defendant objected that the PSR did not adequately reflect the lack of his involvement in the drug shipments. For example, the discovery provided showed that between March 18 to 21, the various participants engaged in conversations about the drugs.

As to Habib, the only allegation that I've seen is a singular message that he wanted a schedule so we can have the guys ready and on standby.

So the government's trying to explain why that's simply not true and the defendant played a significant role in the New Jersey narcotics.

In terms of what the government believes is not disputed, just the basic facts from the presentence report, law enforcement officers seized 400 kilograms of cocaine that were shipped to a warehouse in New Jersey between March 18 and 21 of 2022. The delivery of those narcotics was coordinated in two Signal group charts that were mirrored from the confidential source's phone that involved the defendant and his co-conspirators.

One of those Signal chats is titled "Joker Bus," which you may recall from defendant Virk's sentencing, he's Joker, and the other is "New Jersey to Home."

The defendant used the aliases Gato and No Parking in both these group chats and various other Signal group chats that the government obtained.

One attribution point that the PSR is wrong, it attributes another alias, Guido, as one used by the defendant. That was one used by his co-defendant Christopher Burgos, not by the defendant.

This is an example of the defendant using Gato, a variation of it, for a Signal alias. The avatar is a cartoon of Felix the Cat. They are all basically all of the Gato and No Parking aliases using a variation of Felix the Cat cartoon.

So this is one of the New Jersey narcotics group chats. This isn't from the mirrored Signal. This is taken from defendant Virk's phone. The Court can see at the top "Joker owner." That's a Cellebrite extraction of Virk's phone seized upon his arrest. It is the same chat, it shows all of the participants, third from the bottom El Gato, that 2410 phone number, that was the defendant's phone number.

I should be careful not to touch the screen.

So this is showing the defendant's role in the coordination of the delivery. So this is in the New Jersey to Home chat. Khosa cousin, this is actually Cheema, says: Brad Pitt send pics of the total amount of boxes.

The confidential source, using the alias BK, responds with the picture of boxes and the number 7. The defendant acknowledges the receipt of the shipment of narcotics. Thank you Brad.

Cheema follows up: Yes, how many boxes are there in total. Do you know? Because Frank has seven boxes himself.

Frank, another participant in the chat responds: Seven boxes: Two had 20 packs in them; five had 18 packs in them.

Virk says: My load three boxes with the H sign on it. It is 102, referring to quantity. Frank's load we put F sign on it. 130 winz.

As far as we are aware, "winz" is a reference to

methamphetamine.

So 10 boxes in total. That's what Cheema says.

Virk responds: Yes, bro, 10 boxes.

Cheema: Confirm please.

The defendant chimes in: He only received seven. Seven boxes.

Cheema says: Joker can you ask your guys what's going on. There was only seven boxes received.

They are making sure they've received the correct number of narcotics being shipped.

Habib corrects: Sorry. One sec. It's 10.

Showing he's in communication with the people at the warehouse coordinating the receipt of the narcotics shipments sent by Virk, Joker, as well as Frank.

We're good.

Cheema says: LOL.

Joker says: OMG.

Oh my God, of course it would be very bad for narcotics traffickers to lose track of the narcotics. Hence the relief of making sure they've got the right number of boxes.

King, as the defendant is aware, King is another co-conspirator in Canada in this case who is involved in the transportation of narcotics from New Jersey to Canada. Driver is on legit pickup.

The defendant, again, showing his coordination role: What's his ETA, bro.

C.S. interjects: ETA to WH. WH meaning warehouse.

King responds: ETA 12 p.m.

El Gato wants to confirm when, that's the defendant wants to confirm when the truck is arriving. He says tonight. King says no.

Then the conspirators discuss loading instructions for the narcotics, as they are going to be transferred from the New Jersey warehouse onto King's trucks. King says: Bro, please explain this properly to your guys now. Please put the boxes in the middle of the trailer. There is space between skids. Just put all boxes behind skids, don't put boxes on the back please.

This may be obvious, but if your truck is going to be inspected, better to hide your narcotics in the middle and not leave them at the back of the truck.

The defendant interjects on the loading instructions. He says: The only ones getting loaded are the ones with the seven with F. The other three with H stay.

This is important. As the Court is aware, the government only seized the 400 kilos of cocaine from March 18. This is actually March 16, before the seizures took place. The seven with F, that's Frank's 130 winz or methamphetamine, was not seized by law enforcement because they were shipped at this

point, whereas the three with H, the cocaine, remained behind.

Cheema confirms: Leave the three boxes with H. They're going Friday. Part of the cocaine that was seized.

King reiterates: Make sure, bro, don't put boxes at the back.

The defendant then adds Guido, that's Christopher Burgos, to the group chat.

The purpose of this is, we'll see, is to coordinate, again, the loading instructions that King keeps reiterating. As noted in the PSR, Burgos' role in the shipments included coordinating the assistance of other individuals Burgos recruited to help offload the cocaine boxes brought to the warehouse.

After the defendant adds Burgos to the group chat, Burgos confirms: All done boys. Had to wrap one in green Saran Wrap. The box was damaged when we received it. There was another one that the one side lid was open on was taped down also.

Just updating the group on the status of the narcotics being shipped.

Burgos adds: I will have G -- that's a reference to the defendant, Gato, that comes up more than once. G will put my work phone in once I have it back in my hands and remove this one later.

Again, the defendant added Burgos to this group chat.

Burgos is just saying I am going to be using a different phone number. So this is all before we get to the March 20 chat that the defendant acknowledged in his sentencing submission.

On March 20, this is now the -- we've moved from the New Jersey to Home group chat, so the Joker Bus group chat Government Exhibit 103. Again, defendant adds Burgos to the group chat, responds with the muscle emoji, and defendant says: Please guys can we give him a rough schedule so we can have the guys ready and on standby.

This is not a passive observer in the narcotics shipment. This is someone playing a key role in making sure that the narcotics, millions of dollars' worth of narcotics, are being transferred from one shipment to another correctly.

The same day that he asks for a rough schedule, the defendant also side messages the confidential source and warns him something is coming tonight, please keep on top of the schedule. Again, coordination role.

This is an example of the defendant playing another intermediary role. As the Court remembers, Frank is one of the participants in these group chats who claims responsibility for the winz. This is the defendant telling the confidential source please message Frank just tell him you're putting together and Monday Tuesday should be ready to pass files about 70 to 100 I'm going to put in also.

We'll come back to this at points. The government's

contention this is a reference to passing money. "Files" is code for money. 70 to $100,000.

Again, the defendant is playing an intermediary role between pivotal members of the conspiracy, owners of the drugs like Frank, and the confidential source.

This is back in the group chat Joker Bus. The confidential source says: My driver is there. Let me know ETA.

The defendant acknowledges the back and forth: Thank you bro.

In a side chat with the confidential source, on the 21st, again discussing the mechanics of offloading the narcotics, at the end the defendant acknowledges we need the fork truck again, the pump truck, tools to assist in moving boxes on and off the trailers. Because as the Court recalls, New Jersey was sort of a hub, it was receiving shipments being shipped across the country before being transferred to other shipments bound for Canada.

As the Court may recall, the truck that was bound for Canada was loaded with sham cocaine after the 400 kilos were seized. Law enforcement then stopped the truck on the highway as it was leaving the New Jersey warehouse. And the participants in the conspiracy were trying to figure out what had happened to the truck. There is an instruction from Habib to the confidential source go check on the truck. The picture

is the GPS coordinates that the truck is transmitting back to the conspirators.

And I'll just stop here for a second. We didn't make a big point on this, but I know this is something the defense has raised. We are not saying the defendant went out there personally and took a video of the truck and sent it to the conspirators. He passed the video of the truck on the group chat he received from the source, but he directed the source to go do it. That's all the government is contending. Again, shows his intermediary role. He is not a passive participant in the conspiracy. We are not saying he was personally out there filming in New Jersey.

This is the participants discussing after the stop what happened to the truck. This is the 22nd, the next day. King says he spoke to the driver of the truck. The police took his phone. Joker asks what happened to Brad. And the defendant adds an update: He's getting away from there, the warehouse is in his name also.

Intermediary role, informing other of the conspirators what's going on. This is when people in the group chat start to get upset about the narcotics being seized.

The defendant says: If you want to link up no problem.

Virk says: I'll let you guys know how to link up. If you have a problem with me let's meet in person and hash this

out.

The defendant says: You should know who you telling to be alert. I can leave now if you want.

This is the defendant using his known status as a high-ranking member in the Wolfpack Alliance to threaten his co-conspirators. It is something Virk and Cheema discuss separately, which we'll reach at points, but it's the beginning of and escalation of potential violence.

As the Court is aware, they are all using aliases in the group chats to prevent law enforcement detection of who the participants are, so that the participants themselves don't know who everybody is. And here is the defendant then sending a picture of Virk's driver's license to the group chat. The defendant says: Get the fuck off. Do whatever you want. But tell your family to be safe. You jerk.

So, Virk clearly interpreted this as a threat from the defendant. Cheema, who is Papo, says: You guys need to relax. We don't know what happened yet, we'll find out full story when driver gets back to Canada.

That's the New Jersey narcotics shipments and seizures. Contrary to the defendant's assertion that there is one chat where he asks a rough schedule, as the Court can see, there is repeated interactions by the defendant as an intermediary between owners of the drugs like Frank, shippers of the drugs like Cheema and Virk and King, and the people on

the ground at the warehouse like the source and Burgos, and he is playing a logistics coordination role throughout the process.

THE COURT: Just want to make sure I understand the prior chain correctly. Gato sent the driver's license of Virk, and then Virk responded: Get the fuck off. And then Gato responded: You should know who you are telling to be alert.

Is that right?

MR. SHAHABIAN: That's a reply to an earlier chat. That's why it's in blue. So that comes right before the driver's license. Link up, that's slang for, hey, like, we've got a problem here, do you want to meet in person and we'll settle this. This is Virk saying I'll let you know how to link up. And things are escalating. That's why the defendant says you should know who you are telling to be alert. He follows up with that with I know who you are, here's your driver's license. Now everybody knows who you are. And that's why Virk responds so aggressively. Here he is outing him in a coded Signal group chat. So that's the escalation.

But this particular message, the blue, that's him replying to the earlier message. That's just how Signal works.

THE COURT: Just to clarify something to understand the tone. The clown emoji next to Joker are a default. He is not making, it's not your understanding he's adding that each chat.

MR. SHAHABIAN: That's part of his avatar, his alias. It is actually Joker and two clown emojis, similar to the Joker from the Batman series.

I think the Court will see throughout the defendants all use different repeated aliases, Virk, Joker; Cheema, variations on Tana, Tony Montana, things like that. And the defendant Gato and the Felix the Cat cartoon. So, it's ways they all know who each other is in a coded language, but escalating to sending an actual driver's license to a group chat where not everybody may know each other is what Virk is reacting to here.

So I'll now move to conversations between Habib and the confidential source after the seizure of narcotics. This is important for a couple of reasons. So in the defense sentencing brief the defendant argues the evidence in this case is not that Habib arranged drug shipments; the buyer who became the informant did that. Habib's involvement began when the buyer/informant asked him for help to make more money by getting involved in more serious drug transactions. With the absence of the buyer in this indictment, Habib has been placed in the role of the buyer/informant.

This is similar to what the defendant himself said during his plea colloquy when the Court asked follow-up questions about his role. He said, "After the first shipment that he got," referring to the source got "involved with went

missing in Kansas City, he was held responsible for it, or they were pointing the finger at him. So I was sticking up for him. I advised him basically, like, you got to make it right. Like, talk to the people you are on the same contact with them. And that's when he arranged the second shipment of drugs that came involved in it."

The Court clarifies, "When you are saying 'he,' are you referring to the person who you believe --

"The confidential informant, correct.

"Then there was a second shipment" referring to the New Jersey "Can you say some more about that?

"Well there was -- one, there was the end of February. I got, I think, busted on that some time in March, beginning of March." That's the Kansas City seizure. "And then he had arranged to, I guess, work the payment off, and that was the other shipments, the four shipments that came in March from the, I think, I don't know what the dates were exactly."

So again, the government's contention is this is the defendant minimizing his role in arranging these narcotics shipments and playing this go-between role and shifting blame to the source.

I want to be clear, we are not contending that the defendant was the owner of the narcotics shipments. As we'll see as we go through the evidence, the owner appear to have been Frank, particularly with respect to methamphetamine. Jefe

also is the nickname for Robby al-Khalil, a leader of the Wolfpack Alliance. Also Cheema at points acknowledges a potential ownership role of narcotics. We are not saying the defendant owned the narcotics. But given his role in the organization, he is taking a hands-on role in part of its activities, which includes the international transportation of narcotics.

This is one more part from the plea colloquy. The Court asked, "Where were the shipments coming from, where were they going to?"

The defendant says, "I believe from California. Going to the New Jersey warehouse."

"Do you know what was in those shipments?"

The defendant said, "I knew after the fact of the first one what was, like, happening, do you know what I mean? But I didn't know that he was more or less going to keep continuing to do that. I just told him basically, like, make it right, whether you got to make payments or work it off. He was essentially go to be selling his company to pay off the thing; but because I was the one who introduced him to the people, that, I guess, involves me in the conspiracy."

This is the defendant minimizing his role. He made a mistake by introducing the defendant and vouching for him. He only knew what was in the shipments after the fact of the Kansas City seizure. So the government's going to go through

the evidence that proves the contrary of that and shows the defendant's significant role, and not the source's role, as his attempt at shifting blame suggests.

First, after the seizure of the narcotics, there is a Signal group chat where the defendant tells all of the other participants or many of the other participants they need to be polygraphed by the owners of the narcotics. Includes the source, it includes Cheema, using the Tana nickname, Gato, and again, there are variations on each of these aliases here. It is the G, the at, the palm tree emoji, and the O circle which spells Gato, and Gorilla is another alias used by Burgos.

Again, just summarizing. All of the chats are in the underlying exhibits, but I am trying to keep this as efficient as possible.

