

*U.S. Department of Justice*

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

December 24, 2024

**BY ECF**

The Honorable John P. Cronan
United States District Court Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

    **Re:** *United States v. Michael Habib*, S3 22 Cr. 618 (JPC)

Dear Judge Cronan:

    The Government respectfully submits this letter in advance of the January 9, 2025 sentencing of the defendant Michael Habib, on his conviction for conspiracy to distribute and possess with intent to distribute narcotics. As proven by the evidence presented at the *Fatico* hearing held on October 7, 2024 (the *"Fatico* Hearing"), the defendant is a high-level member of the dangerous Canadian drug trafficking organization known as the Wolfpack Alliance ("Wolfpack"). He engaged in large-scale narcotics trafficking on behalf of Wolfpack, participated in threats of violence against a confidential source working with law enforcement ("CS-1") and CS-1's family, and helped Wolfpack-aligned hitmen attempt to evade Canadian law enforcement until those hitmen died in a plane crash.

    Moreover, notwithstanding Habib's guilty plea, he refuses to accept full responsibility for his conduct. At his guilty plea hearing, in his objections to the Presentence Investigation Report ("PSR"), and even in his sentencing submission to this Court, the defendant has attempted to shift blame and minimize his role, his knowledge, and his involvement in the conspiracy. For the reasons set forth below, the Government respectfully submits that a sentence above the parties' stipulated range of 168 to 210 months' imprisonment calculated under the U.S. Sentencing Guidelines ("U.S.S.G." or "Guidelines"), or at least 25 years' imprisonment, would be sufficient but not greater than necessary to achieve the purposes of sentencing.

# I. Procedural History

## A. Indictment and Plea Agreement

In a one-count superseding indictment filed on November 10, 2022, S3 22 CR 218 (JPC), Habib was charged with conspiring to distribute and possess with intent to distribute five kilograms and more of cocaine, in violation of 21 U.S.C. §§ 841(b)(1)(A) and 846. On December 20, 2023, pursuant to a plea agreement (the "Plea Agreement"), Habib pleaded guilty to Count One. The primary basis for the charges in this case is the defendant's participation in an international conspiracy to distribute cocaine, approximately 400 kilograms of which was seized from a warehouse in New Jersey on or about March 18 through 21, 2022 (the "New Jersey Seizures").

In the Plea Agreement, the parties stipulated to a base offense level of 36 under U.S.S.G. § 2D1.1(a)(5) and (c)(2), as the offense involved at least 150 kilograms but less than 450 kilograms of cocaine; a two-level enhancement under U.S.S.G. § 2D1.1(b)(2), because the defendant made a credible threat to use violence and/or directed the use of violence in connection with the offense; and a three-level reduction under U.S.S.G. § 3E1.1(a) and (b), assuming Habib clearly demonstrates acceptance of responsibility to the satisfaction of the Government and because he gave timely notice of his intention to enter a plea of guilty. (PSR ¶ 5(a)). Thus, the total offense level is 35. (*Id.*).

The defendant has zero criminal history points and is in Criminal History Category I. (*Id.* ¶ 5(b)). But the defendant has prior Canadian convictions for which he was not assessed points under U.S.S.G. § 4A1.2. He was convicted: (1) in or about 2005, as a juvenile in the Burlington Ontario Youth Justice Court, of possession of a scheduled substance for the purpose of trafficking and unauthorized possession of a firearm, for which he was sentenced to 18 months' probation; (2) in or about 2005, in Brampton, Ontario, of assault, for which he received a suspended sentence of 12 months' probation; (3) in or about 2010, in Brampton, Ontario, of careless use of a firearm, weapon, prohibited device, or ammunition, for which he received a sentence of 8 months and 1 day; (4) in or about 2015, in Toronto, Ontario, of possession of a schedule I substance for the purpose of trafficking, for which he was sentenced to 13 months' imprisonment; and (5) in or about 2021, in Kingston, Ontario, of possession of a schedule I substance, for which he received a $1,300 fine.

At offense level 35 and criminal history category I, Habib's Guidelines range under the plea agreement is 168 to 210 months' imprisonment, with a mandatory minimum term of 120 months' imprisonment (the "Stipulated Guidelines Range"). (*Id.* ¶ 5(c)). As offense level 35, the fine range is $40,000 to $10,000,000. (*Id.*).

Probation's Guidelines calculation of the defendant's offense level, criminal history category, and Guidelines range matches those set forth in the plea agreement. (PSR ¶¶ 66, 124). Probation recommends a Guidelines sentence of 180 months of imprisonment, followed by five years of supervised release. (PSR at 33). Probation does not recommend a fine. (*Id.*).

### B. Habib's Guilty Plea and Post-Plea Obstruction

At the guilty plea hearing held on December 20, 2023, the defendant allocuted to the bare minimum facts required to support his plea to Count One, minimizing his conduct and shifting blame for his participation in narcotics trafficking from himself to a confidential source (the "CS") working with law enforcement. Specifically, when the Court inquired as to what Habib did that made him guilty of the crime he was pleading to, Habib said, that there were "two shipments" that the CS had gotten Habib involved in—the first shipment being seized in Kansas City at the beginning of March 2022 (the "Kansas City Seizure"), and the second being the New Jersey Seizures a few weeks later. (Plea Tr. 25:12-26:25). Habib claimed that the CS "arranged" the shipments in the New Jersey Seizures. (*Id.* at 25:23-25).

When the Court asked if Habib knew "what was in the" Kansas City and New Jersey shipments, Habib claimed that he "knew after the fact of the first one," i.e., the Kansas City Seizure, but that he "didn't know that [the CS] was more or less going to keep continuing to do that." (*Id.* at 26:17-21). Habib instead claimed that his guilt amounted to being "the one that introduced [the CS] to the people" shipping the drugs and "sticking up for" the CS after the CS was blamed for the Kansas City Seizure. (*Id.* at 25-26; *accord id.* at 30:1-4 ("I didn't really arrange [the cocaine in the New Jersey Seizures], but I encouraged the confidential informant to more or less pay his bill that he had, he was responsible for. And that's what led to the second shipment that turned out to be the cocaine."); *id.* at 31:25-32:2 ("So I guess my role was to help the informant successfully get the drugs to the warehouse to be distributed to help pay back his debt.")).