The source sends a variety of documents obtained about the seizure of the 400 kilos to the group chat. It says: Approximately 400" referring to the 400 kilos seized.

Burgos says: The driver is talking.

The source says: Lawyer has no idea how the driver was released -- that's referring to the driver of the truck -- unless he signed something.

Burgos reiterates: He definitely talking.

The defendant chimes in: That's great. But it still has no effect on their theory bros. Only way we can put this to bed is the poly -- it is the polygraph -- I have to do it,

King has to, the driver have to, Tana, we all have to. I am just waiting on the day and I'm heading there. They said I'm sure he's talking, but still don't explain how their product became available on the street a few weeks after.

So this is the defendant passing along from the owners of the narcotics, that is Frank, Robby Alkhalil, the theory that somebody is lying. The drugs, they're suggesting, ended up on the street. That's the product. And that in order to figure out who is lying, they all have to take polygraphs in Canada. That's the reference to "I'm heading there."

I've omitted a lot of back and forth on why can't we do this in New York. But again, this shows this isn't the source's load. He is not the mastermind. He is a minor player in a large criminal organization where the defendant is the direct line to the ownership of the narcotics.

The defendant says: How's it look if we all do the poly and someone on your guys' side don't want to go to Canada to take a polygraph.

The source says: Let me know where to go. Me and Guido -- Burgos -- will go.

And again, the defendant explains the bad position that the seizure has put them all in. If they pointing fingers at you, then it is the same as me. Right now they pointing at me. The way the test works, they hook you up. He's explaining how the polygraph works. He is passing on that the people who

own the drugs are upset, they are looking to hold someone responsible, and the defendant is telling Burgos and the source and Cheema that they all need to be polygraphed, because the owners want to find who is responsible or he's going to be held responsible.

This is more about the polygraph.

This is a side conversation between the defendant and the confidential source. If you look at the bottom, there are texts from the defendant to the source saying: I need you to make sure Chris -- that's Chris Burgos -- and his brother or whoever else was there or had access to it -- that's referring to the warehouse and the narcotics there -- will deal with that this week and I'll schedule an appointment for you to go the following week. They are not going to let us use anyone we know or who is connected to us.

Again, he's reiterating you have to do this, we all have to do this, we have to take a polygraph.

The source responds that he is uncomfortable with this because the people who do polygraphs are generally ex-cops and they are going to ask questions, Do you know what was in the boxes? Yes. Cocaine. He is going to see faces. What's to stop him hearing them talking about cocaine and telling other people.

The defendant responds: That's why they -- referring to the owners -- are picking who is going to do the polygraph.

He's referred by the Gambino family -- referring to the organized crime family.

Source asks: How did you find that the polygraph person referred by Gambino family?

The defendant says: They're my people.

Again, this is the relationship. It is not the source as the mastermind, and Habib's just a minor passive participant. He is the intermediary between top levels of this criminal organization and the workers who are shipping the narcotics.

This is a recording of either a phone call or an in-person conversation between the defendant and the source from April 4, 2022, where the defendant is passing along instructions to the source about being careful with his phones, about staying out of trouble, about avoiding police attention. I'll play part of the recording that's clipped here.

(Audio recording playing)

MR. SHAHABIAN: The audio in this room is a little unclear. The Court can refer to the underlying clip in chambers.

I think what's important here is again the defendant is passing along instructions to the source. It is not the other way around. The source is saying I'm not talking; I'm staying low.

A few days later, this is a recording not involving

the defendant. It is between Chris Burgos and the confidential source and they discuss the narcotics seized from New Jersey. I'll skip this one. This is just an acknowledgment that this is serious loads of narcotics from the cartel, referring to the cocaine being seized.

More importantly, this is another part of the same conversation where Burgos refers to the defendant again as "G." We saw that in the text messages earlier and he explains how the defendant told Burgos that it was 200 kilos of cocaine, not 400.

You can see various chats both for Kansas City and New Jersey there are disagreements about how many narcotics were actually loaded onto the trucks.

We'll also see a discussion between Virk and Cheema about the improper practice of double loading, when you add more than one person's narcotics to the same truck. So this is part of the context for this back and forth.

But the most important part is, again, this is the defendant passing along information directly to Christopher Burgos about the cocaine seized. This isn't coming from the source to Burgos.

(Audio recording playing)

MR. SHAHABIAN: That's part of the recriminations, who's responsible for the seizure, who is lying, and Burgos is saying, you know, how did we make up the numbers on the police

report.

Skipping ahead a month to May of 2022, again, this is our continuing conversations about -- now we're shifting to the Kansas City seizure between the defendant and the confidential source. And again, the defendant had provided paperwork to Habib. This is in some of the chats that I haven't summarized but are in the underlying exhibits. And the defendant tells the confidential source that the numbers are wrong on the paper, that it took you too long to get this, and they are going back and forth about this. So I'll play part of this clip.

(Audio recording playing)

MR. SHAHABIAN: So, the important parts of this clip, again, the defendant is acknowledging it's not your thing. Right. This is not the confidential source's business. This is what I do, I know how this works, but you are not an idiot. If narcotics gets seized, you need to get the proof of the seizure quickly, not three months later.

So that's, again, the back and forth that shows the relative roles of the defendant and the confidential source.

And one thing just to note for the record, the slide says Government Exhibit 209. There is no Government Exhibit 209. It's actually Government Exhibit 208 and the transcript is Government Exhibit 208-T. So, apologize for the typo there.

This is the same conversation between the defendant and the confidential source later in the conversation, again, they're going back and forth about what happened when the Kansas City load was seized.

The Court may recall from the submissions in the PSR that there was a debate about the source's role being the person who got the drivers for Kansas City, versus his contention that actually the source is the buyer of the narcotics and arranged the whole thing. This is just part of the conversation that shows the defendant is acknowledging that he -- that the source was getting the driver who is Dre, and he says if you had told me it was Dre's ride from the beginning. This is in the government's sentencing submission. This is just the underlying recording that explains that.

(Audio recording playing)

MR. SHAHABIAN: In addition to these recordings, so these followed text messages on Signal between the defendant and the confidential source. This is one of those chats.

Here he's using the alias No Parking. And while you can't really see it on the screen, the avatar is another Felix the Cat cartoon variation. Were the source sends the defendant the Kansas City seizure report: Boy's got booked with everything. I will call you in a few.

Again, and this is what I was referring to earlier. The defendant says: The numbers are wrong. The weights.

You're looking worse and worse.

This is the context for the recorded conversation where they're arguing about the seizure and what happened.

The reference to Dre on top of the numbers been way off buddy Dre was supposed to have green in there. That's marijuana. Guess he didn't. So the numbers that was sent isn't Jefe or Frank's, again referring to the owners of the narcotics who we'll return to.

The defendant says: the numbers are not the right numbers.

The defendant says: Dre gave me the wrong information. And again, the role of the source versus the defendant.

The source says: this is the info that I got on the guys that got booked.

The defendant said: Yeah, they are 25 years old. Age has nothing to do with this.

The defendant says: When he told us he has been dealing with them for years, you have to understand these guys don't forget anything you tell them they even keep screenshots.

The source said: This is what Dre said.

The defendant is arguing to this Court that actually the source is the buyer and the arranger of everything, and these chats show that's not the case. As set forth in the government's sentencing submission, the source was finding

drivers, he used the co-conspirator named Dre who in turn used some guys who were only 25 years old, and the owners of the narcotics is upset, that's not what they were told when the source said he could get drivers for the narcotics.

Again, here is the source recapping what the arrangement was: You put this on me, I didn't steal this shit. I offered you a driver, you spoke to the guy and offered him more money and he went. The situation is what it is now. You also said more loads will come and this will be taken care of quick.

The defendant doesn't disagree with the characterization of the source's role or his role or what the arrangement was. He says: Yeah, till this next mess, referring to the seizure of the cocaine from New Jersey.

It's been three months. Look at what they drop in one week. Two back to back. You think people funny give a third time. This is why I told you do the poly and bring everyone.

This is the defendant saying we've had two back-to-back seizures now, Kansas City and New Jersey, nobody's giving you a third chance, you got to do the polygraph.

The defendant says, look, let me explain. Put me in a group with Frank, one of the owners of the seized narcotics, or text me his number. I will call him tomorrow just so he knows I am not going anywhere. I am going to make good on my debts.

Defendant, again, his intermediary role: I already

asked. He said he don't want to be in a group with you. He said you're not a man of your word. You made a deal with him and didn't even have enough respect to tell him you don't have it after he agreed to take payments. Also he knows you haven't passed anything. He's pissed and I don't blame him. The only money you passed was the winz and he was the one that gave you.

So again, this is an acknowledgment that the source had made some payment for the lost narcotics, in particular the methamphetamine that was seized in New Jersey owned by Frank.

The defendant again asks: Send me his info. I'm telling you bro I tried to help you. I tried to buy time. I asked him how he find your info and he said he's been looking into you since the 400, and he also said the way this guy looked you up is you're all over the internet.

This is jumping ahead to the threats against the source. It's part of the conversation about where did the information that was used to threaten me and my wife come from. The defendant, as we'll get into, is lying here and saying it was publicly available on the internet.

Again, more context. We're still in setting the role of the defendant versus the source. That's the point of this whole module.

This is part of another recorded conversation. I didn't include the audio clip. But this is a reference to the defendant's intermediary role with Robby Alkhalil who was the

leader of the Wolfpack Alliance, who at the time of this information was still incarcerated in a Canadian detention facility. He escaped during the time span of the conspiracy, which we'll get into in a bit, but he used the alias Jefe using contraband phones in Canadian detention.

And this is the defendant updating the source that Jefe, that is Robby Alkhalil, is back from solitary confinement and he has a new phone and he's upset about everything that's been happening with respect to the seizures.

With respect to the defendant's role, after he passes this message along, and we'll get into some of the threats more in a bit, going back to his role, he says: I can only do so much and, like, you know, to be honest, bro, when everything like it was going before, it was so smooth, it was so beautiful, so I was able to earn and make a difference. But now that everything's fucked up it is like everything's kind of on hold.

Again, this was referenced in the government's sentencing submission. The defendant is acknowledging that he had a business, that this was part of the business, and that it got disrupted by the seizures of narcotics in Kansas City and New Jersey. It's not, I'm so sorry that your narcotics, Mr. Source, were seized.

So that's it in terms of showing the relative roles of the defendant and the confidential source.

The next topic is in particular the Kansas City seizure and the obstruction with respect to that aspect of the conspiracy.

So, as described in the PSR, law enforcement officers seized approximately 96 kilograms of cocaine and 86 kilograms of methamphetamine in the vicinity of Kansas City, Kansas, on March 2, 2022.

There are group chats with the defendants, Cheema, Virk, and the confidential source coordinating that shipment. And as we've discussed, the defendant asked the source to provide drivers for the shipment.

The defendant objects that the shipment was arranged by the C.I.  Habib's involvement was minimal until after the seizure.  They object to the factual recitation that the source, that he asked the source to arrange for drivers.  That the objective evidence shows that the shipment was a deal arranged by the source.

As we've discussed already, some of the evidence fits into multiple categories.  That's simply not true.  And we are going to look at the chats now that further reiterate why this is not true, in an attempt to shift blame away from the defendant and minimize his role.

Again, this is from the defendant's objections to the presentence report.  He states the source was the buyer of the drugs for the March 2, 2022, shipment seized in Kansas City.

Again, from the plea transcript, the defendant says: In 2021, I introduced the confidential informant to one of my friends that I knew was bringing marijuana to New York. And in the early part of 2022, he approached me asking to make more money to transport throughout the United States. And I connected him with somebody that was doing transportation.

Again, minimizing his role and suggesting all he did was connect the source to other people, and not acknowledging his role in the conduct.

This is one of the Signal group chats. This was taken from Virk's phone, you can see at the bottom Joker is the owner of this phone. The defendant using the 2410 El Gato alias as part of the chat. Co-conspirator named Ghost is part of the chat. Brad Pitt is the source's number. Old, the alias was actually changed, it used to be a play on Tana. That's Cheema's phone number.

This is February 28, 2022. Ghost asks Gato: Is your guy here already?

The defendant responds: Here we're. Or it could be a typo for "we're here."

The defendant says: Ghost please pass the pickup address to this group so Joker can give -- that is Virk -- can give to his driver.

As we'll see, there are references to places in California, this is a discussion of picking up the narcotics in

California so they can start their cross country transportation journey. This is the defendant asking for information to provide to other co-conspirators about the location.

The defendant then, after that conversation, adds the confidential source to the group chat, so the source isn't even in the group chat when it starts with the back and forth between Ghost and the defendant.

Ghost says: I don't have it. Brad, do you have it?

The source says: Yes, I got the address for pickup and drop off.

The defendant directs the source, send the Inglewood -- that's California -- address and number please. Also please call him and let him know someone will be by this evening to pick it up.

This isn't just making an introduction. This is the defendant playing an intermediary logistics coordination role in the transportation.

The source provides the address in Inglewood.

Ghost responds: That's not safe driving. You are going through all the Mexican stash house areas in Riverside and Ontario. That freeway is flooded with cops.

At the same time, the same day that both Cheema and Virk are participants in this group chat that they're all using aliases, Virk sends a side chat to Cheema. Hey bro, Gato is from Toronto? Cheema says, yeah, why? Cheema says, he is a

white guy. They're WP guys. You know WP? Virk says no. Cheema says Wolfpack. Virk says, got it. Serious guys, bro, so please make sure we follow rules, no double loading for whatever reason.

So this is an acknowledgment between two significant players in this conspiracy. As the Court is aware from the sentencing of Virk, these guys are shipping literal tons of narcotics cross country on a regular basis. And when they're having a side conversation, they're saying to themselves, Gato, the defendant, he is a serious Wolfpack guy, follow the rules, be careful.

Double loading, as the government's submission, refers to adding multiple loads of narcotics to the same shipment. There are other chats in the exhibits that discuss this. For the sake of convenience, I haven't included all of them in the PowerPoint deck.