The defendant continued to shift blame to the CS in his objections to the PSR, which he submitted on February 20, 2024. In that submission, he argued that the Kansas City Seizure and New Jersey Seizures were narcotics loads arranged by the CS, and that the defendant's only mistake was to "vouch" for his friend, the CS, after the Kansas City Seizure. (PSR at 26-27). The defendant argued that his involvement in the conspiracy was "minimal until after the [Kansas City] seizure" (PSR at 28-29), and, further, that:

> The PSR does not adequately reflect the lack of involvement of Habib in the drug shipments. For example, the text messages do not reflect Habib participating in the majority of the conspiring as detailed in paragraphs 15-19. This is because this was a shipment of drugs arranged by the CI for the purposes of repaying his debt because of the seizure of his first deal in Kansas City.

(PSR at 30).

### C. Post-Plea Habib Phone Extraction

After the defendant's guilty plea and submission of objections to the Presentence Report, the Government extracted data from a second phone seized from Habib upon his arrest the ("Second Habib Phone"). The data from the Second Habib Phone showed that Habib was a far more involved and culpable participant in the drug trafficking organization than he claimed and directly contradicted Habib's attempt to portray himself as a mere facilitator and friend to the CS.

As the Court saw from the evidence presented at the *Fatico* hearing held on October 7, 2024, conversations, images, and video extracted from the Second Habib Phone show Habib was actively involved in arranging cocaine and methamphetamine transactions in November 2022, shortly before his arrest, with co-defendant Surinder Singh Cheema and other co-conspirators who did not include the CS. (*See* GX 401-403; GX A at 91-115).

### D.  Initial Sentencing Submissions and Motion to Enforce Plea Agreement

On June 4, 2024, the Government filed its initial sentencing submission and sought a sentence of at least 30 years' imprisonment, which was above the Stipulated Guidelines Range. (ECF No. 177). Habib, in turn, sought a below-Guidelines sentence and also filed a motion to enforce the Plea Agreement, arguing that the Government's sentencing submission breached the Plea Agreement. (ECF Nos. 205 & 206). The Government filed its written opposition to Habib's motion on October 21, 2024 (ECF No. 229), Habib filed a reply on November 11, 2024 (ECF No. 237). The motion remains pending.

### E.  The *Fatico* Hearing

On October 7, 2024, the Court held a one-day *Fatico* hearing on the defendant's challenges to the factual assertions in the PSR and in the Government's initial sentencing submission. The Government offered exhibits into evidence, which the Government summarized in a demonstrative PowerPoint presentation (GX A). Habib, in turn, offered additional exhibits in his case-in-chief.

The Court ordered the parties to submit post-hearing briefing. In connection with Habib's motion to enforce the Plea Agreement, during the *Fatico* hearing, the Court *sua sponte* raised the suggestion of striking the Government's initial sentencing submission from the docket. Oct. 7, 2024 Tr. ("Tr.") 26. The Government agreed with that suggestion. Accordingly, the Court ordered the submission struck and, pursuant to the Court's direction, the Government is submitting this post-*Fatico* hearing brief as an "overall" sentencing submission, supplemented by the evidence adduced at the *Fatico* hearing. *Id.* at 139-40.

## II. Offense Conduct

### A.  Narcotics Trafficking

The defendant is part of a drug trafficking organization (the "DTO") that, from at least February 2022 through November 2022, conspired to ship large quantities of cocaine, methamphetamine, and other narcotics across the United States and Canada. (Presentence Investigation Report ("PSR") ¶ 11). As detailed below, Habib participated in the charged conspiracy as one of the leaders of the Wolfpack Alliance a Canadian drug trafficking organization notorious for large-scale narcotics trafficking and committing many murders in Canada and abroad in connection with its trafficking activities. (PSR ¶ 33). Wolfpack is headed by Canada's former #1, currently #3 most wanted criminal, Rabih "Robby" Alkhalil, a convicted murderer and narcotics trafficker who escaped from a Canadian prison in July 2022, during the timeframe of the charged conspiracy, and who was in direct communication with Habib before and after the escape. (*Id.* ¶ 34).

The principal basis for Habib's guilty plea, to one count of conspiring to distribute and possess with intent to distribute five kilograms and more of cocaine, is his participation in shipping approximately 400 kilograms of cocaine through New Jersey, for intended distribution in Canada. But after Habib entered his plea, the Government obtained evidence of his extensive involvement in trafficking additional narcotics, such as the 96 kilograms of cocaine and 86 kilograms of methamphetamine seized by law enforcement in Kansas City in March 2022, i.e., the Kansas City Seizure.

The 400-Kilogram New Jersey Seizures

In particular, between March 18 and 21, 2022, Habib and his co-conspirators, including co-defendants Surinder Singh Cheema, Christopher Burgos, and Bhupinder Singh Virk, worked together to ship 400 kilograms of cocaine to a warehouse in New Jersey. (*Id.* ¶ 12). Through an encrypted messaging application, Signal, Habib, using the alias "Gato," and his co-conspirators discussed the logistics of the cocaine shipments, including when the shipments would be arriving at the warehouse and how the cocaine would be packaged. (*Id.* ¶ 13; *see also* GX A at 5-7; Oct. 7, 2024 Tr. 33).

These messages show that Habib played an active role in not only coordinating the transfer of the cocaine but in ensuring everything unfolded according to plan. When an unseized shipment of narcotics transited through the Warehouse on March 16, Habib: (i) confirmed for the group chat that they had received 10 boxes of narcotics at the Warehouse, including methamphetamine, i.e., "winz" (GX A at 8-15; Tr. 34-35); (ii) asked for updates on truck arrival time (GX A at 16-19; Tr. 35-36); (iii) instructed others to load the methamphetamine for "Frank" and leave the boxes with cocaine (GX A at 20-21; Tr. 36-37); and added Burgos ("Guido") to the chat to confirm the loading of the drugs (GX A at 22-26; Tr. 37).

On March 20, 2022, Habib asked the Signal group chat "Please guys can we give [Burgos] a ruff schedule so we can have the guys ready and on standby." (PSR ¶ 14[1]; GX A at 27; Tr. 38). Similarly, Habib sent CS-1 an individual message that same day: "Something's coming tonight please stay on top of schedule." (PSR ¶ 14; GX A at 28; Tr. 38) By this point, the co-conspirators had already discussed in the group chat how approximately 168 kilograms of cocaine had arrived at the Warehouse by March 18. (PSR ¶ 14). And separately, Habib told CS-1 to update another co-conspirator, Frank, that Habib and CS-1 were ready to pay him $70,000 to $100,000 for past drug debts. (GX A at 29; Tr. 38-39).