There is a second group chat that relates to the Kansas City load. It is titled -- they're both titled "Books," as the Court is aware "books" is jargon for cocaine. Joker, Virk is part of this group chat, so is Ghost, Cheema, the source, and the defendant.

This is March 1st, 2022, so the next day after the chats we just looked at. Virk says: Meet tonight?

Ghost says: Your driver called saying we have to meet at 4.

Ghost adds Gato, that's the defendant still working on his end.

Virk asks: Why bro.

Ghost says: Gato's guy -- that's the defendant's guy -- is going to drive the gear. I have my guys tailing.

The government's submission is this is Ghost saying the plan is that the defendant's people will drive the narcotics, Ghost's people will follow to provide protection. This is common in the narcotics world, to ensure that if there is law enforcement stop, if there is an attempted robbery, there is support.

Virk asks: What exact time waiting on the defendant to tell me. Virk asks: Gato?

Ghost adds: Like I said, my team ready.

Virk says: Yeah, but what Gato say.

We've omitted more chats from this, but basically there is a back and forth, we can't get everything together at the right time, they defer a day, and then the narcotics are seized.

This shows the defendant's not simply making introductions. He is playing an active role in arranging the coordination of the handoffs and the driver.

Now, as the Court is aware from the various disputes over the plea agreement, the defendant is -- and the government is not asking that the defendant be held responsible for drug

quantity calculations for this shipment. Going to his obstruction, when he said all I did is make an introduction and I didn't know until after the fact that this load involved narcotics, what evidence we had at the time of the plea was the Kansas City load and the New Jersey load. So, it was difficult for the government to rebut that assertion, given that it's not out of the realm of possibility to say I didn't know what it was the first time, I didn't know what "books" were, I didn't know what we were discussing. But once I realized it after the fact, I did the second load you have evidence of me on, which is the New Jersey cocaine load. That's where we were at the time the defendant pled.

Subsequent to his plea, as the Court is aware, we were able to extract the defendant's remaining phones seized from his arrest. That phone only has text messages basically from a month of its seizure, which is November 2022, because the Signal messages were set to disappearing mode meaning they self-delete after a short amount of time. So we only had basically the recent messages that hadn't deleted that were still on that phone.

What that phone showed was the defendant's continuing significant involvement in narcotics trafficking, totally independent of the confidential source, which shows that it's not just these two Kansas City and New Jersey loads we are talking about. The defendant is a repeat player in the

narcotics trafficking world.

And in particular, as we discussed in our sentencing submission, there were a number of chats. There was a Threema group chat with Habib, Cheema and two individuals using aliases Goku and Onyxx. Threema is another encrypted messaging application similar to Signal that doesn't use phone numbers, to provide an additional level of protection.

There is a side chat between Habib and Goku about where to drop narcotics. There is a Signal group chat with the defendant and three other individuals about trafficking methamphetamine. There's the same version of the group chat from Cheema's phone. It is just for corroboration, given the difficulty with Threema, showing that this conversation existed both on Habib's phone and Cheema's phone and they're both participants on each other's phones. And a separate side chat from Cheema's phone regarding high heat. This is one of the Threema group chats that was taken from the phone after the defendant's plea.

He is Gato, again, variations, it is a G @ and there is a plus sign. It looks better in the actual application. Cellebrite has difficulty sometimes with all these emojis. El Padrino is Cheema, and Goku and Onyxx is the other participants. This is November 2022, several months after the Kansas City and New Jersey seizures, shortly before the defendant's arrest.

Goku says: How many you need?

Onyxx says: Can you send pics and logos and I can prep some orders in advance.

Goku says: Some landed today more on Friday.

Onyxx says: Send pics if HH -- again, that's the high heat reference that we'll come back to later.

Goku sends pictures of what are clearly kilograms of narcotics. Goku says: Want them?

If they're fire HH. That is, if they're good quality, high heat, send them up.

It is certified HH though.

Goku says: Some people try and copy them, but these are untouched. These are pure kilogram bricks.

Subsequent to the delivery, Onyxx says: Hey only 9 not 10. Sends a picture of what he received. Again, says 9 kilograms of apparent narcotics.

Goku says: They sent 9 because one was a little ugly. They know you guys are picky so they didn't want you guys to have to return it so they just sent the 9.

Goku says: Let me know if you can take these today, with a menu of additional narcotics options.

So, so far we haven't discussed any chats with Habib in that group chat. He's one of the four members in the group chat but he is not yet a participant. The same day that Goku asks if they can take additional narcotics, Goku sends Habib a

side chat in Threema. It says: Hey bro can you please ask your boy Tana -- that's referring to Cheema -- to send drop info. I have to drop them or they're going to sell.

The defendant responds: I'll call right now. He said someone coming to COD the nine in like an hour and then he wants the 20. He said he don't feel comfortable owning for 10 and taking more.

So this is the defendant passing on information from Cheema about what he intends to do with the narcotics that Goku is offering.

Later in this same chat, again, this is some of the chats that were referenced in the government's sentencing submission, the defendant tells Goku: Bro, towards the end of the month I was wondering if I could get my little cut. I haven't really been keeping track but I'm kind of in a tight spot and could use it.

Habib says: I'll pass PPR -- or paper -- to your people in dot.

We've seen pass paper. I can drop money to you. The defendant responds: I don't know how much it is or will be but if it is easier for you I can take WRK -- or work -- also. I want to try and get my East Coast program back up.

As we'll see with additional text messages, the government's contention is this is a reference to the defendant saying I want to restart my East Coast narcotics trafficking

after the New Jersey seizures, and so I won't just take cash, I'll take product. Narcotics, work. Which is common slang for narcotics.

There is then discussion of the price for the narcotics that Goku has available. In other words, how much narcotics could he provide the defendant to give him payment. And showing that this isn't just marijuana we are talking about but hard narcotics, the defendant says I thought it was $200, 100 is crazy, I'm not going to cry, I'm going to show these guys they need to break me off also I make more selling a pound of weed.

He is distinguishing between weed and the markets being discussed with Goku, the kilograms in the group chat with the defendant and Goku.

This is another group chat from the defendant's phone that was extracted after his guilty plea. It is the defendant and three other individuals again, not Cheema, not Virk, not the confidential source. It is the defendant and three co-conspirators. They discuss, again, we've summarized the chat. The Court is free to look at it but there is a lot of discussion about meeting up in person. And here, they're talking about where they should meet up. The defendant says: Doesn't matter to me. Just don't want hot around here. There's too many feds. Let's link on U.S. 1.

So as we'll see, this is a meet up to discuss physical

narcotics. The defendant is concerned about being somewhere where there is a significant law enforcement presence, and is trying to find somewhere where there isn't a significant law enforcement presence. He suggests meeting somewhere off U.S. 1 in Florida.

Again, this is back and forth about meeting up in person. He decides to meet up with the person in the group chat using the alias MVP. The last chats before the pictures we're about to look at is where are you at. I'm in front of the taco spot. This is November 5, 2022, about 8:40 East Coast time.

About 40 minutes later, and again, this was a conversation for MVP and defendant to meet up in person. 40 minutes later, MVP sends photographs and videos to the group chat of what appear to be narcotics. They appear to be methamphetamine. Crystals.

(Audio recording playing)

MR. SHAHABIAN: That's the new information obtained from the defendant's phone post plea. And it shows his continued involvement in drug trafficking, independent of the New Jersey and Kansas City loads, independent of the confidential source.

Based on this information, the government then went back to defendant Cheema's phones, which included additional messages. So this is one of the Cheema phones, and to be

clear, we had this information available to us at the time of the defendant's plea. But we are now viewing it in the context of the chats obtained from Habib's phone after his plea.

So this is another group chat. This one's from October 2022, so the month before the chats we just looked at. Cheema, El Padrino, Goku again, Onyxx again, Gato is at the bottom. There is a Habibi who is not defendant Habib, just to be clear. But the same Gato alias appears at the bottom.

And in this group chat, again, there's discussion of narcotics trafficking that is similar to the discussion from Habib's post-plea phone extraction. Cheema says: Yo guys I say we put the winz program on a little bit of a pause and start the books program. My bro has books in DF etc. ready always and he has a Garry ride for 3500 for beach and I know Mr. Clean has worked in DF too. I have rides and sales in beach us guys don't need any customers to bring books etc. we can do it ourselves.

We can even land in beach and keep selling in beach until we make enough where we feel the comfortable to double jump from beach to home as well we can do that in the near future.

He adds: Gato has a handler we can send to beach.

The defendant is Gato is a participant in this group chat. There is a lot of narcotics jargon in this group chat. "Program" refers to narcotics shipments. Like the defendant

asking Goku, hey, can I get work for payment because I'm trying to restart my East Coast program.

Here is Cheema the month before referring to a winz program, that's a methamphetamine shipment program. And a books program, referring to a cocaine shipment program. There are references to "beach." The context makes clear that beach is California, particularly the Los Angeles area. There is reference to a warehouse in Anaheim we'll get to shortly. "Jumps" are what are referred to to get shipments across country and into Canada. But in particular here, the defendant -- Cheema is saying the defendant can help with this, he has a handler he can send to beach. That is someone who can help move the drugs, offload them in the Los Angeles area.

Habibi, this is the same group chat, asks: Brother all this is super HH.

Again, we've seen references to HH which the government contends refers to the quality of the narcotics. That's after Habibi sends many pictures of opened kilograms of what appear to be narcotics.

We did not include the -- we didn't stamp the underlying pictures as separate exhibits. If the Court wants them, we're happy to provide them. But I think the number thumbnails provide enough of an overview of the kinds of narcotics being discussed in this group chat.

Again, putting things in context from the Cheema

phone, there is a side chat on Threema between the defendant and Cheema asking if Frank have HH in the city.

Again, this is Gato in an intermediary role asking Cheema on behalf of Frank if there is HH or high quality cocaine available.

So again, this is additional information that puts the other evidence in context. It shows that contrary to the defendant's assertions at his plea colloquy and his sentencing submission, that he's not really a narcotics trafficker, that he didn't know what was in the Kansas City shipment until after the fact, that it was the source's drugs the whole time and he was just helping him out, the defendant has repeatedly engaged in narcotics trafficking and assisted others in narcotics trafficking, knowing what he was doing.

So I'll now turn to his role in the threats against the confidential source.

THE COURT: Do you have a sense, Mr. Shahabian, how long number 5 will take and whether it will be a good breaking point for lunch now?

MR. SHAHABIAN: I'd say this is about 15 to 20 minutes. I'm happy to take a break now if the Court would prefer or keep going.

THE COURT: Why don't we take a break now and we'll resume around 1:30.

MR. SHAHABIAN: Yes, your Honor.

(Recess)

THE COURT: Mr. Shahabian, you may resume whenever you're ready.

MR. SHAHABIAN: Thank you, your Honor.

Picking up where we left off at the break, your Honor, we're now transitioning to the defendant's role in the threats against the confidential source. As we discussed prior to the evidentiary hearing, there is an enhancement for this in the defendant's plea agreement.

But the reason this became a disputed issue is in part the PSR objections at pages 5 to 6, the defendant argued that he was merely passing along messages from others, specifically Frank and Robby Alkhalil using the alias Jefe, and he was not threatening the source for payment, but explaining to him the demands of others.

As we noted before we got to this point, we saw some texts about this, where the defendant told the source Frank looked you up online and that's how he got your information. This is just walking through the evidence that shows, as alleged in the PSR, not only did the defendant pass along threats from Frank and Robby Alkhalil, and he did so while positioning himself as trying to help out the confidential source. In fact, based on evidence the government obtained, the defendant was seeking the information about the source and his wife that were used by Frank to threaten him.

So, this is a Signal chat between the defendant and the confidential source from March 18 of 2022. The defendant says: Bro call me before you talk anymore to Jefe, you're making me look bad. And he includes that a screenshot of a text chain between Jefe, who is Robby Alkhalil, and the defendant, discussing the source's debt to Jefe. Are you kidding, the guy you gave this to is a bum. He's broke. What are you going to do? How you will sort this. This is all interest. I'm not accepting this.

This is Jefe expressing his displeasure at what the source is telling Jefe.

I want you and your buddy to stop telling me money coming any day and feed me a bunch of dreams. When will I have my money.

This is after the seizures of the Kansas City narcotics that gave rise to the drug debt owed to Frank and Jefe.

This is separately a portion of the chats between Jefe and the source directly, so not involving the defendant, from the next day March 19, 2022. Again going back and forth about when am I going to get paid and how am I going to get paid. Jefe says: You have zero access to funds basically. How am I going to get paid. Obviously not from you. I've been getting stories about mortgages and liquor stores.

The next day, March 20, 2022, and recall this time

frame this is the same time frame as the deliveries of cocaine and other narcotics to the New Jersey warehouse in March 2022.

So this is March 20. The defendant -- sorry, the source messages Frank: Hey Frank you will be getting next week by Wednesday, thank you.

Frank: Says how much.

The source says: Gato -- referring to the defendant -- will be passing on Wednesday.

Frank says: I don't talk on the phone. Just text.

This is a reference to the chats we discussed earlier in the context of the New Jersey warehouse discussion where one of the things the defendant does is tell the source message Frank and tell him you're putting together money to be dropped to him. So this is the backdrop for the threats that come. The source owes money to Frank, and to Jefe, they are asking him when they're going to get paid and how much.

After the seizures, we're jumping ahead to May of 2022, so approximately a month and a half. The defendant, using the No Parking alias, messages the confidential source a screenshot of a message between Frank and the defendant. So that's the inset box where the defendant is saying: Hey bro not yet I messaged him before I went to bed still no answer. And Frank is the white box here: Is that his wife? They found another address.

There are redactions here. We've provided the

unredacted versions to the defense. This is for the public record. Of course we can provide unredacted versions to the Court, but these are pictures of the source's wife's driver's license, real name, and address for her. They use both her real name and her nickname in the redacted portions of the chats between Frank and the defendant.

This is another screenshot of a message between Frank and the defendant that the defendant passes along to the source where Frank says: It's been three months and he's not a man of his word. I suggest you get out of there we're going to grab her.

And what is redacted is a photograph of the source's wife's driver's license picture.