On March 21, 2022, Habib continued to participate in the logistics of the narcotics transfer, thanking CS-1 for informing the group that CS-1's driver was ready to receive shipment (GX A at 30) and telling CS-1 to get the fork truck (GX A at 31; Tr. 39). Law enforcement officers seized a total of approximately 400 kilograms of cocaine shipped to the warehouse between March 18 and 21, 2022. (PSR ¶ 18). They then replaced the seized cocaine with "sham" drugs, so members of the conspiracy would not know the drugs had been taken. On March 21, 2022, law enforcement officers surveilled the warehouse as members of the conspiracy loaded cocaine onto a truck, and

---

[1] The PSR incorrectly dates this message as March 18, 2022.

the truck departed the location. (*Id.* ¶ 19). Law enforcement officers stopped the truck soon after its departure and seized the "sham" drugs that had been loaded onboard. After the conspirators lost contact with the truck, Cheema and Habib instructed CS-1 to videorecord the truck. (*Id.* ¶ 20; GX A at 32; Tr. 39-40). CS-1 then sent the video of the truck to Habib, who provided it to the Signal chat as proof that it was stopped. (PSR ¶ 20).

When Virk ("Joker") and Dupinderdeep Singh Cheema ("King") expressed their anger at the stop and lost cocaine on March 22, Habib responded to the Signal group chat with a photograph of Virk's real driver's license (identifying Virk as a member of the conspiracy to other participants who may have only known him as "Joker"). (*Id.*; GX A at 33-35; Tr. 40-41). He then further threatened Virk by reminding Virk of his dangerousness and status in the conspiracy, saying, "You should know who you are telling to be alert." *See also infra* (discussing Habib's ties to the Wolfpack Alliance and hitmen). Virk interpreted Habib's message as a clear threat, threatening back, "tell ur family to be safe." (PSR ¶ 20; GX A at 36; Tr. 41).[2]

On April 13 and 17, 2022, Habib and CS-1 discussed how other members of the conspiracy wanted the individuals involved to take polygraph examinations to determine who had sold out the organization. CS-1 mentioned that there was "cocaine" in the seized boxes; Habib responded that the other DTO members were going to insist on using someone "referred by the gambino [crime] family" for the polygraph. (PSR ¶ 21; GX A at 42-52; Tr. 46-49). During an in-person meeting with CS-1, which was audio recorded by law enforcement, CS-1 and Habib discussed how CS-1 needed to lay low and their concerns about law enforcement. (PSR ¶ 21; GX A at 53; Tr. 49). Similarly, in a post-seizure conversation, Burgos told CS-1 that he had learned from Habib that the group had lost approximately 200 kilos of cocaine that belonged to the "cartel," i.e., Mexican drug trafficking organizations. (PSR ¶ 22; GX A at 54-55; Tr. 49-50).

On November 16, 2022, law enforcement officers arrested Habib. (PSR ¶ 43). Pursuant to a search warrant, they also searched his electronic devices, in addition to devices seized from his co-conspirators. (*Id.*). Habib has been detained since his arrest.

<u>Habib's Other Narcotics Trafficking, Including the Kansas City Seizure</u>

Subsequent to the execution of the plea agreement and preparation of the PSR, law enforcement was able to obtain an extraction from the second of Habib's cellphones seized upon his arrest (the "Second Habib Phone"). The Second Habib Phone demonstrated Habib's significant additional significant involvement even after the New Jersey Seizure, which also shed light on Habib's role in earlier narcotics trafficking, including the Kansas City Seizure discussed at length in the defendant's submission.

Starting with the Kansas City Seizure, a little over two weeks before the New Jersey Seizures, on or about March 2, 2022, law enforcement officers seized approximately 96 kilograms of cocaine and 86 kilograms of methamphetamine from DTO members. (*Id.* ¶ 25). Signal messages

---

[2] Virk was later arrested in California in possession of three untraceable "ghost" guns and nearly half a million dollars in cash. (PSR ¶ 47).

recovered from Virk's cellphone[3] show that the defendant was part of two Signal group chats with Virk, Cheema, CS-1, and a co-conspirator using the alias "Ghost,"[4] which the defendant and others used to coordinate the transfer of narcotics seized in the Kansas City seizure. (GX A at 74-86; Tr. 58-61). On or about March 1, 2022, the day before the Kansas City seizure, Ghost repeatedly referenced "Gato," i.e., Habib's role in the Kansas City shipment, stating that "Gato" was "working on his end" and that "Gatos guy" was going to "drive the gear," i.e., transport the narcotics, while Ghost's people would be "tailing," i.e., providing counter-surveillance support. (GX A at 87; Tr. 61).

When Ghost said his people were ready and Ghost was "waiting on Gato to tell me," Habib responded, "The fucken guys not answering," and that Habib was waiting for updates from CS-1. (GX 302-2 at 10-11). The meetup that day was cancelled when Virk's people could not make it to meet Habib's people to transfer the narcotics. (*Id.* at 12). The load was instead transported the next day, and ultimately seized by law enforcement in the vicinity of Kansas City.

These narcotics were included in the stipulated Guidelines ranges for Cheema and Virk, in part due to the overwhelming evidence of those defendants' ongoing efforts to ship narcotics. At the time of Habib's plea, however, without additional evidence of Habib's role in the Kansas City Seizure, the Government had some concerns over its ability to prove that Habib knew in advance that he was procuring drivers from CS-1 for a narcotics shipment, specifically. (*Id.*). Accordingly, the Kansas City Seizure quantities were not included in Habib's Stipulated Guidelines Range calculations, and only Cheema and Virk were held accountable for those quantities.

Evidence from the Second Habib Phone, however, viewed in conjunction with this evidence and additional evidence from a Cheema phone, confirms that Habib was a large-scale, repeat drug trafficker. First, the Second Habib Phone showed that, in or about November 2022, Habib was part of a Threema group chat with "Goku," Cheema, and "Onyxx" in which Goku asked Onyxx how much narcotics Onyxx wanted and sent numerous photos of what appear to be opened kilos of cocaine. (GX A at 92-101; Tr. 63-64). In the group chat the participants arranged for the transport of these kilos of cocaine. At the same time, separate from the group chat, Goku messaged Habib and told him to "ask your boy tana [Cheema] to send drop info," i.e., ask Cheema to provide details on where the narcotics exchange would take place for further transport. (GX A at 102-03; Tr. 64-65). Habib responded that Cheema "said someone coming to cod the nine in like a hour and then he wants the 20 he said he don't feel comfortable owning for 10 and taking more." (GX A at 104; Tr. 65).