The defendant passes these screenshots on to the source and says: Ignoring isn't going to fix this shit.

This is reference ignoring the debt you owe to Frank is not going to make this go away. Here are these threats.

We haven't included all of the chats between the source and the defendant in the PowerPoint, but they're available to the Court in the 500 series. This is from the same day, May 4, they're debating about who owes who money.

The defendant says: You're a big boy. You knew what you were getting into. It's your fuck up, you are going to pay the bill.

They're discussing the debts, Cheema said only 30,000

from his money, you said 200,000 you gave. The defendant says there is 25,000 owed to you, the rest was from the stuff that was lost. Frank's winz -- referring to the methamphetamine. He paid the others, not paying you to do the test.

So just to stop for a second. The implication of this text exchange and what the defendant contends he was doing is merely passing along threats from Frank to the source for money owed to Frank. And as we saw earlier, the information Frank obtained about the source about his wife, her driver's license photograph, real name, came from publicly available information.

The government seized a phone used by a man named Jacob Ross and searched that phone. Gave this information to the defense. This is a Signal message chain between the defendant again using that No Parking alias and Jacob Ross. This is from May 3, 2022. That is the day before the defendant passed along the threats from Frank to the source. And the day before, defendant is messaging Ross, I need -- that's the defendant's name or sorry, the source's name that's been redacted -- information, please home address and wife job address please. Keep it between you and me.

And what's redacted is a photograph of the source's driver's license that was provided by Jacob Ross to the defendant, as well as a photograph of his wife's driver's license.

THE COURT: Remind me again, is there information about who Jacob Ross is?

MR. SHAHABIAN: He is -- so we haven't gone into this in detail. He is referenced in various texts between the source and the defendant and recordings as Jacob and delivering money to Jacob to pay to Frank.

The government's contention is he is a money launderer who worked with both the defendant and the confidential source and obtained, received partial payment for the drug debt that the source owed at the direction of the defendant.

THE COURT: Thank you.

MR. SHAHABIAN: But for purposes of the Fatico and the evidentiary hearing, the importance of this information is it shows the defendant seeking the information that was used to threaten the source. His wife's photograph, their address, behind the back of the source and passing it off as actually threats from Frank that Frank obtained on his own, when in fact he is the one getting this information from Jacob Ross, and he presses Ross after he sends the driver's license information.

The defendant says: That's not where he lives now though. He's got a townhouse in BK. Later clarifies BK meaning Brooklyn.

Ross says: His wife's driver's license, that's where he lives, states -- it should be Staten -- Island as far as I know.

The defendant presses again: No, they have a mortgage at a townhouse. I've been there. It's in Brooklyn. I need the townhouse.

So's not merely passing along threats from Frank and acting as an honest go-between trying to protect the source. He's actually pushing for the information on the source and his wife that's being used to threaten him.

This continues throughout the time frame of the conspiracy. This is the next day, May 5, 2022, the defendant texts the source: Yo Jefe is back. Referring to Alkhalil.

May 18: Bro please arrange this paper to drop off these guys are asking me.

This is what I was just talking about, that the source in fact dropped the cash payment to Jacob Ross. This is June 28, at the bottom the defendant says: I thought your guy was doing it for you, you told me you was making a payment on the 14th. Over and over you're making me look like I'm full of shit and just covering you. You're starting to upset me.

July 1st: Bro, why are you taking so long. The same way you text me you can text Jacob or whoever told you the 14th. Now it's the 30th.

Again this is just repeated text messages where the defendant is pressing the source you got to continue to make payments, you owe these people money.

He's explaining where he can make payments, whether

that's through Jacob or a co-conspirator who goes by the alias Machi. You have to take care of the bill.

July 14, this is a screenshot of a message between the defendant and Jefe, Robby Alkhalil, where he says we want to see the sale paperwork, the offer to buy. We'll get to this in a second. This is about a potential sale of the source's liquor business to Alkhalil and his co-conspirators. But important here Alkhalil says: He's lying to you. Sick of this back and forth kill him or grab him or do something.

The defendant says: How do you want me to answer this? He is the intermediary to pass along the threats to the source. I'm just showing you what I'm dealing with.

So that's just an encapsulation of the defendant's role in not just merely passing along threats, but actively obtaining the information that was used to threaten the source.

So now I'll transition to the defendant's role in the Wolfpack Alliance. In his sentencing submission, the defendant argues that the information about the Wolfpack is extraneous, it's not related to the evidence in this case, it puts an unneeded sinister hue on the defendant, and is a penumbra of criminality that the Court should not consider in sentencing him.

We've started to set forth why this information is important, and I'm going to go through more of it, but the basics, especially as it relates to the 3553(a) factors, is the

defendant's role in this offense conduct is not limited to being a logistics coordinator for 400 kilograms of cocaine. As the Court can see from the messages between Virk and Cheema where they discuss this is Wolfpack, these guys are serious, follow the rules, this is part of a broader criminal organization in which the defendant played a significant role, that involved the co-conspirators in the charged conspiracy in many aspects of the conspiracy. Whether that was narcotics trafficking, whether that was the hitmen we are we're going to get to, whether that's laundering money, whether that's obtaining to find legitimate sources of income for Wolfpack members, such as the confidential source's liquor business for Robby Alkhalil. All of this is relevant under 3553(a) because it shows the defendant's role relative to other conspirators, and it shows the nature and seriousness of the offense conduct, as the Court considers an appropriate sentence for the defendant.

This isn't, just to be frank, I don't mean to minimize it. The Court saw how many drugs Virk and Cheema trafficked and the massive scope of just the drug trafficking part of this organization. But the government believes it is important context in situating the defendant's role to explain that this isn't just drug trafficking. This is a criminal enterprise that he was a part of, and the offense conduct here on behalf of that enterprise related to drug trafficking, but it is

situated in this broader context of everything that's happening at the same time.

So, as stated in the PSR, the defendant was a member of the Wolfpack Alliance. He was in close communication with its leader Robby Alkhalil. Part of his membership included formally welcoming Cheema into the Wolfpack during the time frame of the charged conspiracy, passing on messages from other Wolfpack members like Alkhalil who escaped prison during the time frame of the charged conspiracy, after he had been convicted of murder and narcotics offenses, and was again convicted of murder in absentia after his escape.

I mentioned this. I'll skip through it again. Just a reminder that both Cheema and Virk, serious drug traffickers themselves, discussed the defendant as a Wolfpack member and that Wolfpack were serious guys, follow the rules.

I omitted this from the PowerPoint but the Court can of course look at Government Exhibit 602-A which is the defendant sending the news article of Robby Alkhalil's escape from a Canadian prison to the confidential source. We also included the underlying article as an exhibit.

After sending the article of his escape, the source says: Wow. I read it. Felt like I just watched a movie. And he says I thought Jefe was Mexican. Meaning he thought that the person that the defendant was passing along messages to, Jefe, was -- as Jefe is a Spanish word, someone of Mexican

descent. The defendant responds: Na, same as me. Both the defendant and Robby Alkhalil are of Middle Eastern descent.

The source offers his assistance, he says: If buddy needs papers, we can do it. Passport, driver's license.

The defendant says: They have his face on Interpol already, they have facial recognition. He was caught in Greece before. He's laying low for now.

A few weeks later, the source follows up: Any luck from Jefe, his guy never hit me.

The defendant says: He's laying low to he's safe, zero contact.

The next day, the defendant follows up: Jefe's partner is going to reach out to you. They really want to put this liquor out there. I know nothing about it just talk to them and please help them if it can assist with the situation.

So, I'm going to try to speed through the liquor chats because there is a lot of them, and the important part of this is, again, the defendant is in direct communication with the leader of Wolfpack, Robby Alkhalil, who is now on the run and an international fugitive, but at the same time is coordinating the potential sale of the source's liquor business to Robby Alkhalil and his partners in order to satisfy the drug debts that the source owes to Robby Alkhalil and his co-conspirators.

And so this is the defendant, again, acting as a high-level intermediary, consigliere, however the Court wants

to describe it. But he's got his finger in every aspect of this international criminal organization.

It's noted even here, the defendant follows up: Did he message you?

The source says: Not yet.

He says: He will. He's in Asia. Some time difference so he's sleeping. He is the one that has the link to sell in Manila but Jefe said he wanted to get at least 500,000 back first before he helps you start making money.

So again, this is just part of the criminal organization, part of the different aspects of it. The defendant adds the source to a group chat involving other members of the conspiracy. This person with the three monkey emojis later changes his user name to Acab. It's actually a name that appears in connection with a hitman as well. These are all repeat players in this international crime world that the defendant is linking the source into.

They discuss variations of liquor distribution, what they can sell, how they sell it, the value of the business. This is August 2022. Defendant says: Please try to make something happen with these guys for the liquor bro or whatever they're trying to sell.

At the bottom he says: Tana -- that's a reference to Cheema -- and Jefe -- Robby Alkhalil -- sending someone in a few days. I want them to see you're legit. See the operation

you have. So we can get past the debts you owe.

This is one of the group chats that the defendant adds the source to where they're discussing whether the source can sell his liquor business to Cheema. And here is Dontana, a variation on this nickname Tana, and Robby Alkhalil.

Continuing to October 2022, this is another group chat with Ghost, Ghost is, again, another high-level member that we've seen in various chats, he was in the Kansas City coordination chats, he was referenced in some of the King chats between Cheema and King. And here he is introduced by the defendant as Robby Alkhalil's bro. He will arrange the shares in the source's liquor business and the defendant is connecting Ghost to the source.

Again, there are lots of these chats. I'm trying to be efficient. They've all been admitted into evidence and if the Court wants to review them, they're there.

THE COURT: Yes.

MR. SHAHABIAN: Here's Ghost passing on a very long chat that he says is from Jefe, from Robby Alkhalil. It says: I'm tired of all this back and forth. I'm expecting full cooperation.

In this chat the source asks the defendant: Ghost is Cheema's brother.

And the defendant says: No, it's Jefe -- that's Robby Alkhalil's -- manager.

Again, more pushing for documents related to the liquor business. So that's a summary of the liquor business and the defendant's role as an intermediary for high-level members of this organization in all aspects of its operations.

This is a screenshot from Cheema's phone of a text chain between Cheema and the defendant using the El Gato name from March. The screenshot is dated and the metadata March 9, 2022. The defendant says: Bros telling me he wants me to welcome you to the pack brother. Wolf emoji, wolf emoji, wolf emoji, muscle emoji. It's been a little time and discussion but today he told me it's time, so let me be the first to welcome to death my bro. Wolf emoji, muscle emoji, wolf emoji.

The government's contention is this is on behalf of Robby Alkhalil. There is no attribution in the chat, but certainly given the scope of the defendant's role, as I hope we're making clear to the Court, and the structure of the organization, someone formally inducting Cheema as a member of the Wolfpack is likely someone high up in the organization such as Robby Alkhalil, who we know was in contact with the defendant throughout the conspiracy.

This is just showing that the same El Gato avatar used in the New Jersey to Home or one of the Signal group chats that law enforcement obtained from mirroring the source's Signal chats is the same avatar in the screenshot for Cheema's phone.

So that's a broad overview of the defendant's role in

the Wolfpack organization and how it relates to the various aspects of not only the charged conspiracy, but his relationship with different members of the conspiracy.

I am now going to transition to one aspect in particular, which is his efforts to smuggle wanted Canadian assassins out of Canada.

So as alleged in the presentence report, the defendant enlisted both the confidential source and his co-defendant Christopher Burgos during the time frame of the charged conspiracy, April 2022, to gain their assistance in helping two Wolfpack affiliated hitmen evade Canadian law enforcement.

The the two hitmen, one is Gene Lahrkamp who was one of Canada's most wanted at the time. He was ex-Canadian military and had murdered a rival drug trafficker Jimi Sandhu in Thailand.

The other, Duncan Bailey, was on home detention in Canada in British Columbia pending his trial for conspiracy to commit murder in connection with an attempted murder of a rival drug trafficker named Mir Aaali Hussain in Vancouver. It says October 2022, I believe it should be 2021.

So this is the group chat with the hitmen called PP. It's from April 15, 2022. The defendant is using the variation of El Gato alias. He adds the confidential source.

Hey BK can you please arrange the PP -- as we'll see, it's a reference to passport -- for my bro Dave.

April 17 various members are added or removed or changed their aliases. The defendant is controlling who gets added. He removed MSG new. Adds Mr. Egan. Mr. Egan says hi.

There is discussion about what the passport could look like. American, Romanian, Moldova. The defendant says: Just get the R one. Also need you to get Guido -- referring to Burgos -- online. It says so we can arrange pick up in sea, Seattle, I've been messaging him but he hasn't answered.

This is April 18 the next day. The defendant is saying get Burgos online and in the group we need to make sure he's on time and ready for this week.

Mr. Egan says: We've got photographs. They're not taken by a passport place. It says they're in an e-mail. I can give you the login information for the photographs.

The next day, the defendant again follows up with the source directly and says add Chris, referring to Chris Burgos, to the group.

And here is the source adding Gorilla, which is the alias used by Burgos to the group chat. The source says: G I added.

Mr. Egan says: Hello Guido, referring to Burgos.

Burgos, using the Mario emoji again, says: What's up fellas.

The source says: I still need the pictures. Can I message you private with the information. The source says yes.

Mr. Egan asks: Guido are you good to pick us up soon. Burgos says yes.

This is a side chat between Mr. Egan and the confidential source where he provides two Proton Mail e-mail addresses and a password for those accounts. Proton Mail is a messaging service that's difficult for law enforcement to obtain information from.

This is the pics and information is in the draft. You can log in with the browser.

This is from a source report provided to the defense just confirming what's in the chats, that Habib wanted Burgos to go to Seattle to pick up two people, one of whom is in the Signal chat PP, and drive them to Los Angeles. Mr. Egan provided the login for two Proton addresses. The source logged in and took screenshots of the passport photos and passport information in those Proton accounts.