Later in the chat with Goku, Habib said he was wondering if he could get "my lil cut" because he was in a tight spot financially and could use it. Goku responded that he could "pass paper," i.e., money, to Habib's "people." Habib responded that if it was easier for Goku, Habib

---

[3] In its response to the defendant's objections to the PSR, the Government misidentified this chat as having been obtained from the Second Habib Phone; it was obtained from a Virk phone.

[4] The Court may recall that "Ghost" also appears to have played a role in the 2024 Toronto Drug Debt shootings discussed in detail in the Government's supplemental sentencing submission for defendant Cheema. *See* ECF No. 167 at 3, 5.

would take "wrk," i.e. "work," slang for narcotics, because Habib wanted to "try and get my east coast program back up," i.e., Habib wanted to resume his narcotics trafficking operations on the East Coast of the United States, approximately eight months after the New Jersey Seizures. (GX A at 105; Tr. 65-66). Habib objected to the prices Goku offered in response for those narcotics because Habib said he "makes more off selling a lb of weed," indicating the "work" Habib was seeking to restart his East Coast trafficking "program," was narcotics such as cocaine or methamphetamine, not marijuana. (GX A at 106; Tr. 66).

Also on the Second Habib Phone, in or about November 2022,[5] Habib was part of a Signal chat with three participants, "Jdawg," "Mr. Billy," and "Mvp," in which the participants discussed trafficking methamphetamine. (GX A at 108-110; Tr. 66-67). The participants arranged a meeting between Habib and Mvp to discuss "what's able to happen." (GX 403-1 at 3-21). While planning the location for the meeting, Habib wrote, "don't matter to me just don't wanna hot around here there's to many feds" and then "let's link on us1," i.e., expressing his concern about discussing narcotics trafficking where he could be overheard by law enforcement. (GX 403-1 at 9). In the messages, Habib and Mvp agreed to meet. (GX 403-1 at 21; GX A at 110). Less than an hour later, Mvp sent to the group chat two photos and two videos of apparent methamphetamine. (GX A at 111-115; Tr. 67).

After obtaining this evidence from the Second Habib Phone, the Government also re-reviewed the evidence it had already obtained from a phone seized from Cheema that confirms Habib's ongoing participation in drug trafficking. For example, in or about October 2022, Habib participated in a Threema group chat with Cheema, Goku, Onyxx, and "Habibi" (not Habib). (GX A at 116; Tr. 68). Habib used the 'G@TO' alias and the same Threema account number that he used on the Second Habib Phone. Cheema said to the group to put the "winz" (i.e., methamphetamine) "program" on "pause," and start the "books" (i.e., cocaine) "program." (GX A at 117; Tr. 68-69). In other words, both Cheema and Habib used "program" independently to refer to ongoing efforts to transport large quantities of narcotics. Cheema also discussed his connections for obtaining cocaine and transportation from "beach," i.e., California, as well as selling cocaine in California to fund a "double jump from beach to home," i.e., from California, across the U.S., to Canada. Cheema added that "Gato," i.e., Habib, "has a handler he can send to beach." (*Id.*) Habibi (not Habib), then sent numerous photos of kilos of what appear to be cocaine to the group chat, referencing it as "super HH," i.e., "high heat, meaning the highest purity of cocaine. (GX A at 118-120; Tr. 69).

Also on Cheema's cellphone, in or about October 2022, Habib messaged Cheema on Threema, "S asking if frank have hh in the city," again referencing high purity of cocaine. (GX A at 121; Tr. 69-70). This chat also shows Habib's continuing involvement in narcotics trafficking with "Frank," one of the owners of the narcotics seized in the Kansas City Seizure. In addition, as discussed at the *Fatico* hearing, after the New Jersey Seizures, Habib discussed the aftermath of the seizures with CS-1, including the paperwork for the seizures and how both the New Jersey and

---

[5] November 2022 is also the month Habib was arrested and the Second Habib Phone was seized; disappearing messages were set on the Signal messages on the Second Habib Phone, which may explain the absence of earlier messages.

Kansas City Seizures interfered with Habib's ability to earn money from drug trafficking. (GX A at 56-68; Tr. 51-56).

While the evidence from the Second Habib Phone and this Cheema phone postdates the New Jersey and Kansas City Seizures, the defendant's consistent role in large-scale narcotics trafficking even after the seizures is powerful circumstantial evidence of his knowing participation in the narcotics trafficking that led to the New Jersey and Kansas City Seizures. Accordingly, the evidence of the defendant's knowing involvement in conspiracy to traffic the narcotics seized in the Kansas City Seizure—and additional narcotics trafficking—is significantly stronger than it was at the time of the defendant's plea.

B. **Threats Against CS-1**

After the Kansas City Seizure, Habib repeatedly warned CS-1 that he owed money to the owners of the lost narcotics, Alkhalil and Frank, and faced potential reprisal if he did not make payment. (PSR ¶¶ 27-29; GX A at 125-130, 138-142; Tr. 71-73, 77). For example, in or about July 2022, Alkhalil told Habib that Alkhalil was sick of CS-1's excuses for not making payment and that Habib should "[k]ill him or grab him or do something." (PSR ¶ 30; GX A at 143; Tr. 78). Habib texted CS-1 a screenshot of that message, with the message, "I'm just showing you what I'm dealing with." (PSR ¶ 30; GX A at 144; Tr. 78).

Similarly, as proven at the *Fatico* hearing, in or about May 2022, Habib pushed an unindicted co-conspirator ("CC-1") to provide Habib with personal information on CS-1 and CS-1's wife, such as driver's licenses, photographs, and home and work addresses, that could be used to threaten him. (PSR ¶ 31; GX A at 135-137; Tr. 75-77). CC-1 provided Habib a photograph of CS-1's wife. The next day, Frank used that same photograph to threaten CS-1 (through Habib), stating that if CS-1 did not remit payment, Frank's people "have a close eye on" CS-1's wife and "we're going to grab her," i.e., kidnap her. (PSR ¶ 28; GX A at 131-134; Tr. 73-75). Given Habib's direct involvement in obtaining the information used to threaten CS-1 and CS-1's wife, Habib's Stipulated Guidelines Range holds him responsible for these threats of violence. (PSR ¶ 32; Tr. 123-124).