These are the photos that were in the proton accounts that were provided to the source. One is of Gene Lahrkamp, who at the time was Canada's number 2 most wanted. This is a photograph from the Proton account next to the official Canadian be on the lookout for Gene Lahrkamp. The other is of Duncan Bailey, that's the Proton picture next to a law enforcement sourced picture of Duncan Bailey.

Going back to the group chat, still April 19, and there is a discussion of the arrangements to meet. So, this is

Burgos saying: I have to wake up, give me the details. Mr. Egan says: We're going to get on the train and meet you. We may need to hike to get to a different location.

Again, we're summarizing, there are many, many chats which the Court is of course free to review, as they're discussing the logistics of Burgos picking up Mr. Egan and the other individual.

April 19: Whatever it costs we'll arrange for it. They say: Can we have someone in town on Friday. This is April 20. We'll just need pickup somewhere around Seattle. Details are a little fuzzy. But we need someone ready.

April 20 still, this is the defendant telling the confidential source: Please tell C -- Chris Burgos -- jump on the group. Just called him. What am I offering C for the ride? He needs to book hotels and rent the car.

And the defendant says 10K. $10,000.

This is the next day, the 21st. The source says: Can you please let Guido -- that's Burgos -- know on the pay because he needs to know how much the driver is making to let the driver know, plus he needs to book you all of the logistics.

Mr. Egan says: Gato -- that is the defendant -- will sort that out I think. Again, showing the defendant's role in arranging all of this.

Still April 21, again, just updates on the progress,

there is a code word, Last Man Standing.  There is going to be a new user, Jerry, will message Gato, the defendant, for arrangements and BK the source to the passports.

The next day, Jerry messages the confidential source using the code Last Man Standing.

A couple days later, April 24, the defendant removes Mr. Egan and adds Jerry.  Again, attempts to evade detection changing phones, changing user names.

That same day, the source messages Habib:  Let me know where to pick the paper up for Guido.  He asked me a bunch times that uncle needs with him.

The defendant says:  Ima get you to grab 10 from dreams.

This is discussion of the payment.  10, referring to $10,000.  Paper being the payment that the source is going to pass to Burgos for this job.

April 25 the next day, Jerry says:  All good bro. We're packed and ready to roll.  There are two of us.

April 26, Jerry provides an update:  The second driver at the halfway point is having issues getting a car.  Would the first guy be willing to go all the way if need be if the second driver can't show up.

The defendant responds:  Shouldn't be a problem bro.

Still April 26, Jerry says:  Ride no show.  Coming back tomorrow.

Burgos says: Okay, keep me posted. We'll extend our room for another night.

The next day April 27: We're waiting for someone to bring us east now. West is a bust. We tried it. These guys didn't work out.

Again, we omitted a lot of back and forth but basically there are several attempts to cross the border in western Canada that fail. This is Jerry saying it didn't work. Someone's going to bring us east now.

Again, Jerry confirming: We're canceled, west is a no go. We headed east. We'll need east now. Talk to Gato please. Talk to the defendant.

April 26, Acab sending a plane for us to go east. That's the three monkey emoji person we were discussing in the liquor chat. Again, showing the different conspirators operating at a high level. One of them is actually sending a plane to pick up the hitmen in Western Canada.

He said he will let us know if plane can come rush. Not trying to waste anyone's time.

In the meantime, the defendant and the confidential source have a side discussion about who these hitmen are. At least one of them, Mr. Lahrkamp, and what he did. The defendant says: The thing about chess my brother is there is no time. 10 years later, thought he was safe.

He sends him a news article which we've included as an

exhibit describing how Lahrkamp murdered Jimi Sandhu in Thailand. This is part of that article. After Sandhu had stabbed a rival gang leader to death in 2014, approximately 8 years prior.

So there is a discussion of who the hitmen are. The defendant adds details like apparently Lahrkamp would eat the ear of the first kill on each tour for good luck.

And the source says: Jimi, referring to Jimi Sandhu, seems like a nice dude. Canadian I'm sure.

The defendant says: He killed my bro's little brother.

So again, that's the context for the hitmen, that Jimi Sandhu had murdered a Wolfpack affiliated person in 2014 and fled. And 10 years later, approximately, he thought he was safe. And instead, Lahrkamp was dispatched to successfully assassinate him in Thailand.

The defendant asked: Do you still have the guy that can bring people from Montreal to New York City. Again, the plan is shifted from the West Coast crossing out of Canada to an East Coast crossing, and this is the defendant checking to see if he can make arrangements to bring the hitmen over the East Coast border between Canada and the United States.

The defendant says: They are getting dropped in New York City but I need buddy's uncle -- referring to Burgos -- to drive them back to Los Angeles.

Defendant says: I'll talk to Chris Burgos tomorrow, adjust the pay accordingly.

The source texts Burgos on the side: G -- the defendant -- going to reach out to you. He wants uncle to drive from New York to L.A.

Burgos says: With the boys? Referring to the hitmen.

Source says: Yes, everyone will be well compensated to discuss that with him.

This is April 28. That day, plane crashed in the Canadian wilderness, killing Lahrkamp and Duncan Bailey. The defendant sends that article to the confidential source and tells him leave the PP group, that's the group chat with the hitmen, ASAP, please. The source says they were on the flight. And it says, yeah, bro, I'm so upset. That's the two uncle was picking up.

This is the article. Four found dead after a small plane crashed in Ontario. It was the pilot, co-pilot, Lahrkamp and Duncan Bailey. This is just from the article that was sent.

Subsequent to that, the defendant and the source left the group with the hitmen.

So that's the portion of the defendant's role, not only in drug trafficking, not only in communicating threats from Wolfpack leadership and arranging other business activities for Wolfpack members, but also in enlisting

co-conspirators in the charged narcotics trafficking conspiracy and attempting to smuggle two wanted hitmen out of Canada.

Turning now to additional evidence of the defendant's obstruction in this court. This will be brief. This is just additional pieces of evidence referenced in the sentencing submission that we didn't fit in elsewhere.

So one, to the point of the defendant's continued role in narcotics trafficking, on March 18, 2022, he sent a screenshot of a note from his phone with what looks like a narcotics ledger referencing various people whose names have appeared throughout this presentation, such as Machi, Frank, Joker with amounts that appear to be owed. Again, showing his role in ongoing narcotics trafficking.

These are chats involving Machi who was referenced on a recording, between the defendant and the confidential source. Again, just additional evidence showing that the defendant's ongoing role in communicating and working with co-conspirators who are moving drugs like coke and fentanyl.

There is also a group chat. This is from Cheema's phone, three members: Cheema, the defendant using the Gato alias, and a person named Penny Winkle. This is from October of 2022.

You may recall when we were discussing the earlier drug trafficking evidence, we discussed setting up narcotics shipping in Los Angeles. The beach references. This is

another group chat from the same time period referencing beach. Cheema says: Gato when can we send your boy to handle in beach? Also can we put a warehouse in his name, I found one in Anaheim.

Again, this is context for beach referring to California, Gato being the defendant, a warehouse being used for narcotics trafficking, likely that has nothing to do with New Jersey or the confidential source, notwithstanding the defendant's attempts to minimize his conduct and shift blame to the source.

The defendant says: I'll hit him. Referring to the person they would put the warehouse's name in.

Cheema adds: Also anyone need a ride it's in beach right now for winz, etc.

Winz referring to methamphetamine. Making clear this is another chat about ongoing narcotics trafficking that does not involve the confidential source.

The last point, I don't want to spend a lot of time. I'm noting it because it was in our sentencing submission. The government doesn't have any additional evidence -- as the Court is aware, when we do defendant Cheema's Fatico hearing next week, there will be a lot of evidence about his use of cell phones in the MDC to arrange for shootings in the Toronto area. We are not contending that the defendant, that we can prove the defendant had involvement in that conduct.

But in providing contact information to his co-conspirators in Canada, Cheema also passed along not only a phone number for himself, but for the defendant using, again, the nickname Gato.

We know the defendant, Cheema, and Virk were all in the same unit. We know a contraband phone was taken from Virk's cell. I don't know there is much more to do with that, but I wanted to come back to that since it was in the government's sentencing submission.

So that concludes our presentation of the evidence. I think as I've interspersed at points, this is all relevant to the defendant's role in a large-scale, sophisticated, international criminal organization.

He's been convicted of trafficking approximately 400 kilograms of cocaine. He's pled guilty to that. But in fashioning the appropriate sentence for him, that is -- and I hesitate to use the metaphor tip of the iceberg, but it is one aspect of his ongoing high-level role in all parts of this criminal organization.

And as we'll set forth, whether the Court wants to do sentencing today, or in our sentencing submission, an appropriate sentence for the defendant should reflect his role in that conduct, not just in the 400 kilos that were seized.

THE COURT: Thank you.

Mr. Rezenstein, do you need a few minutes to set up

for whatever response you wish to make now?

MR. REZENSTEIN: No and yes. So, to answer that question now in more detail. What I have done as the government has addressed the Court, I've taken notes as to the various slides they've used. I had a chance to review at least half of that with my client over the lunch break, and I'm ready to address those. At least many of them. I won't say all of them. Point by point and give you our view.

I then have a submission significantly less pages than the government's perhaps, in the 50s, which will go much quicker. But if everyone needs a break, I can take a break or just bring my laptop up to the podium and start talking. However you feel.

THE COURT: In terms of the first part, do you have a sense of how long?

MR. REZENSTEIN: No, for two reasons. Because I have just been taking notes contemporaneously as they've been talking. So, when I do a submission, I time myself before I come to court, so I know what it's going to take. But this I don't know. But, it's not going to be every slide and it's not going to be as long.

THE COURT: Why don't we take a five-minute break and you can also set up anything else you want to set up for the subsequent presentation.

MR. REZENSTEIN: I can't do that.

THE COURT: You can't do both?

MR. REZENSTEIN: I need to take my laptop up there. When I do the subsequent one I need to bring it back here and connect to the Court.

THE COURT: Let's take a five-minute break.

MR. REZENSTEIN: I'd welcome that.

(Recess)

THE COURT: Go ahead, Mr. Rezenstein.

MR. REZENSTEIN: Good afternoon. Philip Rezenstein on behalf of Mr. Habib.

I will do two things this afternoon. I will respond to various slides and the arguments made.

Does the Court have a printout of the slides that were before individually?

THE COURT: I do not.

MR. REZENSTEIN: Because I'm going to make reference to them, and I obviously don't have the ability to bring them up nor do I think that would take too much time.

MR. SHAHABIAN: If I can approach, I have a copy.

THE COURT: You may.

MR. REZENSTEIN: I don't know if you brought your reading glasses. They're giving you the six per page.

MR. SHAHABIAN: If the Court would prefer --

THE COURT: I'll try this and let you know if it becomes difficult.

MR. REZENSTEIN: I'm older than everyone in the courtroom, so they gave me the one per page which I appreciate.

So I will just begin.

THE COURT: I think they're saying I'm old too.

MR. SHAHABIAN: Just in case, your Honor. Not a comment.

MR. REZENSTEIN: So, generally speaking, in terms of what our presentation is going to be in terms of our response to this evidence, there are some questions that arise, some things that we believe have a different interpretation which supports our view of Mr. Habib's role.

But to make clear that our discussion of his role is not minimizing his conduct, which the government keeps saying we're doing, because he pled guilty to involvement in a conspiracy with hundreds of kilos of drugs and an exceptionally high guideline range of -- I think it ended up being level 33 and well over a decade and approaching two decades in prison. So, we're not seeking to minimize his role because he pled guilty to it. If we were going to minimize his role and say he had little or no involvement, we would have tried the case.

What we are saying is, though, for purposes of sentencing, his role should be placed into context and that's where I think the disagreement arises.

So one of the things that we feel is an important question to keep in mind is why is there significant discussion

of the parties seeking money from the confidential informant if these aren't his deals. If he's a role player, if he's someone who is minimally involved, why is not his response, hey, it's your deal, guys, not mine. But that's not what happens. And that's why, for example, in my presentation, when we get to the point of the sale of the liquor store, which was the confidential informant's business and something he was agreeing to doing, and there is a whole lot -- as counsel said, a whole lot of discussion of that going back and forth, he's readily agreeing to do this and he's readily agreeing to do this because he's readily agreeing he owes the money. And he's readily agreeing he owes the money because he's involved in this because it's his deal.

And the reason why we know that, this will be again in my presentation, but it is important to keep this as an overview, is because this case didn't arise out of a vacuum. Michael Habib knew the confidential informant, met him through his mother, and established a friendship with him that included at one point a family member of the informant living with Mr. Habib to work on sobriety in Miami.

Out of that friendship arose a business, and the government has the text messages that they've provided us with individuals that have not been brought before the Court, but people like Sailor Moon, and I think Machi, in which the confidential informant along with Mr. Habib, which he's never

denied, were buying and selling Canadian marijuana. It actually arises from Mr. Habib's sharing Canadian marijuana with them in New York and them saying this is good stuff, how can I get it.

And from that relationship the confidential informant ends up owing $90,000 to one of the participants, not Mr. Habib, from the marijuana deals, and then he approaches Mr. Habib and says I need to make more money. And that begets Kansas City and Kansas City gets seized, and Kansas City begets New Jersey, and Mr. Habib pleads guilty.

Now, we've never received discovery on the confidential informant's plea agreement, when he became an informant, what the parameters of this were. But, it is by process of elimination, and I'm not 100 percent sure, they can correct me if I'm wrong, some time after the Kansas City shipment, but some time clearly before New Jersey, because by the time New Jersey is seized, he's clearly on board, the polices are seizing vehicles, they're switching out drugs.

And that will lead us to one big question that I have and I'm going to move forward now into the discussion of the slides. But again, one of the final things that I say is if this is Mr. Habib's deal, he's the kind of individual that they claim he is, then based on all of our collective experience in criminal law, I'm not seeing -- and I've said this in my objections and I have said this to the government -- the kinds

of things we usually see with somebody who is in control of the deal and it's their deal. Discussions of weight and price and sale and payment. The kinds of intimate conversations on chats that they think are protected that drug dealers do. With regard to Mr. Habib, almost completely that's not there. Certainly I believe for Kansas City and New Jersey.