C. **The Wolfpack Alliance**

Habib and his co-conspirators engaged in the charged scheme as members or associates of Wolfpack, a violent Canadian criminal organization. (PSR ¶ 33).

Wolfpack is led by Rabih "Robby" Alkhalil, a convicted murderer and narcotics trafficker. Alkhalil is currently Canada's #3 most wanted criminal, after having escaped from a Canadian prison in July 2022, during the timeframe of the charged conspiracy. (*Id.* ¶ 34; *see also* Kim Bolan, *Gangster, Killer, Escapee: How Robby Alkhalil Broke Out of a B.C. Jail*, Vancouver Sun, Dec. 7, 2022, https://vancouversun.com/news/crime/how-robby-alkhalil-broke-out-of-bc-jail, GX 602-1-A). After his escape, Alkhalil was tried in absentia and convicted of an additional first-degree murder in August 2022. (PSR ¶ 34).

At the time of the Kansas City and New Jersey Seizures, Alkhalil had not yet escaped prison, but was in touch with Habib and other co-conspirators through the use of cellphones in prison, using the alias "Jefe." (PSR ¶ 27; GX A at 67, 125-28, Tr. 55-56, 71-72, 77-78). As described above, and contrary to Habib's suggestion that information about Alkhalil's dangerousness is "extraneous" and "irrelevant" to this case," (Sentencing Br. at 5), Habib's own statements and communications with Alkhalil demonstrate the nature of their relationship and Habib's deep involvement within the leadership ranks of the organization. Alkhalil was one of the owners of the narcotics seized in the Kansas City Seizure and communicated his threats against CS-1 through Habib. Habib also told CS-1 that he was frequently in contact with Alkhalil, both while Alkhalil was in prison and after his escape, particularly in connection with the narcotics debts CS-1 purportedly owed. (PSR ¶ 35; GX A at 143, 152-165; Tr. 80-84)).

Habib also formally welcomed others into Wolfpack during the timeframe of the charged conspiracy, demonstrating Habib's role in recruitment as one of Alkhalil's trusted associates. (PSR ¶ 36). At some point after on or about March 8, 2022, a screenshot of a message recovered from Cheema's phone shows Habib messaging someone on Signal chat, "Bros telling me he wants me to welcome you to the pack brother :wolf emoji: :wolf emoji: :wolf emoji: :muscle emoji: It's been a lil time and discussion but today he told me it's time so let me be the first to welcome to death my bro :wolf emoji: :muscle emoji: :wolf emoji:." (PSR ¶ 36; GX 604-1, Tr. 84). In or about the summer of 2022, Habib also told CS-1 that Cheema and Alkhalil were together interested in selling liquor through CS-1's liquor business (PSR ¶ 37; GX A at 159, Tr. 84).

### D. The Canadian Hitmen Escape Attempt

During the time period of the charged conspiracy, in April 2022, Habib, on behalf of Wolfpack, enlisted his co-conspirators to assist him with smuggling two wanted hitmen out of Canada. (PSR ¶ 39). Habib asked CS-1 to procure fraudulent passports for Gene Lahrkamp and Duncan Bailey and provided photographs of each man. At the time, Lahrkamp, ex-Canadian military, was a fugitive wanted by Canadian authorities in connection with killing a Wolfpack-rival drug trafficker, Jimi Sandhu, in Thailand in or about February 2022. (GX 701-1). Lahrkamp was then Canada's #2 most wanted criminal. Bailey was charged in Canada with conspiracy to commit murder in connection with his involvement in a failed hit on Mir Ali Hussain in Vancouver in October 2020; in April 2022, at the time of the escape attempt, Bailey was on house arrest in British Columbia.

In planning this escape attempt with CS-1, Habib celebrated Lahrkamp's murder of Jimi Sandhu in Thailand, stating, "The thin[g] about chess my brother is there's no time. . . 10 years lat[]er thought he was safe :shrug emoji. . . . ." (PSR ¶ 40; GX A at 204). Habib also discussed the hitmen's background with CS-1, and, in response to a comment from CS-1 that Sandhu "seems like a nice dude," Habib wrote, "[h]e killed my bros little brother." (GX A at 204-208; Tr. 91) Habib also asked his co-conspirator, Burgos, to send people to the U.S.-Canada border near Vancouver, Canada to pick up the hitmen on the U.S. side, after they had evaded Canadian law enforcement. Habib, Burgos, and CS-1 were in direct contact with the hitmen through a Signal

group chat to coordinate the escape pickup on the U.S. side of the border; the escape was unsuccessful. (PSR ¶ 40; GX A at 171-199; Tr. 85-90).[6]

After the failed border crossing, the hitmen told Habib, Burgos, and CS-1 that they were going to take a plane to eastern Canada to try crossing into the U.S. again from there. (GX A at 200-204, Tr. 90-91). In furtherance of that plan, Habib asked CS-1 for assistance smuggling the hitmen across the eastern Canadian-U.S. border, from Montreal to New York. (GX A at 209-212; Tr. 91-92). The plane, however, crashed in Canada on April 29, 2022, killing the hitmen. (PSR ¶ 40; GX 701-2; Tr. 92); *see, e.g.*, Meghan Grant, *Mysterious Plane Crash Killed 2 Suspected Hitmen Linked to Gangs in Alberta*, CBC News, May 6, 2022, https://www.cbc.ca/news/canada/calgary/ontario-plane-crash-bc-fugitives-alberta-connection-bailey-1.6444753. Wary of drawing suspicion, Habib directed CS-1 to leave the Signal group chat with the hitmen "asap" the day after the plane crashed. (PSR ¶ 41; GX A at 213-216; Tr. 92).

### E. Post-Plea Obstruction of Justice

As discussed in the PSR, the defendant submitted false statements to Probation in objection to certain facts contained in the PSR. Specifically, on or about February 20, 2024, the defendant submitted an objection to Probation that claimed, in sum and substance, the Kansas City Seizure and New Jersey Seizures were narcotics loads arranged by CS-1, the Keyser Söze and secret mastermind of the entire conspiracy, and the defendant's only mistake was to "vouch" for his friend, CS-1, after the Kansas City Seizure. (PSR at 26-27). This marked a continuation of the theme the defendant set up during his plea hearing, where, while not denying that he knew the shipment contained more than five kilograms of cocaine and that he conspired with others, the defendant stated that his role was limited to "introduc[ing]" CS-1 to the "people" to make money transporting narcotics, and that that introduction was the sole way he became "involved" in the narcotics conspiracy. (Plea Tr. 25-27).