So that being said, the first set of government slides which start early on and say New Jersey narcotics, and I'm looking at slide number 8, all of this is March 16, and Mr. Habib is indicted for crimes that occurred on March 18.

This is why I raise the question of when did the confidential informant become a confidential informant. Because on slide 8, Brad Pitt, which is the name of the confidential informant, is going to send pics of the total amount of boxes. And then on slides 8 and 9 and 10, there is this discussion of these boxes and it is all on March 16. And from everything that I can piece together, these boxes of drugs arrived in New Jersey at the warehouse, there was a significant amount of methamphetamine, and left the New Jersey warehouse and that drug deal was completed.

To this day, I have a question that maybe the government would want to address, is what happened with that? Did the confidential informant not tell law enforcement about these drugs? Because this March 16 discussion about boxes is not the same amount that was seized. Did he lie? Did he just

not tell the police when he was cooperating? It can't be that he cooperated on March 17, because the seizure is on March 18 I believe and it is just too soon. So, it is very puzzling to me as to what's going on with the March 16 shipment, but, and discussion, but all the way through slide -- I have it in my notes here, but up to in fact the government says at one point the March 16 was not seized by law enforcement. They said that in their presentation to you. And that's the question that I've always had arose, when did he become an informant and what happened to those drugs? Was he not the telling the truth?

If he lied to law enforcement and hid that shipment because he wanted to make money, that's *Brady* that we would demand to have that disclosed to us. That's just not clear.

But up through the government's slide of 22, Habib adds Burgos to the Signal chat, that's still March 16. That's still talking about a shipment that's uncharged.

And now on March -- on slide 23, they have Burgos' role in the March 18 which is the indictment. But even after that, on slides 24 and 25, they're still talking box was damaged when we received it. FYI. That's from Guido, which is Burgos. So that's the shipment that arrived at the warehouse that they haven't accounted for and it is not the shipment that my client is indicted for.

Now on slide 27, we get to one of the reasons why Michael Habib is here. Because on slide 27, people are added.

Guido, Chris Burgos is added, and Michael sends a text: Please, guys, can we give him a rough schedule so we can have the guys ready on standby.

I referenced in my pleadings, maybe I said one text, there is a couple of texts that show Mr. Habib's involvement in this conspiracy and asking for the schedule, and there is another message about talking about getting ready to get this done and there is something coming in tonight.

He's accepted his responsibility for that. That's his knowledge that this was going on in New Jersey. And as we said, this is because the first deal in Kansas City, which we'll get to, was again the confidential informant's. And as my submission is going to show to you, he's right in the middle of vouching for the confidential informant. And that's going to be very clear. But not from the government's submission.

Now, there is a slide, though, however, slide 29, in which Mr. Habib says: Hey bro, can you please message Frank and just tell him you're putting together Monday and Tuesday should be ready to pass files, 70 to 100. I am going to put in also.

Now, we agree that files, 70 to 100, is talking about 70 to $100,000. Frank has been described by the government and we don't disagree as the owners of this narcotics.

And this is showing a couple of things. It's showing that the confidential informant is not going through Michael

Habib as they would, as the government would have, that Mr. Habib is organizing everything and manipulating the confidential informant.

It is showing the confidential informant, and I am assuming they have his phone, they arrested him, has direct contact with Frank, and is preparing to pay Frank, because this is in March 20, slide 29, after the seizure in Kansas City. And Michael Habib says I'm going to put in also. Again, the answer as to why he's doing that is because he is in fact sticking up, having vouched for the confidential informant. Again, not in their submission, but it will be in ours.

Moving forward.

We agree again that the government's submission and slides that show after, well, first of all, 31 looks like we need to get that fork truck again and the pump truck, yes. That's why Mr. Habib has pled guilty to his involvement in this. He did know what was going on. He's involved in that conspiracy. When the shipment is seized and things go bad, Mr. Habib is part of that as well.

I appreciate the government saying, because it wasn't clear at first, but they did agree with me and they corrected it and they've always stood up and said the truth, which is when the shipment was stopped by the police, the informant sent a picture to Mr. Habib. And then Mr. Habib sent the picture out to the rest of the group. Once again, demonstrating his

involvement in this conspiracy.

And again, showing that he has not minimized his role by pleading guilty.

The next thing that occurs that I think is significant is what the government portrays as threats to Joker, who is Mr. Virk. Mr. Habib, the deal's gone bad by slides 32, 33, 34, there has been a stop. My client says on 34: If you guys want to link up, no problem. We agree that means a meeting to discuss this. Joker says I'll let you guys know how to link up.

Now, it seems like a non sequitur on 34 because the reply that is attributed to El Gato: You should know who you're telling to be alert. I can leave now if you want.

It's not really in a reply to Joker, as near as I can see, which says "I'll let you guys know how to link up." But the final part of this is "I can leave now if you want."

It can't possibly be a threat by Mr. Habib. He's merely saying I can meet, he is saying you should know who you're talking to. Which people say all the time, from bar fights in the streets to all sorts of disputes between everybody and lawyers even I see it. You should know who you're talking to. That's a common phrase. That's not unique to somebody demonstrating that he's in an international crime organization.

And then in response to that, at some point on

slide 35, there is a text attributable, and we don't disagree to Mr. Habib, letting Joker, Virk, know in fact that they know who he is. And then the threats start because Joker says get the fuck off.

Then it looks like a repeat on slide 36 where El Gato says, you know, who you telling to be alert, I can leave now if you want. Joker is replying to that, says do whatever you want. And now the threat comes.

And just so it's clear, because I don't know if the government was clear about this. Maybe I heard it wrong. Joker says but tell your family to be safe you fucking jerk.

The only threat that I see to someone or their family is by Mr. Virk. Joker.

Moving forward.

THE COURT: You don't think posting the driver's license of Mr. Virk was a threat?

MR. REZENSTEIN: I think it certainly escalated the issue. I think that somehow it appears to me there is just more going on here, because in the government's prior slide, prior couple of slides, starting on 33, there is a discussion between the parties, not sure who is driving, this is King, Joker says where's Brad. Mr. Habib says he's getting away from there, the warehouse is in his name also. Which is I think an important issue.

And again, my client is then saying let's meet. And

the next thing he says, you know who you should be telling to be alert. Something has caused my client to say that. And yes, I think there is an escalation saying we certainly know who you are. But I don't know that I consider that a direct threat to Mr. Virk. It's certainly not a threat to his family, and to bring innocent people into this, Mr. Virk is the one who escalates that.

But again, there's lots of things that I wish hadn't occurred here and lots of things Mr. Habib has accepted responsibility.

The government's citation to my arguments to the Court is something about, again, my client's role that I will address more in detail in my submission.

So now the government includes on slide 39 a statement from the plea after the first shipment that he got involved with went missing in Kansas City. He was held responsible for it or they were pointing the finger at him. This is my client speaking.

"So I was kind of sticking, I was sticking up for him. And I advised him, like, you got to make it right. Like, talk to the people, you are in the same contact with them."

All of that is supported by the evidence. It is supported by the slides I just showed you that showed that the confidential source had contact with Frank, and we'll show you he had contact with other people. That Mr. Habib in fact was

sticking up for him and that Mr. Habib is telling the source you got to make it right, and the source is agreeing I have to make it right. Nobody said to Virk to make it right. Nobody said to Mr. Burgos to make it right. Nobody said to the myriad of other people involved in this to make it right. It was to the person who arranged the deal to make it right. The source.

And therein lies our significant differences between the government and the defense on how we see the parties in this case.

And again, on page on slide 41 where my client speaks, the Court says: Did you know what those shipments?

I knew after the fact of the first one was, like, what's happening, do you know what I mean. But I didn't know that he was more or less going to keep continuing doing that. I told him basically, like, make it right. Whether you got to make payments or work it off. He was essentially going to be selling his company. Which the evidence supports. To pay off the thing. But I guess I was the one that introduced him to the people. That I guess involves me in the conspiracy.

And that is exactly what we think the evidence and his role here shows, and then that bring us to the polygraph. The polygraph is not evidence of some sort of sinister actions or involvement of Mr. Habib. It is an attempt to allay the accusations and fears of the owners of this drugs, who were not Mr. Habib, because the Court has seen texts where Mr. Habib

says they are accusing me, they are accusing you. The way to resolve this is let's all do a polygraph.

And again, in other submissions that I will give to the Court later today, there is clear evidence of Mr. Habib sticking up and vouching for the informant. So the issues of this polygraph is that even Mr. Habib is under the gun here. Which also contraindicates the government's argument that he's some high level in the Wolfpack.

Slide 45, Gato, Mr. Habib: That's great. But it still has no effect on their theory, bros, only way we can put this to bed is to poly.

What's the theory? The theory is he is as much potentially involved in stealing the drugs as anyone else.

We all, I have to do it, King has to have the driver do it. To Tana, we all have to. I am just waiting on the day.

They're all under suspicion. How is the best friend of Jefe, the person who is higher up in this organization as being accused of being a master manipulator, having to take this polygraph. Unless they're saying this was all a lie, which I haven't heard them say at this point.

And I am on slide 47. They're pointing fingers at you, then it is the same as me. Right now they're pointing at me. The way the test works is they hook you up and ask you questions and the answer is true, it doesn't move. False, it bounces.

The polygraph is not evidence that should be used to enhance Mr. Habib's sentence. It is evidence that in fact supports his theory of his involvement, not our theory, our assertion of what the facts show.

Just one point and I don't know how much of this is in the record, but I'm on slide 51, the blue is my understanding the confidential informant. And he says he's talking about doing the polygraph, there are cameras everyone, the guys who do this shit are ex-cops. Sir, did you know what was in the boxes? Yes, cocaine.

That's the confidential informant talking about the fact that he knew what was in these boxes that were seized. There may have been some point where the government informed the Court that the informant did not know, that he was just involved in a peripheral part of this case. But this is clear evidence that he knows what's involved, he knows what are in these boxes, because in fact this is his deal.

So I'm pausing but I'm also skipping slides to move this along.

Now, there's an issue that arose I think or some contention about who's involved in obtaining drivers in the case. And this person Dre is someone who apparently arranges for drivers, and the evidence shows that the confidential informant is doing that. He's in blue on slide 61.

Then Dre gave me the wrong guys, this is the info I

got on the guys that got booked, meaning the people that were arrested in Kansas City. Michael Habib says they're 25 years old. The informant says age has nothing to do with it. Mr. Habib says he's told me he's been dealing with them for years. You have to understand these guys don't forget anything you tell them, even keep screenshots. That's what Dre side.

That shows that the confidential informant is arranging for the drivers through Dre and through transportation in this matter.

Now, in my submission, there is a part where the confidential informant says in a chat to Mr. Habib, you told me to get -- let me skip back because I want to get it right and I'll bring it up in my submission.

In 62 through 64 -- on 63 Mr. Habib says to the informant, it's been three months and look at what they dropped in one week. Two back to back. You think people funny give a third time.

What's he saying there? He's saying to the informant, you've done two deals and they've both been seized. You think they are going to give you a third chance?

That's something that is said to the person who is behind this deal, who is organizing this deal, who has asked for this deal. you did two deals and both got seized. You think they are going to give you a third chance. That's what the evidence shows. Which is why, again, we claim this is the

informant's deal.

Now, on 66, Mr. Habib slide 66 says to the informant: I'm telling you, bro, I tried to help, I tried to buy time.

There is significant other text messages that we'll show the Court that shows that's exactly what he did. Mr. Habib says I asked him how he found your info. He said he's been looking into it since the 400 and he also said the way this guy looked you up is all over the internet.

Why is the people behind this deal looking at the informant if it's Mr. Habib's deal? How is it some sort of, I don't know, are they saying it is some sort of scam where Mr. Habib is working with these high-level people, one of them who is in prison, the informant is doing almost nothing, the loads get caught, and they somehow run some sort of scam to convince the informant he's the one responsible. That's the the only way this really fits within the government's theory is that with everybody looking at the informant to pay this money back, several hundred thousand dollars and the informant agreeing to do so, that's what doesn't fit within the role of the individuals here.

The government's argument that he's the minimal participant and it is Mr. Habib's deal. And again, when there is a discussion and they have transcripts of a conversation between Mr. Habib and the informant on 67 and 68 and Mr. Habib is talking about Mr. Alkhalil who is in prison and had a phone

and then got in solitary and got back out and since escaped, and Mr. Habib's talking about Mr. Alkhalil being tripping and being upset, why, again, are all of these people looking to this person? I think by this point, I don't need to keep beating this point. The answer is obvious.

Okay. That brings me back to my disagreement and argument against the government on slides where they list my arguments. My objections to the PSR, my objections still stand. The March 2nd shipment was arranged by the C.S. by the confidential informant. And again, that's what Mr. Habib tells the Court on slide 73.

At the beginning, this is what I referenced when I start addressing the Court. I introduced the confidential informant to one of my friends that I knew was bringing marijuana to New York. And in the early part of 2022, he approached me, and by "he" meaning the confidential informant asking to make more money to transport throughout the United States. And I connected him with somebody that was doing transportation.

Now it all really begins to fit when you look at it from our point of view. He gets involved in the marijuana business. We'll show you that went south. We'll show you that he approached Mr. Habib and that he asked to make more money because he owes money.

We've never said Mr. Habib doesn't know these people.

That's why the informant went to him. And you will see that there is one audio statement in which Mr. Habib clearly says when we change -- something along the lines of when we change, when we decided to go outside of what we normally do, which is marijuana, this all went south. This is not him minimizing his role. It's explaining his role.

So in Kansas City, the shipment that the government references chats from, which is now the first one. And to be clear again, the drugs are out in Los Angeles, and they're coming I think to New Jersey, but they get stopped in Kansas City. Ghost, Gato is your guy here. Your guy. The guy that Michael introduced at his request to the people in California. Because this guy, the confidential informant, wanted to get and make more money.

Now, Michael's response is here were. Government claims it's we're here. I think it is equally interpretable as here where. Like where do you mean. I don't know how relevant this is.