Based on this fanciful alternate reality, the defendant has contended that his plea was based solely on his second-hand participation in the New Jersey Seizure, which he frames as a benevolent attempt to help CS-1, the true narcotics trafficker, get out of debt. (*See id.* at 30:1-4 ("I didn't really arrange [the New Jersey Seizures], but I encouraged the confidential informant to more or less pay his bill that he had, he was responsible for. And that's what led to the second shipment that turned out to be the cocaine."); *id.* at 31:25-32:2 ("So I guess my role was to help the informant successfully get the drugs to the warehouse to be distributed to help pay back his debt.")). As described in the PSR and *supra*, Habib made these statements under oath to this Court and filed his objections to the PSR *before* law enforcement was able to extract the Second Habib Phone, and; that extraction confirmed that much of his submission was a lie. The defendant attempted to minimize his conduct and avoid responsibility for his role in this conspiracy when he thought he could get away with it.

---

[6] After receiving information about this planned escape attempt from CS-1, U.S. law enforcement provided information about the planned escape attempt to Canadian law enforcement; Bailey, however, cut his ankle bracelet and evaded Canadian law enforcement while attempting to escape.

Without rehashing the discussion in the PSR at length,[7] in this submission the Government will point to the following two examples of the defendant's false statements at his plea colloquy and in his objections to the PSR:

- The Kansas City Seizure was "arranged by" CS-1 and Habib's "involvement was minimal until after the seizure" – PSR at 28-29; the defendant "knew what was in [the] shipments, after the fact of the [Kansas City Seizure]" – Plea Tr. 26:17-19

This is false. First, as described above, the group chat obtained from the Second Habib Phone between Cheema, Virk, Habib, CS-1, and "Ghost," shows that it was the plan from the outset that "Gato's guy," i.e., the drivers Habib sourced through CS-1, would be transporting the "gear," i.e., the narcotics. That now-clear conclusion is only buttressed by the additional evidence already collected in this case that made clear CS-1's role was solely to supply drivers. First, when Habib and CS-1 discussed repaying Frank and Alkhalil in May 2022 for the lost narcotics, Habib acknowledged on a recording that cross-country narcotics trafficking was not CS-1's "thing," and that Habib asked CS-1 to get involved after an associate asked for transportation assistance. (GX A at 56; Tr. 51).

Habib also mentioned, at one point, "if you would've told me it was Dre's ride from the beginning . . . ." (GX A at 57-63; Tr. 52-54). This shows that Habib knew "from the beginning" that CS-1's role was to find drivers, i.e., the 'ride,' and that Habib wished CS-1 had told him in advance who those drivers were. Habib referenced making payments to Frank and Alkhalil in the amounts of $50,000 to $100,000 to repay the debt, and stated that even though this was not CS-1's "thing," if they could do it once or twice a month, i.e., transport more narcotics, they could pay off the debt in a timely fashion. Habib also referenced on the recording that Alkhalil had recently "just got a phone." (GX A at 67). Alkhalil was still in Canadian prison at the time of the recording and had not yet escaped, i.e., it was more difficult for Alkhalil to communicate with Habib at the time. On the recording, Habib also said, 'When everything was going before it was so smooth it was so beautiful, so I was able to earn. Everything's fucked up, everything's on hold." (GX A at 67; GX 206 & 206-T). In other words, the Kansas City and New Jersey Seizures were an impediment to Habib's ongoing narcotics trafficking, not his first time getting involved.

- The PSR "does not adequately reflect the lack of involvement of Habib in the drug shipments. For example, the text messages do not reflect Habib participating in the majority of the conspiring as detailed in paragraphs 15-19. This is because this was a shipment of drugs arranged by the CI for the purposes of repaying his debt because of the seizure of his first deal in Kansas City" – PSR at 30.

Again, this is false. There is no evidence that CS-1 arranged the shipment of the narcotics in the New Jersey Seizures—which CS-1 assisted law enforcement in seizing. To the contrary, from the phones of Habib, Cheema, and Virk, as described *supra*, there is evidence of multiple

---

[7] Because the PSR combines the two submissions in ways that may not be entirely clear, and because this is relevant to the Court's consideration of obstruction of justice, the Government is submitting the defense's submission and the Government's response as exhibits to the attached submission.

group chats in which Habib actively arranged the transportation of cocaine and methamphetamine. CS-1 is not involved in any of those group chats. Indeed, in an October 2022 Threema chat between Habib and Cheema recovered from Cheema's phone, Cheema discussed speaking with an owner of a warehouse in Anaheim, California; Habib responded that he would confirm that his associate (not CS-1) would be the person to rent out the warehouse. (GX A at 221-224; Tr. 93-94). In other words, the New Jersey warehouse rental that led to the New Jersey Seizures was not the only time that Habib and his conspirators rented out a warehouse in furtherance of their narcotics trafficking conspiracy. On March 18, 2021, Habib even sent to CS-1, through Signal, a screenshot of what appears to be a running narcotics ledger for previous shipments, including: three shipments with "Mojo" for $25,000; two shipments with "Dragon" for $10,000; one shipment with "Machi" for $2500; one shipment with "Backy" for $7500; one shipment with "Frank" for $13,000; and two shipments with "Joker," i.e., Virk, for $16,700. (GX A at 219; Tr. 93).

The defendant persists in his attempt to submit a false narrative to this Court in his sentencing submission, framing CS-1 as the "buyer" of the narcotics seized in Kansas City and New Jersey. *See* Sentencing Br. at 2, 4. This contention is absurd. It is contradicted by the above-described evidence showing Habib's knowing and ongoing participation in narcotics trafficking. But it is also preposterous considering: (1) the above evidence demonstrates CS-1's role in the Kansas City Seizure was providing Habib with the driver; (2) the apparent buyers/owners of the Kansas City Seizure, Alkhalil and Frank, used Habib to threaten CS-1 to repay them for the lost narcotics; (3) the Signal Group chats, the cellphones, and the recordings all show that CS's role with respect to the New Jersey Seizures was to set up the Warehouse that was used to transfer the narcotics from the U.S. interstate shippers (Virk) to the U.S.-Canada shippers (Cheema/King), for distribution in Canada, where CS-1 does not live; and (4) after the New Jersey Seizures, the buyers/owners of those narcotics wanted CS-1 to come to Canada to take a polygraph examination to explain the lost narcotics. In sum, Habib allocuted to the bare minimum offense conduct and thereby avoided a full trial on the facts; he then falsely shifted blame to CS-1 and persisted in the falsehood that CS-1 had arranged the drug shipment even after law enforcement extracted, from the Second Habib Phone, despite the evidence to the contrary.