What happens next is very relevant. Page 76. Ghost please pass the pickup address so Joker can give to his driver. Okay. What's the next thing that happens? El Gato adds Brad Pitt who is the confidential informant. Why? It's his deal.

Drug deals you don't bring more people into it, you keep more people out of it. When Ghost asks for addresses, Michael doesn't say the address. He brings in Brad Pitt.

Page 77, Ghost don't have it, Brad do you have it? Brad: Yes, I got the addy, meaning address for pickup and dropoff. Why? Pickup and dropoff. It's his deal.

Gato says send the address and the number please. And call him and let him know that someone will be by this evening to pick it up.

And then Brad Pitt on 79, he sends out the address which I won't read into the record. The Court has it. But it's in someplace in California.

What happens next on 80 is not really involved and then this back and forth between Cheema and Virk about do you know who Michael Habib is and WP and they're serious people. That's Cheema talking. I'll have more to say about Wolfpack in my presentation.

And then the Threema chats that were received from Michael Habib's phone that are in November of '22, I've seen these recently. Again just to be clear, the government and I conferred and they made every effort to alert me to what they were going to use, but chats 92 or 93 through 102 at least have nothing to do with Michael Habib as to whatever's going on with these deals out there.

I want to now address the allegations of threats involving the confidential informant or to the confidential informant. It begins on government's pages 124 and I will tell the Court very clearly we have an absolutely different take on

this than the government has.

Mr. Habib had been friends with the informant, was introduced to him by his mother. He knew his family. So, when there is information that the government has about Mr. Habib apparently trying to obtain addresses, I certainly understand how they can look at it one way. But there is two parts to this. Number 1 in their submission to the Court there are things they didn't show the Court that are in the texts that I will raise, and number 2 there is another explanation for this.

So the first thing is on 125, is slide 125 is Mr. Habib says: Bro, call me before you talk any more to Jefe. You're making me look like a retard. Why is that important? Confidential informant's talking to Jefe, the person Michael Habib introduced him to. If Michael Habib is a high-ranking member, why introduce somebody who is a bit player to Jefe, unless this is the informant's deal with Jefe.

Now, there is then problems between the informant and Jefe. And Mr. Habib is in fact communicating this. But the government would have you believe he's just communicating it as a way of perhaps surreptitiously or threatening him somehow. But, if you look, but to now explain the context of this information that is discussed on page 128 under Jefe's texts, which I believe the government says is chats between Jefe and CS-1, bro, this is Jefe what happened to the 7 to 900K. You have zero access to funds, basically, no houses, cars,

businesses. Doesn't seem like you are going to give any more money. How am I going to get paid? Obviously not from you. I've been getting stories about mortgages and liquor stores.

That becomes very significant as to what happens next. I've explained the liquor store issue which again is them seeking their money from the person who is involved.

But Jefe says I've been getting stories about mortgages.

Why is that significant? Let me catch up and I'll explain to the Court.

The next thing that happens is there is on 132, there is the picture that's been redacted. No problem with that. And this is a screenshot that Michael Habib sends to the informant. Between it is a screenshot of him speaking with Frank, and Frank says apparently to Mr. Habib it's been three months and he's not a man of his word. I suggest you get out of there. We're going to grab her. And there is a picture that's been redacted.

What the government didn't read, which I will read to you now, which we have in our submission, is the bottom part of that, which is Mr. Habib responding to Frank. The informant's not involved. If Mr. Habib is pulling some sort of scam, this is Mr. Habib talking to Frank. Just please, bro, give me until the afternoon to try and reach him. Hopefully he's got -- and then I've got the rest of it in my submission, I don't recall

it. But this is Mr. Habib responding to the person who is threatening apparently the informant and his wife. And what is he saying? Give me time. I vouched for him. It's not in there, but I'm saying this. I will speak with him.

He's not involved in threatening the informant. I'm not saying the other people are, but he's not involved in threatening the informant. Unless you jump to some sort of conclusion that him and Frank are playing a game, they're creating this text for Mr. Habib to send to the informant and I just don't think that's the case.

Again on page 133, I'm sorry. That's not what I wanted to get. Let me skip that.

On 135 we now have the appearance of Mr. Jacob Ross. It's my understanding, and the government can correct me if I'm wrong, they said Mr. Ross is a money launderer for Mr. Habib. My understanding is he is a mortgage broker, and that now places everything into context with what's going on with the relationship and the addresses.

So when there is a discussion about addresses, it's for the purposes of answering Jefe's statement about what about houses, what about mortgages, what about liquor stores. Because he's in the middle and because he's vouched for somebody, he's now saying let's get the addresses for purposes of mortgage.

137. No, they have a mortgage at a townhouse. I've

been there. It's in Brooklyn.

He's been there. He doesn't need to find out the address. He's been there. I need the townhouse in Brooklyn. For what purpose? Why is he talking to a mortgage broker about an address for somebody when he's telling Frank don't grab her, give me time. And when Jefe is asking about being paid back. Because Mr. Ross is a mortgage broker. He's not threatening his friend.

I will discuss that more again in my submission.

And again, now when we get to this page 140, in the texts, over and over you're making me look like I'm full of shit. My sense is to the people Michael is vouching the informant for. You think this is going away? You're starting to upset me and think this whole ordeal is a joke.

He is upset. He said what hotel are you staying at in Istanbul? There was a conversation about traveling and I think Mr. Habib was saying if you've got money for this, why aren't you working to pay them back.

And then he is says on 141, you're taking too long. The same way you text me, you can text Jacob. Whoever told you the 14th is now the 30th.

Why is Mr. Habib talking to the informant about texting Jacob? Jacob's now involved in this. If Jacob was somebody who just Mr. Habib was using to get the address of a house he's been to, this makes no sense. But if Jacob is being

brought in because he is a mortgage broker, and this man owes money for a drug deal and he is supposed to be selling his liquor store, he's not also supposed to be getting mortgages on houses. That's Mr. Habib's role in this. This is not threatening to kill the CSI.

Very briefly to talk about the Wolfpack. Saying that Mr. Habib is a member of the Wolfpack I don't think meets the standard even for a preponderance of evidence or for admissibility. I think it travels down a very dangerous path here, which is in my objection to the PSR and my sentencing memorandum.

I cited to the Court extraneous sources in a book on the Wolfpack. As near as I can tell, Mr. Habib is not mentioned. The government has talked all along about a criminal enterprise and an international criminal enterprise. I don't see evidence that's come before this Court to meet standards even for sentencing and a Fatico hearing, not a preponderance of evidence.

They hear Mr. Alkhalil is a member of the Wolfpack. I don't know there has been any evidence of that. But assuming that this is some sort of criminal organization, I feel that it has really nothing to do with why he's here. And their characterization of him as being so high up in the Wolfpack and yet he is being accused of stealing drugs, they can't have it both ways.

The slides that start on 156 involving the liquor store is something, again, I will deal with in my presentation to the Court.

When the government read to the Court I believe portions of slide 159, which is Habib's, they talk about Habib's role in the Wolfpack, they omitted the full statement that Mr. Habib said in the bottom of 159 which again supports our argument as to his role. Tana, who is Cheema, and Jefe sending someone in a few days, now that's to look at the liquor store. I think the government would agree there was a lot of texts about the liquor store they didn't include, and I have no problem with that. But they're sending someone in a few days, I will say, and they can correct me if I am wrong, about the liquor store. Just be yourself. I want them to see you're legit. I want them to see the type of person you are.

Why does he say that? He's known him for years and your operation. They and your operation. The have really been up my ass. I'm really hoping we can get past this and get back to earning.

That's him telling the informant the deal with these people and to show them for the person that he thought he knew that informant was.

As to Canadian hitmen, what I will say to the Court is I think I heard the government say that Mr. Habib asks the informant to procure false passports. In the rather large

mountain of papers I have on my desk, I do remember seeing, and the government can correct me and I will have to supply this by separate submission, that it is in fact the informant who offers initially to procure false passports. And as near as I can tell, of all people on earth, why would Mr. Habib go to the informant and say can you do false passports. That is kind of a specialized skill. And especially in New York, I guess, or anywhere in the world, there are lots and lots of people who maybe do that kind of illegal activity.

So I disagree with the government's assertion it is Habib that brings the informant into this. It is in fact the informant who puts himself into this as somebody who can do this.

We disagree that Mr. Habib was involved in bringing the informants into the United States. We do agree that he was involved -- I'm sorry. Not the informants. The hitmen. We do agree that once the informants were coming into the United States, he participated in a chat with the informant with Chris Burgos and apparently Mr. Burgos' uncle about them assisting the hitmen when they crossed the border and with respect in the United States and providing transportation. That's his role in this. But we don't feel that is exceptionally relevant to being sentenced.

With all that being said, it's 3:20. If I can have a break and a drink of water and make sure my PowerPoint is ready

to go. It will be either as long as I've spoken or shorter.

THE COURT: Let me ask one question. Part of the arguments that you just made challenge whether Mr. Habib was involved in threats against the C.S.

MR. REZENSTEIN: Yes.

THE COURT: What is the basis for the enhancement then in the plea agreement?

MR. REZENSTEIN: That's an interesting question. And part of our agreement then to that -- may I pause for a moment? I need to speak with my client.

THE COURT: You may.

(Defendant conferring with his counsel)

MR. REZENSTEIN: Okay, Judge. From my point of view and in the helicopter view of all of this, there was a lot of back and forth between myself and the government. There was some good and bad to this. That was a tough one to swallow.

I understood from reading the text messages their view of what was occurring, and I fundamentally disagreed with it and my client knew that. But, they certainly I can't say didn't have a basis for it based on what they were seeing.

So, we were at a point where I believe we had a hearing scheduled before the Court, that there was a lockdown in the jail, and I was able to see him with about two days beforehand, meaning Mr. Habib, and we went over all of this. And I said to him the good and the bad. That was really bad

for a whole lot of reasons. It affected his status points, where he would serve, it was a tough one to swallow.

But there were other things the government was offering, we went back and forth on it. At the end of the day, he agreed to accept it.

It is probably the one that bothers me the most, and if the Court wanted to make an inquiry of my client, go right ahead. And that's why I can't challenge the guideline calculation and I haven't, that was our agreement, but I can say it is not a reason under 3553(a) to go higher. Because I do think there is enough in the record there for that plea to occur on that basis.

THE COURT: Thank you. You said about five minutes?

MR. REZENSTEIN: I drank the water. Your staff has been so great helping me make sure my computer works.

THE COURT: We'll take a 10-minute break.

(Recess)

THE COURT: You may resume.

MR. REZENSTEIN: Thank you, Judge. A couple of things. I was with the help of your staff, I was able to quickly review this, so there are things I am going to skip over because I know you have addressed them now in full. Number 1. Number 2, there will be a point where I ask to turn this off because I do have a slide that's not redacted that I agree should be, but I need to read from it, but I've arranged

with your courtroom deputy. And number 4, I'm sorry I don't is have a copy of this. I will e-mail it to your chambers if you need it.

THE COURT: We actually just made a copy of the deck so we should be okay.

MR. REZENSTEIN: It is not the deck. That's just my exhibits. But I'm going to give you my explanation for it. As way of explanation, I'm the visiting team here being on the road. I didn't have a chance to print it out.

THE COURT: That's fine.

MR. REZENSTEIN: As I said, it's really part of our theme here that he stands before the Court to be sentenced for his actions, and not things that we believe to be extraneous. What you will see from our presentation and documents that the government has given us in discovery that Mr. Habib continually said to the informant, this is the mess you got us into. Which is why we say this is how it happened with the informant approaching him.

So, now, there's a text that is sent in May, after the seizure, I'm not leaving you hanging, I put my hard earned paper. Meaning he's paying for the informant. Mistakes to try and buy you time. But you knew what you were getting into. I told you and you agreed to it. It's your fuck up and you're going to pay your bill so fix it.

Why is that happening for somebody who is not

involved? Now we've discussed this one. So I will skip it where Michael says I'm going to put in also, and I think we've discussed this where Michael says over and over again you're making me look like I'm full of shit and just covering to you buy time.

But this wasn't brought out and this was a text in June and Michael says to the informant, you have no idea how much I put my head out for you and how much I vouch for you.

If you're not planning on taking care of this mess you got us into, just say it.

Why does he use that phrase "you got us into?" Because the informant is the one who approached Michael and said this is what I want to do, and Michael said I'll make the introductions.

So again, why is the sale of the liquor store important? Why is the informant agreeing to sell the liquor store for the deal and seizure that the government says Habib is responsible for?

And Michael texts to the informant, please help them if I can assist in this situation. He is again being someone who is vouching for the informant. And he says, again, a pic of the e-mail so I can show these guys you are not bullshitting. That's a discussion about there is a sale of the liquor store and there is contracts going back and forth. And apparently, I believe at this point, the informant is working

for the government so he doesn't want -- he is not really doing any of this. But he is saying he is doing it.

So Michael is saying please send me a pic of this e-mail so I can show them. Michael says I want them to see you're legit. I want them to see the type of person you are. And I'll add the type of person he had known the informant to be through his years of dealing with him. I can only tell them what you tell me, is Michael speaking to the informant again, just showing how he has placed himself in the position of vouching for him.

And again for the Canadian hitmen, Michael should be judged on what he pled guilty to. I have a little bit of a different take here on something. This is what the government provided in discovery, and there is an e-mail or text message back and forth. The government referenced this a different way. What the text message shows is Michael is speaking about the person in Thailand who was killed. He killed my bro's little brother. I don't see anything about member of Wolfpack or anything else. Killed my brother's little brother.

And I think they make much of the fact that he's angry about this person being killed and he's celebrating the fact that the person in Thailand was murdered. And as I said, his involvement was in arranging transportation for the people who were dropped into the United States.

But I want to talk for a moment about what the Court

should make of Mr. Habib's admitted celebration over the death of someone in Thailand who killed his friend's little brother.