## III. Discussion

### A. Applicable Law

The Sentencing Guidelines provide strong guidance to sentencing courts after *United States v. Booker*, 543 U.S. 220 (2005). Because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall v. United States*, 552 U.S. 38, 46 (2007), district courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings. (PSR 49). The Guidelines are not merely a "body of casual advice." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc) (internal quotation marks omitted).

Following the calculation of the applicable Guidelines range, the Court must consider the factors outlined in 18 U.S.C. § 3553(a), which provides that a sentencing "court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection," and then sets forth seven specific considerations:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed—

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established [in the Guidelines];

(5) any pertinent policy statement [issued by the Sentencing Commission];

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a). The Guidelines' relevance throughout the sentencing process stems in part from the fact that, while they are advisory, "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives." *Rita v. United States*, 551 U.S. 338, 348 (2007). To the extent a court imposes a sentence outside the range recommended by the Guidelines, that court must "consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Cavera*, 550 F.3d at 189 (quoting *Gall*, 552 U.S. at 46).

### B. The Court Should Impose an Above-Guidelines Sentence

The Government respectfully submits that a sentence above the Stipulated Guidelines Range of 168 to 210 months' imprisonment, of at least 25 years' imprisonment, would be sufficient, but not greater than necessary, to reflect the nature and seriousness of the offense; promote respect for the law; provide just punishment for the offense; and afford adequate deterrence to criminal conduct, as required by 18 U.S.C. § 3553(a).

#### 1. The Nature and Seriousness of the Offense

The seriousness of the defendant's conduct supports a substantial term of imprisonment, well above the 120-month mandatory minimum sentence requested by the defense. Habib is a member of a significant international drug trafficking operation. That operation involved repeatedly moving enormous quantities of dangerous drugs, both cocaine and methamphetamine, through the United States. (PSR ¶¶ 11-23). Habib was far from a mere courier or bit player in the scheme: he played an active role in organizing the logistics of the narcotics shipments and conferred at length with his co-conspirators and CS-1 to secure the loads. (*Id.*).

The Government assesses the defendant as the most culpable of the four defendants in this case. (*Id.* ¶ 38). The defendant played a knowing and significant role in shipping narcotics, as described above. Moreover, the defendant appears to have functioned as a lieutenant of Alkhalil, Wolfpack's leader, both before and after Alkhalil's escape from prison. Habib used others—such as CS-1 and Burgos—to fulfill roles that advanced Wolfpack's ends. He threatened co-conspirators, such as Virk, who he thought were overstepping their roles. He collected drug debts on behalf of Alkhalil and Frank from CS-1. To do so, he went as far obtaining from CC-1 a photograph of CS-1's wife that Frank used to threaten CS-1—while pushing CC-1 to give him more details like CS-1's home address for use in threatening CS-1.

And Habib enlisted Burgos and CS-1 to assist him in a brazen attempt to smuggle wanted hitmen out of Canada that ended only after the hitmen died in a freak plane crash. The defendant wasn't just doing a job—he bragged to CS-1 about Lahrkamp's cold-blooded murder of Sandhu in Thailand in retaliation for killing "my bros little brother" 10 years earlier. And the smuggling attempt involved not only helping Canada's #2 most wanted criminal evade justice, but the defendant also sought to smuggle another would-be killer, Duncan Bailey, out of Canada *while Bailey was already on house arrest for attempted murder*. The defendant's casual endorsement of violence and utter disregard for law enforcement and consequences is a calling card of Wolfpack, as shown recently by Habib's cellmate, Cheema, who decided to direct shootings and kidnappings from MDC while facing this Court's impending sentence.

Even setting aside the defendant's broader role in Wolfpack, the seriousness of the defendant's large-scale narcotics trafficking alone—evidence of which was only further buttressed by the recent evidence found on the Second Habib Phone—is compounded by the broader context in which he chose to traffic these dangerous drugs: a narcotics crisis that continues to claim lives across the United States and in other countries, such as Canada.[8]

Methamphetamine is a particularly potent and dangerous drug. Its abuse leads to permanent brain and heart damage, damage to other vital organs, psychosis, hallucinations, violent behavior, and death.[9] The number of overdose deaths from psychostimulants (a category that includes methamphetamines) has ballooned over the past decade, increasing on average about 30 percent each year, as shown by this figure below.[10]

---

[8] Methamphetamine Use Is on the Rise, Worsening Canada's Already Complex Opioid Crisis, https://www.theglobeandmail.com/canada/article-methamphetamine-opioids-drug-crisis.

[9] U.S. Dep't of Health and Human Services, Learn About Methamphetamine (last updated Sept. 6, 2023), https://www.samhsa.gov/meth.

[10] Hedegaard et al., CDC, Drug Overdose Deaths in the United States, 1999–2018, https://www.cdc.gov/nchs/data/databriefs/db356-h.pdf, at 4.

Figure 4. Age-adjusted drug overdose death rates involving stimulants, by type of stimulant: United States, 1999–2018

Specifically, from 2011 through 2016, the age-adjusted rate of drug overdose deaths involving methamphetamine more than tripled, from 1,887 deaths in 2011 to 6,762 deaths in 2016,[11] and overdose deaths involving methamphetamine nearly tripled from 2015 to 2019 among people ages 18-64 in the United States.[12]

And, of course, as the same graph shows, cocaine has also led to increasing deaths, and is a highly addictive substance that destroys lives, destabilizes communities, and funds criminal organizations. Cocaine use leads to, among other things, paranoia, psychosis, stroke, seizures, respiratory failure, organ damage, and death.[13] Cocaine harms not just its users, but also their family and friends and the broader communities to which they belong. For this reason, major drug crimes are among "the most serious" offenses proscribed by federal law. *United States v. Dillard*, 214 F.3d 88, 101 (2d Cir. 2000); *see also United States v. Colon*, No. 10 Cr. 197 (CM), 2020 WL 4496761, at *2 (S.D.N.Y. Aug. 4, 2020) (describing cocaine as "a highly addictive drug that destroys lives, families, and communities"); *United States v. Qayyem*, No. 10 Cr. 19 (KMW), 2012 WL 92287, at *4 (S.D.N.Y. Jan. 11, 2012) (describing study in preeminent medical journal

---

[11] Hedegaard et al., Drugs Most Frequently Involved in Drug Overdose Deaths: United States, 2011-2016. National Vital Statistics Reports: from the Centers for Disease Control and Prevention, National Center for Health Statistics, National Vital Statistics System. 2018;67(9):1–14, https://www.cdc.gov/nchs/data/nvsr/nvsr67/nvsr67_09-508.pdf.