I don't think it is a reason for the Court to enhance his sentence. In our life, in our recorded history as people, as human beings, I would argue to the Court that the thirst for vengeance is something that's timeless, that's classic. It is in the epic of Homer; it is in the tale of Hamlet. Eyes being sacrificed are referenced in our Bible. It is as contemporary as the story of Don Corleone in *The Godfather*, and as recent as the death of Osama bin Laden or what's occurring now in the tragedy in the Middle East.

These feelings of being happy for them dying, they're ageless, they're normal. But they're irrelevant for this Court in considering sentencing Michael Habib.

The government didn't show this to you. I showed this to you. This text. Because what happened hurt him and his response was very human.

Now, assisting with Canadian people coming over the border and hiding, it is an illegal act. I didn't say it's not. But I felt the government may show this and they didn't, but I wanted to address it because I do apologize and he should apologize and will to the Court about his involvement in helping those people evade justice. But I don't think he apologizes for his expressed happiness that somebody who killed one of his friends died.

So with regard to the New Jersey shipment, again, I can move quickly over this. This is Michael's involvement in the conspiracy. Something's going to come in tonight, please give him a rough schedule. He knew this.

This, though, I think is important. There is a text here by the informant on May 4, and it says: You asked me for a driver and I found you one.

This is what I was talking about earlier when I said we have a disagreement. And I think it's trying to create, I think and I don't know, but it is my argument that what this appears to me to be is law enforcement telling the informant, who is clearly an informant in May, of bringing in facts that don't really support Michael's involvement in the case.

Because the government's slide 57, the informant -- Michael says, if you would have told me from the beginning it was Dre's ride. And the informant said it wasn't. And Michael says it was just no. And the informant says it wasn't. Do you remember what happened at the last minute we needed a driver and I went to Dre.

I don't think that that conversation supports this text message. I think this text message is them trying to say that Michael goes to him and says for my deal I need drivers. I don't think that that's what really the evidence shows here.

And I skip this. I have dealt with the threats. You know, the Court has seen this. Michael says to the informant

I'm showing you what I'm dealing with. Joker then says tell your families to feel safe.

I need go back if they turn this off now. Okay.

So I just want to read this, though, and the Court will have this. So, in that text message where there is a picture of the cooperator's wife, and it is a text from I think Frank to Michael and then Michael responds and the government didn't read this. What Michael says is just, I'm sorry, I have -- just please, bro, give me until the afternoon to try and reach him, hopefully he's got something good to say.

That's not somebody who is on board with threatening or hurting somebody. I am going to move off this and you can bring it back up. I've gone through again the polygraph that shows that Michael is vouching for the informant.

At first, the participants in the KC deal were suspicious, and that's why they wanted that police report that was obtained and seen. They wanted to see what was going on. Then Michael says this is why I told you to do the poly.

On the next slide Michael texts that they think the New Jersey seizure was because of him. And again, I've made different references. They think the second one, I didn't talk to the Court about this, Michael says to the informant and the second one, meaning the second seizure, they think was me.

So, it's our view that he's at this point in as much hot water as anybody else. Just trying to clear are -- I think

he meant our -- name. And that is taken from a slice of the text that's rather long and is on that point. It, again, shows the purpose of the polygraph, which to me is not nefarious and not any reason to enhance his sentence.

Another text message in April, they're pointing at me and Tana, who is the co-defendant Cheema in the case. Just know I'm with you, I'm not against you. They're on me and my ass and the only way to put it to bed is let's just get it over with. It clearly does say it's because he wants to get back to earning. I think there was, as I said, knowledge of this plea deal, there was knowledge of the facts of Kansas City before Michael pled. And I believe that comes from the government's analysis of Cheema's phone and speaking with the confidential informant as well.

But, now I'm really close to concluding here. Where are the texts of Michael Habib requesting drivers from Kipperman? There are none. Why is Michael Habib here? It's not because of the Canadian hitmen scheme. It has nothing to do with the charges.

Habib had a relationship with the informant. He knew him for over a year. He met him through his mother. His brother-in-law stayed with Michael in Miami to help with cocaine and alcohol addiction. And it was through this relationship that the C.S. and his friends tried marijuana that Michael had that is Canadian grown, and the friend says he can

move marijuana in New York.

I didn't have a chance to go through all the text messages, but I just pulled one. Kilo Moon is somebody they are dealing with and there is discussion here about payment and a deal for marijuana. And this is just another text, can you move these packs shipping to Canada. This is all about marijuana. There's someone named Sailor Moon, and Sailor Moon is the person that Michael Habib, that the informant gets involved with. And Sailor Moon is in the texts doing marijuana deals. And there becomes an issue. And that issue creates the warehouse in New Jersey, and the CS-1 is the one who says his mother is a real estate agent and she'll find it and they do find it and he is the one involved in renting it in February 2021.

My point is, this is how all of this starts. And after multiple deals between the CS-1 and Sailor Moon, the informant owes $90,000, Michael Habib sticks his neck out for the first time in this case. And then that's what occurs.

The C.S. approaches Michael asking to make money. This becomes Kansas City which becomes New Jersey and this is why Michael sends the text the mess you got us into.

Now, I hope this works. I have a little audio on the next page. The government has an exhibit and I believe part of it is in here. And it is Michael talking with the informant and they played part of it. And Michael says my feeling right.

U/I meaning unintelligible, not even a hiccup as soon as that one week, we started unintelligible everything went bad.

Now I've listened to it. And I am going to try to play it. I hope it comes out. There is definitely music. If not, I will work with the government because I hear it very clearly what the second unintelligible is, is "we started doing something different and everything went bad."

And so that to me is the most direct evidence I have of Michael Habib talking to the informant, not knowing he's wearing a wire, saying to the informant we started doing something different. Meaning, we went from marijuana because you wanted to make more money, to the cocaine.

I have no idea if this is going to work. I am going to tap my screen and hope for the best.

(Audio recording playing)

MR. REZENSTEIN: It was right there.

THE COURT: I know what you're referring to.

MR. REZENSTEIN: That to me is as much direct evidence in everything the government gave us. Why did he say he started doing something different. Because they were doing something different. They did something different, that became Kansas City, that became New Jersey.

So now I've said this to you, but I've done this before to the Court. Now this places into context those text messages that we saw before. I'm not leaving you hanging. I

put my hard earned paper to try and buy you time. You knew what you were getting into.

My view of this is you knew what you were getting into when you came to me and asked to do this. I told you and you also agreed it's your fuck up. Meaning it's his deal. And you are going to pay your bill, so fix it. You have no idea how much I put out my head for you and vouched for you. I shown this Court before.

Of course to me, this with that audio becomes somewhat not a smoking gun, but our strongest points here of characterizing his role and supporting my objections. If you're not planning in taking care of this mess you got us into, just say it.

He's here because of this mess that you got us into.

Thank you, Judge.

THE COURT: Thank you.

No further evidence either party wishes to put on?

MR. SHAHABIAN: If I could have a few minutes just to clarify some things in the record. It won't be additional evidence but just showing the Court exhibits. I'll try to make it quick.

MR. REZENSTEIN: May I say that in connection with this, I've provided the Court our exhibits 1 through 37 and I would move those into evidence for the purposes of the hearing.

THE COURT: No objection?

MR. SHAHABIAN: No objection.

THE COURT: Those are received as well. 1 through 37 you said?

MR. REZENSTEIN: 37. Thank you, sir.

(Defendant's Exhibit 1 through 37 received in evidence)

THE COURT: Mr. Shahabian.

MR. SHAHABIAN: Yes. I just wanted to briefly focus on the threats against the source, and I didn't anticipate, frankly, this was going to be a disputed issue, given the plea agreement. I know there was some in the sentencing submission but more came out today.

Just to briefly walk the Court through this. If we turn to slide 135 of the PowerPoint. So the defense argument is this is asking a mortgage broker for information to support a mortgage. This is the text between the defendant and Jacob Ross. He says: I need the name of the wife information please -- sorry. The C.S. I need his information, please. Home address and wife job address. Please keep it between you and me.

You don't go asking for mortgage information for somebody else and say keep it between you and me. The license information that's provided is a New York State driver's license with an address in Staten Island.

And if we go to the next slide. The slide after that.

Ross says: Here you go.

And the defendant says: That's not where he lives though. He's got a townhouse in Brooklyn.

He needs the address in Brooklyn. Why? It's obvious as we get to the threats. It is not very effective to threaten someone that you know where they live if the driver's license -- it's pretty common in the metropolitan area that people move without updating the address on their driver's license, so that's why the defendant is pushing Ross on May 3, 2022, for the address that they're actually living at, not just the address reflected on her driver's license.

If we go to Government Exhibit 504-3. This is the full screenshot of the text between Frank and the defendant that the defendant sends to the source. When you click the sort of cropped version in Signal, the full version shows up.

And if you look at Frank's threat to the source through the defendant, he says: Is this his wife? It provides her name information and the source's wife has an ethnic name but uses an Anglican nickname, which is not uncommon.

And that's why at the bottom, where the defendant is saying: I don't know who the ethnic name is. His wife's name is the Anglican name. We'll provide these unredacted under seal so the Court can see.

This is the same information that the defendant has just gotten from Jacob Ross that same day, May 3, 2022. And

then, what does Frank say? They found another address. They GPS his Volkswagen, lead him to a complex, they have a close eye on the girl driving the Volkswagen. The defendant says, yeah, they live in a gated complex.

They didn't get the exact address in Brooklyn they wanted to use to threaten the defendant, but another way to do that is to tell them we're following you and we figured out where you live roughly, even if they don't give the address. That's what's going on here.

And then if we go to Government Exhibit 504-5. This is the picture of the driver's license, again, after saying we're following her, we've got GPS, tell him where we're going to grab her. These are threats that are based on the information the defendant obtained from Jacob Ross the same day, May 3.

And if we then go back to the PowerPoint and go to slide 66. This is the next day, May 4, 2022, the day after this exchange between Frank and defendant, and this is the day that the defendant actually sends the threats to the source, he says: I asked him how he found your info, and he said he's been looking into you since the 400 and he also said the way this guy looked you up you're all over the internet.

This is not a mortgage broker. This is him covering up the information that he looked up the information.

That is why the government insisted that there be a

threat enhancement in the plea agreement for this defendant. Not because of the back and forth between the defendant and Virk. As the Court is aware, we didn't include a threats enhancement for Virk's plea in connection with that back and forth. And similarly we didn't think it would be fair to attribute it to the defendant, since they were threatening each other.

But this is a clear participation in a threat from Frank transmitted to the source through the defendant's assistance. So, I wanted to point that out because it is something I had summarized rather than go into detail.

In terms of doing something different, the defendant's repeated argument that this was the first time that this had changed to something other than marijuana, the government doesn't dispute that the source's involvement in this kind of hard narcotics trafficking began with, as the government is aware, with the Kansas City load and the New Jersey load. And the government agrees that's the mess that the source got the defendant into.

But I think as the Court understands from seeing all of the other evidence that we've obtained from the defendant's cell phones and from his co-conspirators' cell phones, including evidence that doesn't include the source, narcotics trafficking was one part of the defendant's ongoing criminal activities. And that is why it's simply a mischaracterization

of the truth of what actually happened here to suggest that this is the source's narcotics trafficking that the defendant played a minimal role in.

The last thing I just note for the -- and in terms of who owed money and how much money and how the defendant was on the hook too, even just the 400 kilos of cocaine, if you approximate a street value of 10,000 a kilo, which is very low, that's $4 million worth of cocaine seized in one shipment. It is not surprising that everybody is pointing fingers at each other and holding each other responsible when that kind of valuable narcotics goes missing.

One thing I just note for the record is the exhibits referenced in the PowerPoint use lettered subparts like 513-A, and the underlying index uses a numbered index. The government plans to correct that and submit a corrected version to the Court and the defense counsel for demonstrative purposes.

THE COURT: Sure.

MR. SHAHABIAN: If the Court has any questions, I'm happy to answer them. But that's it.

THE COURT: I don't think so, although, Mr. Rezenstein, is there anything further you wish to add?

MR. REZENSTEIN: Not at this time. I think we need to discuss more scheduling.

THE COURT: Yes. Exactly. As I mentioned earlier, I think post-hearing submissions will be useful, including for

the government's overall submission in connection with sentencing.

How much time do you request to make that submission, bearing in mind that there is also briefing on the motion to enforce that I set earlier?

Mr. Rezenstein?

MR. REZENSTEIN: Probably a significant amount because I'm about to start a death penalty trial in Florida. So, as I understand it, my response to the government is due -- the government was going to send a briefing on the 21st and I had until --

THE COURT: I believe November 4.

MR. REZENSTEIN: I think it was the 4th. Yes, it's here, which I will be in trial. I hate to say this but like December -- end of December-ish. I'm sorry. If that's okay.

THE COURT: For the defense submission?

MR. REZENSTEIN: Yes.

THE COURT: I think the submissions can be simultaneous unless anyone feels otherwise.

MR. SHAHABIAN: No, your Honor.

MR. REZENSTEIN: No that's fine.

THE COURT: End of December. What do you propose?

MR. REZENSTEIN: I was trying to keep it out of holiday week, so I was thinking Friday the 20th. So I can get it done before holidays.

THE COURT: Mr. Shahabian?

MR. SHAHABIAN: That's fine, your Honor.

THE COURT: So we'll do December 20 for post-hearing submissions. We'll also set a sentencing date as well. Maybe the week of January 6.

Would January 9 at 10 a.m. work?

MR. REZENSTEIN: Yes, sir.

MR. SHAHABIAN: That's fine by the government, your Honor.

THE COURT: So, again to recap, on by October 21, the government will submit its opposition to the motion to enforce I believe it's called the plea agreement. Two weeks after that, November 4, any reply from defense. And then December 20 both parties shall make their post-hearing submissions in connection with sentencing, and then January 9, 2025, at 10 a.m. we'll reconvene for Mr. Habib's sentencing.

Is there anything further then we should take up this afternoon?

MR. REZENSTEIN: Not on behalf of the defense.

MR. SHAHABIAN: Not for the government.

THE COURT: Thank you all. Mr. Rezenstein, we have your exhibits up here. And I hope everyone stays well.

(Adjourned)