[12] *See* Nat'l Institute on Drug Abuse, Methamphetamine-Involved Overdose Deaths Nearly Tripled Between 2015 to 2019, NIH Study Finds (Sept. 22, 2021), https://archives.nida.nih.gov/news-events/methamphetamine-involved-overdose-deaths-nearlytripled-between-2015-to-2019-nih-study-finds.

[13] *See* Nat'l Institute on Drug Abuse, What Are the Long-Term Effects of Cocaine Use? (May 2016), https://www.drugabuse.gov/publications/research-reports/cocaine/what-are-long-term-effects-cocaine-use.

in which cocaine was found to have "second-highest mean harm score of all twenty drugs [under study], after heroin").

The harms posed by cocaine have only increased over time. Empirical data shows, for example, that overdose deaths involving cocaine have increased dramatically in the United States over the last two decades, as shown by the more granular graphical depiction below[14]:



And the crisis created by the availability of dangerous drugs is in no way confined to the United States. In British Columbia, for instance, the drug crisis was first declared a public health emergency in 2016, and last year the province saw a record of more than 2,500 overdose deaths.[15]

It is against this backdrop that Habib worked with his co-conspirators to distribute hundreds of kilograms of cocaine and methamphetamine and sought to transfer these narcotics across national borders. Habib's sentence should be commensurate with the scale of this scheme.

**2. The Need to Promote Respect for the Law, Provide Just Punishment, Afford Adequate Deterrence, and Avoid Unwarranted Sentencing Disparities**

Without question, a significant sentence is needed here to promote respect for the law and provide just punishment. As courts in this District have recognized, the harm that is done by large-scale narcotics traffickers like Habib and his co-conspirators is almost incalculable. "The lives affected, the families affected, the communities affected by drugs of that type and that volume is staggering." *United States v. Palagio Suarez*, No. 16 Cr. 453 (RJS) (Dkt. No. 160, Tr. 27). "[T]he

---

[14] Drug Enforcement Admin., 2020 National Drug Threat Assessment (Mar. 2021), at 30, https://www.dea.gov/sites/default/files/2021-02/DIR-008-21%202020%20National%20Drug%20Threat%20Assessment_WEB.pdf.

[15] Success or Failure? Canada's Drug Decriminalisation Test Faces Scrutiny, https://www.theglobeandmail.com/opinion/editorials/article-how-bad-is-canadas-drug-overdose-epidemic-american-level-bad/,https://www.bbc.com/news/world-us-canada-68621012.

drugs at issue here cripple individuals and destroy[] families and whole communities." *United States v. Santibanez*, No. 13 Cr. 912 (RJS), 2020 WL 3642166, at *3 (S.D.N.Y. July 6, 2020) (internal quotation marks omitted). When, as here, defendants fuel the narcotics trade and traffic substances as dangerous as cocaine and methamphetamine, they "participate[] in an important way in the distribution of a substance, which creates misery in the lives of the people who use it," and show they are "indifferent to the poison . . . being distributed and ruining people's lives." *United States v. Aguirre Cuero*, No. 15 Cr. 125 (PKC) (Dkt. No. 36, Tr. 22, 24).

A significant sentence is warranted here not only to adequately deter the defendant from engaging in such conduct in the future but also to send a message to other individuals who may be considering similar narcotics activities. Those who traffic these drugs and seek to profit from the ruination of others should know that they will face serious consequences, especially when they do so on behalf a notorious criminal enterprise. Specific and general deterrence are even more important where, as here, pretrial detention for Wolfpack members like Cheema and Habib has not dissuaded other co-conspirators from continuing to engage in large-scale narcotics trafficking through the United States and violence in furtherance of their enterprise.

Specific deterrence and incapacitation has additional purchase with respect to Habib, given that, unlike his co-defendants, Habib has already been convicted of multiple narcotics and weapons-related offenses in his native Canada for which he has served jail time. *See supra*.

Moreover, severe consequences for this defendant are all the more just where, as here, the defendant purports to admit guilt while also attempting to minimize his role, shift blame to others, and avoid the consequences of his own choices. The defendant attempted to insulate himself from the full exposure of his role in the conspiracy. Faced with overwhelming evidence of his guilt, he then attempted to walk a tightrope by pleading guilty before this Court, but only to a version of events that minimized his culpability as much as he thought he could get away with and shifted blame to CS-1. That tightrope snapped when the Second Habib Phone was extracted. The Court should impose a substantial sentence that is commensurate to this conduct. Defendants like Habib who attempt to game the justice system with lies should be amply punished when those lies are exposed.

Finally, while the Government initially sought an above-Guidelines sentence of 30 years' imprisonment for Habib, the Court recently sentenced Habib's co-defendant, Surinder Singh Cheema, to 18 years' imprisonment, below the Government's above-Guidelines recommendation of 25 years' imprisonment for Cheema. The Court also sentenced co-defendant Bhupinder Singh Virk to a Guidelines sentence of approximately 17 ½ years' imprisonment. In light of these sentences and the need to avoid unwarranted sentencing disparities, the Government has revised its recommendation accordingly, and submits that an above-Guidelines sentence of 25 years' imprisonment is sufficient, but no greater than necessary, under all the relevant Section 3553(a) factors.

**C. Conclusion**

For the reasons set forth above, the Government submits that an above-Guidelines sentence of at least 25 years' imprisonment is sufficient but not greater than necessary in this case.

Respectfully submitted,

EDWARD Y. KIM
Acting United States Attorney

By: /s/
Thomas S. Burnett
Jane Y. Chong
Matthew R. Shahabian
Assistant United States Attorneys
212-637-1064/-2263/-1046