UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

v. 22 CR 618 (JPC)

MICHAEL GIAN WILLIAM HABIB,

Defendant. Sentence
------------------------------x

New York, N.Y.
February 21, 2025
10:10 a.m.

Before:

HON. JOHN P. CRONAN,

District Judge

APPEARANCES

MATTHEW PODOLSKY
Acting United States Attorney for the
Southern District of New York
BY: MATTHEW SHAHABIAN
THOMAS BURNETT
Assistant United States Attorneys

WOODWARD & REIZENSTEIN
Attorneys for Defendant
BY: PHILLIP L. REIZENSTEIN

Also Present:
Kelly Cunningham, FBI

(Case called)

MR. SHAHABIAN: Good morning, your Honor, Matt Shahabian appearing for the government. Along with Thomas Burnett. With us at counsel table is FBI Special Agent Kelly Cunningham.

THE COURT: Good morning, Mr. Shahabian, Mr. Burnett, and Special Agent Cunningham.

MR. REIZENSTEIN: Good morning, Phillip Reizenstein on behalf of Michael Habib, who is present in the courtroom.

THE COURT: Good morning, Mr. Reizenstein and Mr. Habib.

THE DEFENDANT: Good morning.

THE COURT: We are here today for Mr. Habib's sentencing.

On December 20, 2023, Mr. Habib pled guilty to Count One of a superseding indictment that charged him with a conspiracy to distribute and possess with the intent to distribute five kilograms and more of mixtures and substances containing a detectable amount of cocaine in violation of Title 21, United States Code, Section 846 and 841(b)(1)(A).

After sentencing was originally scheduled for March 19, 2024, I adjourned it a few times, largely due to some factual disputes that needed to be resolved that led to a *Fatico* hearing on October 7, 2024.

To prepare for Mr. Habib's sentencing today, I have

reviewed the presentence investigation report, dated May 24, 2024, including the judiciary sentencing information at appendix A of that report.

In addition, to prepare for today's sentencing, I have reviewed many submissions from the parties. I will list them in the order they were filed, and I will only mention the submissions that contained substantive arguments.

I have reviewed the defense's submission of June 2, 2024, which is a 12-page sentencing memo from Mr. Reizenstein and is at docket 175.

I have reviewed the 31 letters in support of Mr. Habib which Mr. Reizenstein filed on June 4, 2024. Some of those letters have slight redactions. The last letter is from Mr. Habib himself. Those letters are at docket 176.

I have reviewed the May 2, 2024 report submitted by a mitigation specialist and social worker named Vivianne Guevara. For that, I have reviewed the redacted version, which is publicly filed at docket 182, as well as the unredacted version of the report.

I have reviewed the defense's motion to enforce the plea agreement, and objections to the government's sentencing submission, which are at dockets 205 and 206.

I mentioned objections to the government's sentencing submission. That was in reference to a submission by the government that I have since struck from the record.

I reviewed the government's three-page letter of September 11, 2024, which is at docket 215. That requested that I reallocute the defendant on his guilty plea. I ultimately did not do so.

I reviewed a declaration from Mark H. Allenbaugh that the defense filed on October 7, 2024, which provided statistical analysis of U.S. Sentencing Commission data. That is at docket 220.

I have reviewed the government's opposition to the defense's motion to enforce the plea agreement. That is a 27-page brief from the prosecutors filed on October 21, 2024 and at docket 229.

I have reviewed the defense's reply memorandum of law in further support of the motion to enforce the plea agreement. That was filed on November 11, 2024 and is at docket 237.

I reviewed the government's post *Fatico* hearing submission. That is a 19-page letter from the prosecutors that was filed on December 24, 2024, and is at docket 258.

In that submission the government makes a sentencing recommendation in this case.

I reviewed the defense's post *Fatico* hearing submission, which is an eight-page letter from Mr. Reizenstein followed by an exhibit, which includes communications by Mr. Habib with the jail requesting medical attention. That is at docket 259.

I also went back and reviewed the plea agreement in this case and the transcript from Mr. Habib's guilty plea before me on December 20, 2023. That transcript is at docket 126.

I also reviewed the preliminary consent order of forfeiture as to specific property/money judgment, which I received from the parties -- I have reviewed the transcript of the *Fatico* hearing on October 7, 2024. That is docket 238, as well as the exhibits received into the evidence at that hearing.

Have the parties received and reviewed all of those materials?

MR. SHAHABIAN: Yes, your Honor.

MR. REIZENSTEIN: Yes, your Honor.

THE COURT: Are there any other submissions or materials in connection with sentencing that I did not mention?

MR. SHAHABIAN: Not from the government, your Honor.

MR. REIZENSTEIN: Judge, not from the defense that we filed.

I have three certifications that I got from Mr. Habib this week that I will just read into the record when I make my presentation. They are not legal based. They are just what he earns while he is in prison. We have submitted some of those, and I just want you to be aware of these.

THE COURT: Thank you. Yes, I have received the ones

that you have submitted, and certainly you may read those into the record later.

I also mentioned that there are redactions to the mitigation report at docket 182 and certain letters at docket 176.

Do the parties have views as to whether those redactions should remain in place with respect to the publicly filed versions of those materials?

Does the government have a position?

MR. SHAHABIAN: The government doesn't have a position, your Honor.

MR. REIZENSTEIN: Yes. We ask that they do remain in effect because it is personal and sensitive data to Mr. Habib and his family.

THE COURT: I would agree. I reviewed the redacted and unredacted versions of the report and the letters and believe that the redactions are appropriate. The redactions in the mitigation report contain information, such as dates of birth, the name of Mr. Habib's daughter, and photographs of that girl. The redactions to the letters are for home addresses, phone numbers, dates of birth, and, once again, Mr. Habib's daughter's name. I find all those to be appropriate, so I will allow the redactions to remain in place.

Maybe at this point I will turn to the forfeiture order that I mentioned earlier.

Mr. Habib, as I mentioned, I received from the parties the document titled consent preliminary order of forfeiture as to specific property/money judgment. On the last page there appears to be a signature above your name.

Did you sign this document?

THE DEFENDANT: Yes, sir.

THE COURT: Did you read it before you signed it?

THE DEFENDANT: Yes.

THE COURT: Did you also discuss it with your attorney, Mr. Reizenstein?

THE DEFENDANT: Yes, I have.

THE COURT: Mr. Reizenstein, is that right, did you discuss this consent preliminary order of forfeiture with Mr. Habib?

MR. REIZENSTEIN: Yes.

And I will just mention for the record that my understanding is that it involves property seized from a codefendant. I am not sure we would even have standing if we did object, but we do not object.

THE COURT: I assume your signature is above your name too?

MR. REIZENSTEIN: Yes, it is.

THE COURT: Nice signature.

MR. REIZENSTEIN: Should have been a doctor. I know.

THE COURT: Mr. Habib, did you understand this order

before you signed it?

THE DEFENDANT: Yes, sir.

THE COURT: Pursuant to this order, as Mr. Reizenstein just previewed, I would be entering an order that you forfeit to the United States your right, title, and interest, to the extent that you have any, in certain specific property. That property is $8,000 in U.S. currency that was seized from the vehicle of your codefendant, Bhupinder Singh Virk, at the time of his arrest on November 16, 2022; $479,900 that was seized from Mr. Virk's residence in Fresno, California; a Louie Vuitton bag that was seized on November 16, 2022 from Mr. Virk's vehicle at the time of his arrest, and also a vehicle, a 2020 Mercedes Benz, AMZG GT63 with vehicle identification number WDD7X8JB5LA014070, which was seized on November 16, 2022, at the time of Mr. Virk's arrest.

Do you understand that's what this order would do?

THE DEFENDANT: Yes, sir.

THE COURT: Do you consent to me entering this order in this case?

THE DEFENDANT: Yes.

THE COURT: I will so order the order and enter it on the docket, assuming that we proceed with sentencing today.

Let me now turn to the presentence investigation report.

Mr. Reizenstein, have you read the presentence

investigation report?

MR. REIZENSTEIN: Yes, I have.

THE COURT: Have you discussed it with Mr. Habib?

MR. REIZENSTEIN: Yes, I have.

THE COURT: Mr. Habib, have you also read the presentence investigation report?

THE DEFENDANT: Yes.

THE COURT: Have you discussed it with your attorney?

THE DEFENDANT: Yes, I have.

THE COURT: Have you had enough time to read the report and discuss it with your attorney?

THE DEFENDANT: Yes.

THE COURT: Have you been able to go over with Mr. Reizenstein any errors that you saw in the report?

THE DEFENDANT: Yes.

THE COURT: Have you had enough time to go over with Mr. Reizenstein any errors that you saw in the report?

THE DEFENDANT: Yes, I have.

THE COURT: More generally, have you had enough time to discuss with Mr. Reizenstein anything you would like him to raise with me today at sentencing?

THE DEFENDANT: Yes, your Honor.

THE COURT: Mr. Shahabian, have you also reviewed the presentence investigation report?

MR. SHAHABIAN: Yes, your Honor.

THE COURT: Let me first make a couple of quick changes or get the parties' views on a couple of quick changes that I think might be appropriate.

Footnote 1 on page 4 indicates that the government indicated that it does not believe Mr. Habib should receive a three-level reduction for acceptance of responsibility and that he should receive an obstruction-of-justice enhancement. And then paragraph 125 says much the same when discussing the impact of the plea agreement.

Mr. Shahabian, from your submission it appears that that is no longer the government's position. Is that correct?

MR. SHAHABIAN: That's correct, your Honor.

Just to be clear for the record, that was never the government's position, even with the previously struck sentencing submission. So I think that's an inference probation made that was not the government's position and still is not the government's position.

THE COURT: Is there any objection to me then cutting footnote 1 and also revising paragraph 125 to say something along the lines of: Consistent with the plea agreement, the government's position is that the defendant has an offense level of 35, a criminal history category of I, and a guidelines range of 168 to 210 months in prison?

MR. SHAHABIAN: No objection from the government, your Honor.

THE COURT: Mr. Reizenstein, I assume you have no objection to that?

MR. REIZENSTEIN: I don't want to snatch defeat from the jaws of victory, so no objection.

THE COURT: I will make that change.

Also, given the amount of time that passed since this report was filed and today, I will update it to reflect the sentences for Mr. Habib's codefendants. That would be at paragraphs 6 through 8. In particular, Bhupinder Singh Virk was sentenced on July 17, 2024 to 210 months' imprisonment, followed by four years of supervised release; Surinder Singh Cheema was sentenced on December 19, 2024 to 216 months' imprisonment, followed by four years of supervised release; and Christopher Burgos was sentenced on December 16, 2024 to 54 months' imprisonment, followed by three years of supervised release.

Does everyone agree with those changes too?

MR. SHAHABIAN: Yes, your Honor.

MR. REIZENSTEIN: Yes, Judge.

THE COURT: Let's now turn to the evidentiary hearing that I held on October 7, 2024, which addressed a number of objections that Mr. Habib had to the factual recitations in the presentence investigation report.

I have already heard quite a bit on those issues, but I will give counsel the opportunity to add anything else they

wish to add to their submissions or any other arguments they wish to make dealing with, in particular, the matters addressed in the *Fatico* hearing. Of course I will later give counsel the opportunity to make any arguments as to the appropriate sentence.

Mr. Shahabian, is there anything further the government wishes to add?

MR. SHAHABIAN: Not unless the Court has any specific questions, your Honor.

THE COURT: I think this was relatively clear, but do I understand right that your view -- I am talking now about the passport checks that Mr. Egan was one of the two hitmen and that Jerry was added to that chat, was another one of the hitmen?

MR. SHAHABIAN: It is unclear whether those were two different people or the same person using multiple profiles, but, yes, they were either the hitmen themselves or directly in communication with those people.

THE COURT: Mr. Reizenstein.

MR. REIZENSTEIN: I feel it incumbent, first, to make it clear that the objections that we lodged and are part of our purpose for the *Fatico* hearing, I acknowledge that your resolution of our objections, I don't see an effect on the guidelines calculation, which is not always the case. But I did feel it was incumbent to do that because of the

government's position for overall sentencing and your analysis of 3553(a) factors.

It does concern me a little -- I do have an email from the government, dated May 21, 2024, that, in light of the defendant's false denial of relevant conduct, the government no longer believes the defendant's guideline calculation should accept an acceptance of responsibility.

In addition, the government believes an additional two points are warranted for Habib's sentence due to obstruction of justice under Section 3C1.1 for providing materially false information to probation.

I accept and appreciate the fact it's no longer their position, but it did engender and generate our vigorous response to it because, at least at one point in writing, that was their position.

I say that as a matter of explanation for the Court's time that it gave us on October 7, because this greatly concerned us.

THE COURT: I do think, regardless, that time was well spent because the issues, if not applicable to the guidelines, they certainly do have some relevance to other Section 3553(a) factors, so they were important to have.

MR. REIZENSTEIN: That's my general comments on my objections and, feeling fully confident that the Court has reviewed everything that we have before us, I don't have

additional argument on my objections. I think I would, under 3553(a), when we get to that, and I would just cite to what my arguments were.

THE COURT: Just a couple of clarifications, because I don't see any dispute as to these issues, but I wanted to make sure there wasn't a need for any further discussion.

It does not seem that you're disputing that Mr. Habib went by "Gato" and also that in the October and November 2022 Threema chats, that winz was code for methamphetamine, books was code for cocaine, and HH referred to high heat, meaning the purity of the cocaine, and also that work means narcotics.

That did not seem to be in dispute, but I just wanted to confirm that with you, Mr. Reizenstein.

MR. REIZENSTEIN: First, I acknowledge I didn't dispute it.

Can you ask the first part of your question again. And I want to confer with my client about it.

THE COURT: Sure. I'll list each of them.

First, Mr. Habib went by Gato.

MR. REIZENSTEIN: May I respond individually?

Yes, there has never been an objection to that.

THE COURT: Code words used for two types of drugs: Winz for methamphetamine and books for cocaine.

MR. REIZENSTEIN: There also has not been an objection to that.

THE COURT: HH means high heat, which means the highest purity of cocaine.

MR. REIZENSTEIN: That's not something that I honestly recall, but I know we didn't object to it, and I have conferred with my client, and there is no objection.

THE COURT: And, lastly, work means narcotics.

MR. REIZENSTEIN: No objection.

THE COURT: Thank you.

I will now state my factual findings based on the evidence at the October 17, 2024 *Fatico* hearing. At the hearing I received documentary evidence and heard argument from Mr. Shahabian on behalf of the government and Mr. Reizenstein on behalf of Mr. Habib. Neither party called any witnesses to testify at the hearing.

After carefully considering the evidence and the parties' arguments, I make the following findings by a preponderance of the evidence.

As I expect, as will be clear later on in sentencing, some of these findings confirm the guidelines range, and others go to different factors under Section 3553(a).

First, I find that Mr. Habib played an active role in coordinating and facilitating shipments totaling approximately 400 kilograms of cocaine in March 2022 to a warehouse in Newark, New Jersey. Mr. Habib's involvement in those shipments to Newark, which I will refer to as the New Jersey shipment, is

the offense conduct in this case, and the weight of the cocaine transported to Newark triggers the drug quantity under guidelines Section 2D1.1(c) for purposes of calculating Mr. Habib's advisory guidelines range.

I apologize. I misspoke at the very beginning. Of course, as I mentioned earlier, the *Fatico* hearing was on October 7, 2024, not October 17.

That was my first finding.

Second, I find that Mr. Habib also participated in other narcotics trafficking activity. This includes a shipment of drugs that was seized in the vicinity of Kansas City in March 2022, shortly before the New Jersey shipment. I will refer to that shipment as the Kansas City shipment. Mr. Habib also was involved in other narcotics trafficking activity that occurred in and around October and November 2022, up until shortly before his arrest in Florida on November 16, 2022.

Third, I find that Mr. Habib was, at a minimum, associated with the Wolfpack Alliance, a Canadian drug trafficking organization.

Fourth, I find that Mr. Habib participated in efforts to threaten the confidential law enforcement source, who I will refer to as CS-1, in order to collect on a purported drug debt.

Finally, I find that Mr. Habib played an active role in efforts to coordinate and facilitate the attempted escape of two men from Canada to the United States. These individuals

were suspected hitmen who were being sought by Canadian authorities. This scheme failed when a plane carrying the two hitmen crashed in Ontario, Canada, killing them.

Again, I will consider these factual findings to the extent relevant under the factors set forth in 18 U.S. Code Section 3553(a), and also rely on them in resolving Mr. Habib's objections to the presentence investigation report.

Before I discuss my reasons for these factual findings, I will briefly summarize some relevant background facts, none of which appear to be in dispute.

Between March 18 and March 21, 2022, law enforcement seized approximately 400 kilograms of cocaine from a warehouse in New Jersey. Again, this is the New Jersey shipment. Earlier, on March 2, 2022, law enforcement seized approximately 96 kilograms of cocaine and 86 kilograms of methamphetamine in the vicinity of Kansas City. This is the Kansas City shipment. Mr. Habib was arrested on November 16, 2022.

He pled guilty before me on December 20, 2023, to Count One of the indictment, to a conspiracy from, in or about February 2022 through in or about November 2022, to distribute and possess with intent to distribute five kilograms or more of mixtures and substances containing a detectable amount of cocaine, in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A), and 846.

This guilty plea was pursuant to a plea agreement with

the government. That plea agreement considered as relevant conduct Mr. Habib's involvement in the New Jersey shipment and, accordingly, contains a stipulated offense level of 35, which contemplated a drug weight of at least 150 kilograms but not more than 450 kilograms of cocaine, under Sections 2D1.1(a)(5) and 2D1.1(c)(2), and also an enhancement for using violence, making a credible threat of violence, or directing the use of violence, under Section 2D1.1(b)(2).

I will now explain my reasons for those factual findings, beginning with my conclusion that Mr. Habib was actively involved in coordinating and facilitating the New Jersey shipment. At the outset, I reiterate that Mr. Habib's guilty plea was based on his involvement with this shipment. At his guilty plea hearing, Mr. Habib allocuted that his role was to help the informant successfully get the drugs to the warehouse.

The documentary evidence received at the *Fatico* hearing established by a preponderance of the evidence that Mr. Habib played an active role in the New Jersey shipment. In the days before law enforcement seized 400 kilograms of cocaine, Mr. Habib participated in a Signal group chat called New Jersey to home, which also included two of his codefendants, Mr. Virk, and Mr. Burgos, as well as other coconspirators operating under various aliases. The New-Jersey-to-home group chat is at GX-102-1. The participants

in this group chat sent messages and pictures to coordinate the shipment of narcotics to the New Jersey warehouse.

For example, on March 16, 2022, a group chat participant using the alias KHOSA Cousin sent a message asking an individual referred to as Brad Pitt to send pics of the total amount of boxes. Another group participant using the alias BK then sent an image that appears to depict a number of boxes stacked on top of each other. Mr. Habib, using the alias El Gato, replied: Thank you, Brad. The parties agree that the individual using the Brad Pitt and BK aliases was CS-1. KHOSA Cousin and another group chat participant who was using the name Frank then exchanged further messages discussing the number of boxes in the shipment. Frank wrote in the group chat "7 boxes: Two had 20 packs in them; five had 18 packs in them." Mr. Habib wrote: "He only received seven," and KHOSA Cousin echoed: "There was only seven boxes received." Mr. Habib then followed up: "Sorry." "One second." "It's 10." And "we're good."

Mr. Habib then exchanged messages with CS1 and another group chat participant using the name "King Canada" with Mr. Habib, asking about the delivery driver's estimated time of arrival. Mr. Habib later sent a message in the group chat stating: "And the only. One's getting loaded are the ones with the 7 with the F. The other 3 with H stay." KHOSA Cousin responded: "Leave the three boxes with H". And "they going

Friday."

Also on March 16, 2022, Mr. Habib added Mr. Burgos to the group chat. Mr. Burgos used the alias Guido. Later that day, Mr. Burgos sent messages in the group chat stating: "All done, boys." "Sorry for the delay." And "had to wrap one in green Saran wrap." Mr. Burgos also noted that one of the boxes had arrived damaged and flagged other issues with the shipment.

A few days later, on March 20, 2022, Mr. Habib sent messages in another group chat asking his coconspirators to provide a schedule, and then advised CS1: "Something's coming tonight. Please stay on top of the schedule." The following day, Mr. Habib sent a message to CS1 stating that they need a fork truck and a pump truck to handle the shipment.

The evidence also established that Mr. Habib likewise played a role in organizing the earlier Kansas City shipment. His involvement with this shipment was demonstrated from his participation in a Signal group chat called books, which also included CS-1 and Mr. Virk, who was using the alias Joker. That chat is at GX-303-3.

On February 28, 2022, a few days before the Kansas City shipment was seized, a coconspirator using the alias Ghost sent a message in a Signal group chat asking: "Gato, is your guy here already?" Mr. Habib, again who was using the moniker Gato, responded: "We are we're." That same day, Mr. Habib sent a message in the Signal group chat stating: "Ghost,

please pass the pickup address to this group so Joker can give to his driver." Again, Joker was the moniker used by Mr. Virk. Ghost and CS, who was still using the Brad Pitt alias, then exchanged messages regarding the addresses for pickup and dropoff.

At the same time, Mr. Habib sent messages stating: "Send the Inglewood address and number, please," and "also please call him and let him know someone will be by this evening to pick it up." CS-1 responded with an Inglewood, California address and stated: "Just give him a heads-up. Someone is coming, so there home."

On March 1, 2022, Ghost sent a message in the Signal group chat stating: "Gato still working on his end." This exchange is at GX-302-2. Mr. Virk, still using the Joker alias, responded: Why, bro? Ghost then responded: "Yes. 4 p.m. Won't make it if we leave now." And "Cuz Gato's guy is gonna drive the gear. I have my guys tailing." Mr. Virk followed up asking: "What exact time"? To which Ghost answered: "Waiting on Gato to tell me." Ghost and Mr. Virk then continued exchanging messages, indicating that they are waiting on Mr. Habib, again referred to as Gato in these chats, to provide status updates regarding the narcotics shipment. Eventually, Mr. Habib sent messages to the group stating: "The fucken guys not answering" and "I'm waiting for Brad to see then guy any minute and get a update, but there not even on the

road yet. Bros will update soon."

Ultimately, the group called off the planned shipment, which ended up taking place the next day instead.

In addition to the New Jersey and Kansas City shipments, evidence admitted at the *Fatico* hearing also established Mr. Habib's involvement in additional narcotics trafficking activity in October and November 2022.

In October 2022, Mr. Habib was a participant in a Threema group chat that included Mr. Cheema, who used the alias "el padrino." Threema is an encrypted messaging platform that is similar to Signal. This Threema chat is at GX-404. On October 23, 2022, Mr. Cheema sent a message in that group chat stating: "Yo, guys, I say we put the winz program on a little bit of a pause and start the books program." The government has proffered that winz is code for methamphetamine and that books is code for cocaine, and Mr. Habib does not dispute these characterizations. Mr. Cheema also sent a message stating: "Gato has a handler, so he can send to beach." The following day, another participant in that group chat, who goes by the name Habibi, who is not Mr. Habib, sent several pictures of packaged narcotics and wrote: "Brother, this is all super HH." The government has proffered that HH refers to high heat, meaning the highest purity of cocaine, and Mr. Habib also does not dispute this interpretation. A few days later, Mr. Habib sent a message to Mr. Cheema stating: "S askin if Frank have

HH in the city." That message is at GX-405.

In early November 2022, Mr. Habib participated in a Signal group chat called pom. That chat is at GX-403-1. On or about November 5, 2022, Mr. Habib and an individual using the alias MVP exchanged messages to coordinate a time to meet up. For example, Mr. Habib sent messages stating: "Do you have time to get a bite?" "Or you just wanna link quick?" "Don't matter to me. Just don't wanna hot around here. There's too many feds." And "let's link on us1." Mr. Habib. Habib and MVP then continued exchanging messages coordinating their meet-up. Then, less than an hour later, MVP sent several pictures and videos of what appears to be methamphetamine in the group chat. Those videos are at GX-403-3 and GX-403-4.

Mr. Habib also participated in a Threema group chat called "connect the dots" in or about November 7, 2022. This group chat is at GX-401-1, and included Mr. Cheema as well as two other individuals who used the aliases, GOKU and Onyxx. On November 7, 2022, GOKU sent a message in that group chat asking: "How many you need?" Onyxx replied: Can you send pics/logos? And I can prep some order in advance." GOKU later responded: "LOL. Ya there some that landed today and more on Friday." Onyxx then asked GOKU to send pics if HH, prompting GOKU to send images that appear to depict packaged narcotics and ask "want them?" Onyxx then replied: "If theyr fire HH bro, send them NP" and "it's certified HH though, right? Those

blue/green paint tape jackets make me nervous." GOKU, Onyxx, and Mr. Cheema continued exchanging messages over the next couple of days regarding the narcotics.

Then, on November 12, 2022, GOKU sent messages stating: "Hello, brother. Let me know if you can take those today." GOKU messaged Mr. Habib on Threema later that day in a chat that is at GX-402. GOKU wrote: "hey, bro." "Can you please ask your boy Tana to send drop info," and "I have to drop them or they gunna sell." Mr. Habib responded: "I'll call right now" and "he said someone coming to cold the nine in like a hour and then he wants the 20. He said he don't feel comfortable owning for 10 and taking more." GOKU and Mr. Habib then continued exchanging messages about the narcotics.

A few days later, Mr. Habib engaged in an exchange about payment for the drugs. This is also at GX-402.
Mr. Habib sent a message to GOKU asking: Bro, towards the end of the month I was wondering if I could get my lil cut. I haven't really been keeping track, but I'm kinda in a tight spot and could use it." After GOKU replied that he can "pass PPR, which appears to mean paper, to your PPL, which appears to mean people, in dot," Mr. Habib responded: "I don't know how much this is or will be, but if easier for you, I can take WRK, which appears to be work, and also I wanna try and get my east coast program back up." The government has proffered that the term work is slang for narcotics, and Mr. Habib also does not

dispute that interpretation.

A couple hours later, GOKU sent another message to Mr. Habib stating: "I mean, I put 250 bucks on top every unit. There's not much room because they need it for so cheap, so it's 100 and 100 and 50 for the handler. Mr. Habib responded: "I thought it was 200$. 100 is crazy, but I'm not gunna cry. Ima show these guys they need to break me off. Also, I make more off selling an lb of weed." GOKU then responded: I tried to charge more, if you'd look at the chat, and they said they can't do it."

Mr. Habib's participation in the Threema and Signal group chats and his personal messages with GOKU demonstrate that he was involved in narcotics trafficking activity as late as October and November 2022.

The evidence also established that Mr. Habib was, at a minimum, an associate of the Wolfpack Alliance, a Canadian drug-trafficking organization. On February 28, 2022, Mr. Virk sent a message to Mr. Cheema asking: "Hey, Bro. Gato is from Toronto." This exchange as GX-301-2. A few minutes later Mr. Cheema responded: "There WP guys" and "you know WP?" Mr. Virk then responded: "No," to which Mr. Cheema answered: "Wolfpack." Later, on March 9, 2022, a screenshot recovered from a phone belonging to Mr. Cheema showed a screenshot of an exchange between Mr. Habib and an individual in which Mr. Habib told that individual: "Bros telling me he wants me to welcome

you to the pack brother, wolf emoji, wolf emoji, wolf emoji, muscle emoji. It's been a little time and discussion, but today he told me it's time, so let me be the first to welcome death to my bro. Wolf emoji, muscle emoji, wolf emoji." That is at GX-604.

In addition, the evidence shows that Mr. Habib was in direct contact with Rabih "Robby" Alkhalil, the leader of the Wolfpack Alliance. And as I will discuss next, Mr. Habib assisted Mr. Alkhalil in his efforts to recover a purported drug debt from CS-1. These facts, in conjunction with the evidence of Mr. Habib's drug trafficking activity, establish that Mr. Habib was at least an associate of the Wolfpack Alliance and assisted the Wolfpack Alliance in its drug-trafficking activity.

Following law enforcement's seizure of the New Jersey and Kansas City shipments, Mr. Habib took part in threatening CS-1 in order to help collect on the purported drug debt that CS-1 owed as a result of those seizures. On March 18, 2022, Mr. Habib sent messages to CS-1 stating: "Bro, call me" "before you talk anymore to Jefe" and "Fuck. Ur making me look like a retard." This is at GX-501-1. Jefe is the alias of Mr. Alkhalil, again, the leader of the Wolfpack Alliance.

Along with those messages, Mr. Habib sent CS-1 a screenshot of messages that Mr. Habib had received from Mr. Alkhalil. The messages from Mr. Alkhalil read: "Are you

kidding? The guy you gave this to us a fuckin bum". "He's broke." "40K". "Bullshit, bro. What are you gonna do?" "How will you sort this?" "This is all interest." "I'm not accepting this off the debt." "And I want you and your buddy stop telling me money coming any day." "And feed me a bunch of dreams." and "when will I have my money?" These are at GX-501-2 and GX-501-3.

The following day, Mr. Alkhalil sent CS-1 messages directly complaining about the drug debt: "Bro, what happened to 7-900K?. "You have zero access to funds, basically." "No houses, cars. Your business doesn't seem like it's gonna give you any money." "How am I going to get paid?" "Obviously not from you." "I been getting stories about mortgages." "And liquor stores and selling." Those messages are GX-502-2 and GX-502-3.

Later, on May 23, 2022, Mr. Habib sent a message to Jacob Ross, an unindicted coconspirator, requesting information on CS1's home address and the job address of CS-1's wife, telling Mr. Ross to "keep it between you and me."

(Continued on next page)

THE COURT: Mr. Ross responded that he would try to obtain that information, and later sent Mr. Habib a picture of the driver's licenses of CS-1 and CS-1's wife. That is at GX 513-2. Mr. Habib and Mr. Ross then exchanged messages regarding CS-1's address, with Mr. Habib complaining that CS-1's current address did not line up with information Mr. Ross had provided. Mr. Habib stated that CS-1 was now living in a townhouse in a different location and that this was the address Mr. Habib needed. Those messages are at GX 513-3 and GX 513-4.

The next day, on May 4, 2022, Mr. Habib sent a screenshot to CS-1 of messages between Mr. Habib and Frank. Frank was one of the owners of the seized narcotics who is likely an associate of Mr. Alkhalil. Along with that screenshot, Mr. Habib wrote: "Ignoring isn't going to fix this shit." The screenshot that Mr. Habib sent to CS-1 is at GX 504-4.

In the screenshot, Frank had sent CS-1's wife's photograph to Mr. Habib, which was the same photograph appearing on the driver's license that Mr. Ross had previously sent to Mr. Habib. *Id.*

The screenshot shows that Frank also wrote: "It's been 3 months and he's not a man of his word I suggest you get outta there we're going to grab her." *Id.* In a second screenshot that Mr. Habib sent to CS-1 that day, Frank messaged Mr. Habib

the names and addresses for CS-1 and CS-1's wife. That screenshot is at GX 504-3. The names and addresses matched the information on the driver's licenses that Mr. Ross had sent to Mr. Habib.

In the screenshot, Frank also wrote: "They found another address they gps his Volkswagen lead them to an complex [redacted address] I have a close eye on the girl driving the Volkswagen." *Id.* The screenshot also shows that Mr. Habib replied to Frank, stating: "Dam" "I don't know who [redacted name] is his wife's names [redacted name]" "But yea they live in a gated complex let me try and reach out again I really don't want anymore headaches bro." *Id.*

That same day, Mr. Habib sent a message to CS-1 stating: "you're a big boy e you knew what u was getting into I told u and u also agreed it's your fuck up and you going to pay your bill so fix it." That message is at GX 504-7. Mr. Habib also told CS-1 "I'm telling u bro I tried to help I tried to buy time" and mentioned that Frank "found your info and he said he's been looking into you since the 400 and he also said The way this guy looked u up is your all over the internet." That message is at GX 207-16. CS-1 replied: "Perfect" "He got my first name and last name from you." *Id.* The following day, Mr. Habib sent messages to CS-1 stating: "Yo" "JEFE is back" "And tripping call me when you u" "Up." Those messages are at GX 505-2.

Mr. Habib continued messaging CS-1 regarding the drug debt in late May, June, and July 2022. Mr. Habib sent a message to CS-1, which is at GX 508, stating: "Bro please arrange this paper to drop off these guys are asking me." GX 508. Then, on June 28, 2022, Mr. Habib sent messages to CS-1, which are at GX 509-1, stating: "I thought ur guy was doing it for u u told me u was making payment on the 14th" "Over and over your making me look like I'm full of shit and just covering for u to buy time bro do u think that this is going away? your starting to upset me u must thing tht this hole ordeals a joke or I'm just going to be responsible" "U think I'm dumb" and "What hotel are u at in Istanbul."

Mr. Habib also messaged CS-1 about the drug debt on July 1, 2022, writing:

Bro. Y are u taking so long the same way u text me u can text Jacob or who ever u told me the 14th now it's the 30 so 1 or 2 things first is u don't give a fuck and u not paying or 2 u think it don't matter when u tell me something if y not planing in taking care of this mess u got us in to just say it I don't need to keep getting this run around we're I'm from when someone gives u there word it means something let me k or what it is enough of the run around.

This message is at GX 509-2.

That same day, Mr. Habib wrote to CS-1:

Send to Jacob or machi if his guys back and last time

I paid the wire fee even after u said u would it was 150$ it not about the wire fee it's about your lack of communication and consistency of taking of them when there's a bill like that and u pass 5k every 4 months what's u think it's going to get people to think u need to set a proper payment schedule u have no idea how much I had put my head out for u how much a vouch for u but I'm starting to look like I'm just covering up for u and full of shit u need to be more on top of this bro make sure u face time me when you get back.

This message is at GX 509-4.

Mr. Habib continued messaging CS-1 regarding the drug debt in mid July 2022. On July 14, 2022, Mr. Habib sent a screenshot to CS-1 of messages that Mr. Alkhalil had sent to Mr. Habib. Mr. Habib's message with the screenshot is at GX 510-1. The screenshot showed Mr. Alkhalil writing, in part: "He's lying to you" "Sick of this back and forth" "Kill him or grab him or do something." *Id.* Mr. Habib sent a screenshot of those messages to CS-1 with the question: "How do you want me to answer to this." *Id.* Mr. Habib also messaged CS-1: "I'm just showing u what I'm dealing with" "I'm telling them to send someone to verify I'm not not telling u anything I'm being honest" "I told u just showing proof that you have a deal happening will make then ezz up a bit." That message is at GX 510-3.

These messages show that Mr. Habib played a role in

assisting Frank and Mr. Alkhalil in coercing CS-1 to repay a purported drug debt. Although some of the screenshots that Mr. Habib sent to CS-1 suggest that Mr. Habib may have been reluctant to use violence against CS-1 or CS-1's wife, Mr. Habib was proactively seeking out personal information regarding CS-1 and CS-1's wife from Mr. Ross and discussing that information with Frank. And in many of the messages to CS-1, Mr. Habib was demanding that CS-1 take steps to repay the drug debt while passing along threatening messages from Frank and Mr. Alkhalil. Accordingly, the evidence establishes that Mr. Habib took part in threatening CS-1 in connection with the drug debt.

Next and finally, in April 2022, Mr. Habib took part in a scheme to smuggle two wanted Canadian hitmen out of Canada and into the United States. Those two hitmen were Gene Lahrkamp and Duncan Bailey. At that time, Mr. Lahrkamp was wanted in connection with the murder of a drug trafficker in Thailand. Mr. Bailey was on house arrest in British Columbia after having been charged with conspiracy to commit murder following an attempted hit in Vancouver.

Much of the evidence of Mr. Habib's involvement in the scheme comes from messages sent in a Signal group chat called "Pp," which likely stood for "passport." That group chat is at GX 703. This group chat consists of hundreds of messages exchanged between various individuals involved in the scheme,

including Mr. Habib, Mr. Burgos, CS-1, and aliases likely used by one or both of the Canadian hitmen.

Mr. Habib sent messages in this group chat using a variation of the "El Gato" alias. Mr. Burgos sent messages in the group chat using the alias "Gorilla."

I will briefly summarize a few examples of exchanges that took place in that group chat.

On April 15, 2022, Mr. Habib sent a message in the group chat asking CS-1 to help procure passports for the hitmen, writing: "Hey Bk can you please arrange the pp for my bro dave." *Id.* CS-1 then replied: "Hey brothers todays and tomorrow is a holiday Sunday Monday will reach out and start the process will just need a pic." *Id.* at 7. The CS-1 then followed up: "Hi I just need to know which one is needed USA Romanian/Moldova I can find out about Russian but for now these are the 3 options American is obv a little more expensive than the others." *Id.* at 10. Mr. Habib responded: "Just get the R one," "Also need u to get goido [Guido] online," and "So we can arrange pick up in sea." *Id.* at 10-11. CS-1 replied "Will need picture," to which Mr. Habib answered: "Ok thank u I been msgkng [messaging] him but he hasn't answered." *Id.* at 11.

Over the next two days, a participant in the passport group chat who went by the alias Mr. Egan -- and may have been one of the hitmen or at least in contact with one of the hitmen -- and CS-1 exchanged additional messages about procuring

passports for the two hitmen. *Id.* at 16-19.

Regarding the passport photos for the two hitmen, Mr. Egan wrote: "Ok we can't get the photos just now we could in a bit the photos are in a email we can psss the log in for." *Id.* at 17. Mr. Egan eventually sent login information to CS-1 for email accounts that contained the passport photos. That message is at GX 705.

CS-1 accessed those accounts, which contained passport-style photographs resembling Mr. Lahrkamp and Mr. Bailey and what appeared to be fake driver's licenses belonging to them under the names "Oliver Flynn" and "Noah Wilson." Those apparently fake Florida driver's licenses are at GX 707-2.

Around this time, Mr. Egan also sent a message in the passport group chat asking: "Guido how are you are you good to pick us up soon?" GX 703 at 20. Mr. Burgos responded: "Yes." *Id.*

At the same time that CS-1 was working to procure passports for the two hitmen, Mr. Habib was coordinating transportation for them once they crossed the border, with the original plan seeming to have been to pick the hitmen up from Seattle and drive them to Los Angeles.

As also reflected on the chat at GX 703, between April 19 and April 21, 2022, Mr. Habib, Mr. Egan, CS-1, and Mr. Burgos exchanged messages coordinating the logistics of the

pickup of the two hitmen from Seattle. For example, on or around April 20, Mr. Egan sent a message in the passport group chat stating: "Will just need pick up somewhere around Seattle." CS-1 responded "[e]veryone will be ready" and Mr. Burgos responded: "Yes."

On April 21, 2022, Mr. Egan sent a message in the passport group chat stating: "Jerry. Will message gato for arrangements and bk for the passports." "Jerry" was the alias of an individual sending messages in the passport group chat and also may have been one of the two hitmen, including possibly the same person who was Mr. Egan.

And on April 24, Mr. Habib removed Mr. Egan from the passport group chat and added Jerry instead, in fact. The following day, Jerry sent a message in the group chat stating: "Lol all good bro we packed and ready to roll."

The evidence admitted at the *Fatico* hearing reveals many more messages sent back and forth in the passport group chat from April 21 to April 26 as the hitmen attempted to cross into the United States to Seattle. Those efforts proved unsuccessful, however, and on or around April 26 the group scrapped the plan for the hitmen to cross the border near Seattle and opted instead to have them fly east and attempt to cross the border closer to Montreal.

Specifically, on April 26 or April 27, 2022, Jerry sent messages in the passport group chat stating: "Mountains

didn't work" and "Acab sending a plane for us to go east." Around the same time, Jerry sent a message stating: "Yes west is a no go now we headed east will need east now" and "but talk to gato pls." Jerry also told Mr. Burgos to cancel the plans to transport the two hitmen from Seattle. These messages also are at GX 703.

Then, over the next two days, Mr. Habib and CS-1 exchanged messages to coordinate transportation for the two hitmen from Montreal to New York, and then from New York City to Los Angeles. These messages are at GX 701-1.

For example, on April 28, 2022, Mr. Habib sent a message to CS-1 stating: "They are getting dropped in nyc I need buddy's uncle to drive them back to la." "Buddy" was a reference to Mr. Burgos. Mr. Habib also asked CS-1: "Do u still have the guy that can bring people from Mtl to nyc." Around the same time, CS-1 and Mr. Burgos also exchanged messages, which are at GX 710, to coordinate transportation for the hitmen from New York City to Los Angeles. For example, on April 28, 2022, CS-1 wrote to Mr. Burgos: "G is going to reach out to u please mention to him again that you didn't get paid for the drops and you paid out of your own pocket to take care of the buys" "He also wants uncle to drive from NY to LA." And "G" is a reference to "Gato," one of Mr. Habib's aliases.

On April 28, 2022, however, the plane carrying the two hitmen east crashed in Ontario, Canada, killing both men. That

same day, Mr. Habib sent a message to CS-1 on the chat, that is GX 701-1, linking a news article describing the crash and stating: "Bro leave the pp group please asap." GX 701-1 at 31. Again, "pp" was the name of the passport group chat at GX 703. CS-1 replied: "They were on the flight." *Id.* Mr. Habib then wrote "Yea bro I'm so upset," to which CS-1 responded "Fuck how." *Id.* Mr. Habib then stated: "That's the 2 uncle was picking up." *Id.* Mr. Habib and CS-1 subsequently left the passport group chat, as reflected in GX 703.

This evidence supports the conclusion that Mr. Habib and his coconspirators played an active role in coordinating and facilitating the attempted escape of two hitmen from Canada, both by seeking to procure foreign passports for the two men and by attempting to arrange for transportation for them across the United States once they crossed the Canadian border.

Based on these factual findings, I will also now resolve Mr. Habib's specific objections to certain factual recitations contained in the presentence investigation report, or PSR.

First, Mr. Habib makes a broad objection to the PSR's characterization of his involvement in the Kansas City shipment, which is discussed at paragraphs 24 to 32 of the PSR. Specifically, Mr. Habib suggests that what he did was merely to be involved after the seizure by vouching for CS-1's statements

to the owners of the drugs that the drugs had been seized by law enforcement on March 2, 2022.

Based on the evidence submitted at the *Fatico* hearing, however, I found that in fact Mr. Habib played an active role in coordinating and facilitating the Kansas City shipment. Accordingly, I reject his suggestion that he only became involved after the fact by vouching for CS-1 to the other coconspirators, and I overrule his broad objection to these nine paragraphs.

Second, Mr. Habib objects to paragraph 21 of the PSR on the ground that it does not explain the context behind Mr. Habib's suggestion that those involved in the Kansas City and/or New Jersey Shipments take a polygraph test. *Id.* at 28. According to Mr. Habib, his suggestion to take a polygraph test was done to protect CS-1, not to harm him. *Id.* In other words, taking the polygraph would be a way for CS-1 to prove his innocence to the other coconspirators and thereby shield himself from reprisal.

Based on the evidence admitted at the *Fatico* hearing, I reject this objection. Following the seizure of the New Jersey shipment, Mr. Habib and the others involved in that Shipment exchanged messages attempting to determine who was responsible for the loss. In a Signal group chat, Mr. Habib wrote: "That's great but it still has no effect on there theory bros only way we can put this to bed is the poly I have to do

it king has to the driver have to tana we all have to I'm just waiting on the day and I'm heading there." That is at GX 201-8.

Mr. Habib also wrote: "How's it look we all do the poly and someone on ur guys side don't wanna go do it." That is at GX 201-9.

Soon after, Mr. Habib sent messages in the group chat directed toward CS-1 stating: "U guy are me," "If they pointing fingers at u then it's the same as me," and "Rite now they pointing at me." That is at GX 201-12.

And Mr. Habib, in the same chat, described how the polygraph works, writing: "And they way the test work they hook u up ask u questions when the answer is answered true the line dosnt move when. False it bounces." *Id.* Mr. Habib then wrote: "Need to bring anyone that was involved touched or had access." That's at GX 201-13.

Mr. Habib and CS-1 subsequently exchanged messages about setting up a polygraph appointment, and Mr. Habib mentioned that the polygrapher was "referred by the gambino family." That's at GX 202-3.

These messages do not suggest that Mr. Habib wanted CS-1 to take a polygraph for CS-1's own benefit, but that the use of polygraphs was contemplated for all members of the conspiracy involved in the New Jersey Shipment as a means of determining who betrayed the group. These text messages also

suggest that Mr. Habib was anxious that the owner of the lost shipment might hold him responsible for actions by CS-1.

Accordingly, I find that paragraph 21 is accurate as written, and I overrule Mr. Habib's objection to that paragraph.

Mr. Habib next objects to paragraph 26 of the PSR insofar as it states that Mr. Habib asked CS-1 to arrange for drivers on the ground that this statement implies that the shipment was Mr. Habib's. PSR at 28-29.

To the contrary, Mr. Habib asserts that the shipment was arranged by CS-1, who he alleges was the buyer of the drugs, and that it would therefore make no sense for CS-1 to have supplied drivers. *Id.* at 28. Mr. Habib again asserts that his involvement in the Kansas City shipment was only "minimal until after the seizure." *Id.*

On a recorded call in May 2022, however, Mr. Habib told CS-1: "if you would have told me that it was Dre's ride from the beginning." GX 208-T at 10. CS-1 responded: "It wasn't" "Do you remember what happened? Last minute last minute we needed a driver" and "I went to Dre." *Id.* This evidence is more consistent with Mr. Habib using CS-1 to facilitate the transportation of the shipments than with CS-1 being the primary organizer or buyer of the shipments, a proposition for which Mr. Habib has not offered any other convincing evidence.

Also in May 2022, CS-1 and Mr. Habib exchanged

messages regarding the purported debt that CS-1 owed to Frank and Mr. Alkhalil. As I noted earlier, during that exchange Mr. Habib sent CS-1 a screenshot of messages from Frank threatening CS-1 and his wife, and Mr. Habib wrote: "Ignoring isn't going to fix this shit." GX 504-4. CS-1 then responded: "You asked me for a driver I found you one" and "You sending them to me instead of Dre cool no problem." That is GX 504-6.

These exchanges undercut Mr. Habib's objection that the PSR inaccurately suggests that he had used CS-1 to provide drivers to transport narcotics.

Additionally, for the reasons I discussed earlier, Mr. Habib's involvement in the Kansas City shipment was not "minimal." Accordingly, I reject the objection to paragraph 26, and will leave that paragraph unchanged.

Mr. Habib next objects to paragraphs 27, 28, and 37 of the PSR to the extent they suggest that Mr. Habib took part in threatening CS-1. As discussed a few moments ago, I do find by a preponderance of the evidence that Mr. Habib assisted Frank and Mr. Alkhalil in threatening CS-1, including by passing along threatening messages sent by Frank and Mr. Alkhalil and by procuring personal information about CS-1 and CS-1's wife from Jacob Ross while telling Mr. Ross to "keep it between you and me." GX 513-1.

Because Mr. Habib was taking part in the efforts to threaten CS-1 around the same time as sending messages like "I

tried to help I tried to buy time," I find that the PSR's suggestion that Mr. Habib attempted to position himself as a mere conduit between Frank or Mr. Alkhalil and CS-1 is accurate; therefore, I overrule Mr. Habib's objection to paragraphs 27, 28, and 37.

Next, Mr. Habib broadly objects that the PSR "does not adequately reflect the lack of involvement of Habib in the drug shipments."  PSR at 30.  As previously explained, however, I find by a preponderance of the evidence that in fact Mr. Habib played an active role in both the Kansas City and the New Jersey shipments, and that Mr. Habib also participated in narcotics trafficking in and around October and November 2022. Accordingly, I reject Mr. Habib's objection to the PSR's purported failure to minimize his role.

And finally, I note that the PSR on pages 30 to 32 places two responses by the government back-to-back without an objection by Mr. Habib in-between them, so there does not appear to be any other objection in the presentence investigation report for me to address.  But maybe to that point, I want to make sure that that is the case and there are no other objections to the presentence investigation report that Mr. Habib has raised or wished to raise.

Have I covered all the objections, Mr. Reizenstein?

MR. REIZENSTEIN:  Yes, Judge.

As I noted, our objections were lodged for a reason

that it's clear to me the Court understands but did not affect guidelines calculations, and you have addressed them.

THE COURT: And does the government have any objections to the factual recitations in the presentence investigation report?

MR. SHAHABIAN: Just one minor correction, your Honor, as we noted in our December 23 letter at footnote one, which is on page five.

THE COURT: Uh-huh.

MR. SHAHABIAN: Paragraph 14 dates a message as March 18, 2022, about please guys can we give Burgos a rough schedule, and that should be March 20, 2022.

THE COURT: I'm sorry. You said that was paragraph 16?

MR. SHAHABIAN: Fourteen.

THE COURT: Fourteen.

MR. SHAHABIAN: So, the date March 20 in the middle of the paragraph --

THE COURT: Okay.

MR. SHAHABIAN: -- should be March 18.

THE COURT: Any objection to that change, Mr. Reizenstein?

MR. REIZENSTEIN: No, sir.

THE COURT: Okay. So, towards the middle of paragraph 14, it will now read: For example, on

March 18, 2022, Habib asked the signal group, "please guys can we give Christopher Burgos a rough schedule"; is that right?

MR. SHAHABIAN: Yes, your Honor.

THE COURT: Great.

Anything further?

MR. SHAHABIAN: No, your Honor.

THE COURT: Okay. So, in light of my findings, I will adopt the factual recitations set forth in the presentence investigation report, aside from my deletion of footnote 4 and the modifications to paragraphs six, seven, eight, 14, and 125. And of course, I make the factual findings I just discussed.

I was going to turn now to the motion to enforce the plea agreement, but let me see if anyone would like to take a break at this point.

MR. SHAHABIAN: The government is fine, your Honor.

MR. REIZENSTEIN: We're good. Thank you for the offer, Judge. We're good to continue.

THE COURT: Great.

So, I of course heard some argument previously on this issue and I have reviewed the parties' submissions, but is there anything further either counsel would like to add on this topic?

I guess, Mr. Reizensten, since this is your motion, anything further you wish to add?

MR. REIZENSTEIN: Yes. May I have just a moment to

collect myself?

THE COURT: Absolutely.

MR. REIZENSTEIN: May I also stand over here?

THE COURT: Oh, yes.

MR. REIZENSTEIN: Thank you. It's easier for me.

THE COURT: As long as you're near the mic, that's fine.

MR. REIZENSTEIN: There's a microphone up here.

Does this work? Yes. The court reporter is nodding yes.

I will summarize my argument, Judge, and make just one or two brief observations.

We've provided the Court case law, and I don't think there's any dispute, as a general proposition, that when the defendant forfeits valuable rights and agrees that he's going to prison without a trial, the highest standard of fairness means that the government should not engage in plea agreements without the defendant being fully informed. I think the quote in my argument to the Court was as if they're selling a used car. And the question, I think, before the Court was what did Mr. Habib reasonably understand, what did I as his counsel reasonably understand, as we entered into this plea agreement.

Well, we knew when we entered into the plea agreement, and we have not said we didn't, about the issues that the Court has resolved here today regarding what occurred in Canada with

the Canadian hitmen. We knew about the allegations regarding Mr. Habib's involvement with the Wolf Pack, and we knew and Mr. Habib accepted responsibility for the allegations that were made regarding the threats to the confidential informant and his wife. And because of the case law that we cited, because of the issue of reasonableness, because of the essential -- what I think shows by courts that the government must honor the spirit as well as the letter of the agreement, that what the government was left with was the argument that things for them fundamentally changed at the time after Mr. Habib pled that they accessed his second phone.

And my brief response, which I've said before but I think bears highlighting now is, it is just not reasonable for their assertion that this was knowledge that was new to them when the confidential informant apparently became a confidential informant when the Kansas City shipment was seized.

I know from my ten years as a prosecutor working for Jen Moreno's office in Dade County, Florida, in the 1980s and '90s when there was a tremendous amount of narcotics prosecutions that I was involved in because I was in the narcotics unit, is that when people begin to cooperate, they're debriefed. Now, back then we didn't have the phone evidence we have today, but I think all of us know from our experience that when people begin to cooperate and they're debriefed, their

phones are searched. If they want to cooperate with the government, they have to give up what they have.

And so I have asked continually for the government to address my argument that what they learned from Mr. Habib's phone ostensibly would have partially been through conversations with the informant they did not know in March when they arrested the informant, they debriefed the informant, and they reviewed his phone. And the response I get is deafening silence. They just won't address that argument.

And I'll just conclude with this. The Court knows that I'm from Miami. I'm staying in Midtown. I looked out my hotel window and I saw the United Nations. And I'm a student of history, and it occurred to me that, famously at the United Nations during the Kennedy administration and the Cuban Missile Crisis, Adlai Stevenson was our embassador to the U.N. And when he brought evidence of Russia's involvement in placing missiles in Cuba, the Russians wouldn't respond. He famously said, "I'm prepared to wait here, Mr. Ambassador, until hell freezes over." Well, it's cold outside today in New York.

The government has never addressed the argument that what they've learned was different than what the informant told them. And I submit to you that until they do that, their request to exceed the guidelines under 3553(a) is not well taken, and that my motion to enforce the plea agreement and have my client sentenced within the guidelines or strike the

government's request to exceed the guidelines should be granted. Because when you boil it down, that's the new piece of information and it just doesn't make sense, when they had the informant on their team, cooperating with the FBI at that time period.

Thank you.

THE COURT: How would have it impacted the plea agreement, though? I mean, perhaps it would have resulted in a higher offense level by two points, but most of what we're talking about here is not something that really seems to affect the guidelines range but it goes to other Section 3553(a) factors, and the agreement makes clear that both parties can argue for a higher or lower sentence based on those factors.

MR. REIZENSTEIN: I cited to you the *Davis* case.

THE COURT: Yes.

MR. REIZENSTEIN: The government breaches a plea agreement when its overall conduct is inconsistent with what is reasonably understood by the defendant when entering a guilty plea. And my argument to you, and I understand what you're saying to me, is that when you're dealing with the Department of Justice, they have an obligation, just like they told me about Wolf Pack, just like they informed us about the Canadian hitman scenario, to say, our understanding from the informant is that there's a significant amount of activity that is not accounted for here, and beyond that clause that either party

can go above this, you need to reasonably understand we're going to make that motion because we know this information, and it's not going to be two years, it's not going to be four, it's going to be double. So that I can say to my client, look, there's stuff floating around out there that you're not charged with, and they fulfilled their obligation, they've alerted me to what they've known, and most likely, if you enter a plea, guidelines are going to be in play only to a small extent and you're looking at something double. My point is, if they didn't know it, so be it. But their argument to exceed it is based significantly on the new evidence and I just can't wrap my head around the fact that this is new evidence that the informant didn't tell them, since it's my client's dealings, a lot of with the informant.

So, I guess my simple answer is that little clause that either party can go ahead and go higher isn't enough to put us on notice, based on what I think they know.

THE COURT: And we've discussed this before, but in terms of the relief you're seeking, you're asking to enforce the plea agreement, but what does that mean? Because enforcing the plea agreement -- again, we're going back to the same clause with the plea agreement is that parties agree what the guidelines range is but either party can argue for above or below that.

MR. REIZENSTEIN: I guess, I see what you're saying.

There is, in a sense, a circular pattern to this where if my motion is granted, we go back to the agreement that allows them to go above it, and I do understand that.

So, first, let me say, you have offered Mr. Habib more than once the opportunity to withdraw the plea, and he has consistently rejected that. I've never specifically advocated for it, and I believe we're on the same point today, and if not he'll correct me. So, I think that, to use a phrase that's been used in this court before, it may be inartfully drawn and argued because not only did I ask to enforce the plea agreement but also to strike the government's sentencing request to exceed the guidelines. And based on your correct analysis that if my first part is correct, we've circularly reasoned ourself back into a plea agreement that allows them to do it, I guess I should more forcefully say to strike their request to go above 3553(a), and I do believe is more logical.

That's all, sir.

THE COURT: Thank you very much.

Mr. Shahabian.

MR. SHAHABIAN: Yes, your Honor.

I know the Court is very familiar with the contours of this argument from the briefing. I just want to make things clear on the record that I think the Court already knows.

The plea agreement never restricted the government's ability to seek any sentence it felt appropriate under the

Section 3553(a) factors up to the statutory maximum of life imprisonment. It's in the four corners of the plea agreement.

What the plea agreement does is stipulate to a guidelines range. We disclosed all of the evidence that we had in our possession that was required to be disclosed at the time this plea agreement was reached, including, as we've discussed today, evidence about the defendant's involvement with Wolf Pack, with the hitmen, with the threats to the CS, much of which just doesn't factor into the guidelines range in any shape or form and goes to 3553(a) arguments that the plea agreement expressly reserves the government the ability to argue above the guidelines range, as we have done and as we continue to do.

The only reason that, at various points, the government referenced the new information it had learned from the second Habib phone extraction post-plea agreement is because it bore on the government's sentencing position in two respects:

One, the stipulation to a drug quantity in the guidelines range that was then supplemented by evidence of additional narcotics trafficking that the government could now prove the defendant's knowing involvement in that were not reflected in the agreement we struck at the time and that we were honoring and continuing to honor.

What the government may have known or suspected or

heard from witnesses, as the Court is aware, doesn't necessarily bear on what the government believes it can prove by competent evidence to the Court at a *Fatico* hearing and that informs the plea negotiations and the bargains the government is willing to strike. That quantum of evidence changed when we extracted the second Habib phone that had all the November 2022 references to continued drug trafficking and informed our ability to say it wasn't just the Kansas load and the New Jersey load, it's this ongoing pattern. And so we wanted to bring that to the Court's attention only to explain what would otherwise be an apparent discrepancy between the plea bargain and later 3553(a) arguments.

Similarly, it also related to the government's argument that the defendant has attempted to obstruct justice by advance -- and again, although the plea agreement allows the government to seek additional points for obstruction of justice, we're not doing that. We still think it's relevant as a Section 3553(a) argument. And the difference between what the argument the defendant attempted to advance both at his plea colloquy and in his objections to the presentence report were undermined significantly by the additional evidence that was extracted from that second phone after those representations were made and showed the defendant's attempt to minimize his responsibility and to obstruct this Court's understanding of his role in ways that were contradicted by

that new evidence. That's the only thing the post-plea evidence relates to, not the government's ability to hold Mr. Habib accountable for all of the factors relevant under Section 3553(a).

THE COURT: And I know you're not arguing for obstruction of justice, but this wasn't situation like with Mr. Cheema where the conduct occurred after his arrest; is that right?

MR. SHAHABIAN: That's right, your Honor. The obstruction is the plea colloquy and the objections to the PSR tailoring to what Mr. Habib thought we would be able to rebut at the time. We got more evidence that we could show he was lying once we extracted the second phone.

THE COURT: Why was the drug base offense level not 38 under 2D1.1(c)(1) here? Did you not have that additional information at the time of the plea?

MR. SHAHABIAN: No.

And I want to be careful not to get into the specifics of plea negotiations. But if you look at what we had at the time the plea bargain was struck and now, we had the defendant's involvement in two narcotics transactions: The Kansas City shipment and the New Jersey shipment. We had no difficulty proving with the text messages and the documentary evidence that the defendant knowingly engaged in narcotics trafficking in March with connection to the New Jersey

shipment, in part because he'd already been involved in the Kansas City load. What was more difficult would be establishing, just based on the text messages that the Court reviewed in detail, that in February the defendant knew at that time what he was arranging was a narcotics transaction, because we had no additional evidence of his prior involvement that would have allowed us to prove knowledge in a way that we felt comfortable proceeding, for example, at a *Fatico* if he objected to his knowing involvement in transporting narcotics as opposed to something else in February.

That changed when we extracted the second Habib phone because now it's not just two narcotics transactions, it's multiple narcotics transactions continuing into the future, demonstrating his familiarity with terms like work and books and winds and high heat, his reference to restarting his program, that that evidence provides additional circumstantial evidence that informs whether in February he knew he was participating in a narcotics load. That's the judgment the government was striking in agreeing in the plea agreement before that second phone extraction that we might not be able to prove at a *Fatico* that he knowingly engaged in narcotics trafficking at the time of the Kansas City shipment.

THE COURT: Okay. Thank you.

MR. REIZENSTEIN: Judge, may I have a brief response?

THE COURT: You may, yes.

MR. REIZENSTEIN: And in making this response, because I'm going to raise something new, if the Court wants to hear from the government I certainly wouldn't object to that.

So, as I hear them and I understand it, it's these activities that occurred in October and November of 2022. And one of the things we had referenced, although very briefly, at the *Fatico* hearing was correspondence between the government and Mr. Cheema's attorney that was provided to me by Mr. Cheema's attorney, and that occurred in November of 2023 before my client pled. And in that correspondence to resolve Mr. Cheema's case, these drug deals of Mr. Habib are referenced by the government to Mr. Cheema's counsel. It was in my *Fatico* presentation, and it talks about a theme of group chat with Cheema and others, 11/5/2022, 89 kilos of meth, two kilos of coke, a group chat with Cheema and many others.

It goes back to my point that when they say the extraction from Mr. Habib's phone, they had used this word but I'm going to use it, fundamentally changed their view of Mr. Habib to the point where they feel obligated to go above the plea agreement, I get back to my point that they had enough to reasonably advise us that this was out there as opposed to buyer beware.

MR. SHAHABIAN: If I could respond to that, because I think --

MR. REIZENSTEIN: We have no objection to that.

MR. SHAHABIAN: -- there's a factual misunderstanding.

What Mr. Reizensten is referring to is the Cheema phone that had already been extracted that includes chats from October and November 2022. Some of those include Mr. Habib, as the Court went through. There are additional chats demonstrating Mr. Habib's involvement from November 2022 -- again, which the Court just relied on -- which we did not have available until the second Habib phone was extracted.

Now, as the Court is aware, the government is always making judgments about when do we have enough evidence that we feel comfortable proving something such that it's going to be included in a plea agreement. And it's not a question of whether we fundamentally think differently of Mr. Habib now than we did before that phone extraction. Frankly, we have the same view. It's what we thought we could prove by a preponderance at a *Fatico*, and so what we were willing to agree to and stipulate to in a plea agreement for the offense level at the time the plea bargain was struck.

And once we obtained additional evidence, which we had an obligation to explain to the Court in advancing our view of the facts and our understanding of Mr. Habib's role, we are not seeking an adjustment to the guidelines range. But as the Court is asking and as we were anticipating, the question was why wasn't this included in the drug quantity at the time the plea bargain was struck, and I'm explaining to the Court how

that judgment was made. It's what we thought we were comfortable proving at that time based on the evidence we had at the time.

We then obtained additional evidence which we felt obligated to bring to the Court's attention under the Section 3553(a) factors. We are standing by the bargain we struck at the time we struck it in terms of the offense level.

THE COURT: Okay.

MR. SHAHABIAN: But it bears on this Court's understanding of this defendant's specific characteristics, of his role in the offense, of what the offense conduct is, which is he's a repeat narcotics trafficker, not a mechanical calculation of whether it's 400 kilos of cocaine or a little more that would pump him up into another two-point range. That is not what's driving the government's recommendation of a significantly-above-guidelines sentence of 25 years.

THE COURT: Let me resolve the motion by Mr. Habib to enforce the plea agreement which is at docket numbers 205 and 206.

To briefly summarize, and as indicated by the arguments I just heard, Mr. Habib argues that the government is in breach of the plea agreement that the parties entered into by virtue of the government advocating for an above-guidelines prison sentence of 300 months, and that is after the government previously had advocated for a sentence of 360 months'.

Mr. Habib argues that the government's advocacy for this sentence is inconsistent with the plea agreement and defeats his reasonable expectations at the time he entered into it. Accordingly, Mr. Habib seeks specific performance of the plea agreement, and particularly an order that requires the government to seek a within-guidelines sentence. For the following reasons, I deny the motion.

Mr. Habib pleaded guilty to the offense, for which he will be sentenced today, on December 20, 2023, pursuant to a written plea agreement. Under the terms of the plea agreement, Mr. Habib and the government stipulated to an advisory guidelines range of 168 to 210 months' imprisonment.

Under the terms of the plea agreement, the parties stipulated that "neither a downward nor an upward departure from the Stipulated guidelines Range . . . is warranted," and the parties agreed that neither side would seek a departure from or an adjustment to the stipulated guidelines range, outside of in a few expressly delineated circumstances. The parties agreed, however, "that either party may seek a sentence outside of the stipulated guidelines range based on the factors to be considered in imposing a sentence pursuant to Title 18, United States Code, Section 3553(a)." The plea agreement also stated that "nothing in this agreement limits the right of the parties . . . to present to the Probation Office or the Court any facts relevant to sentencing."

At his change-of-plea hearing on December 20, 2023, Mr. Habib confirmed under oath that he read the plea agreement, fully understood it, and discussed it with his attorney, which Mr. Reizenstein corroborated. I also explained to Mr. Habib that given the advisory nature of the guidelines, I would have the power to impose a sentence below or above the guidelines range, and that I would be able to arrive at a sentencing determination only after having considered the submissions from Mr. Habib's lawyer and from the government, and after having considered all applicable sentencing factors. Mr. Habib confirmed he understood that as well.

This case is, therefore, similar to the Second Circuit's decision in *United States v. Sealed Defendant One*, 49 F.4th 690 (2d Cir. 2022). In that case, the defendant pleaded guilty pursuant to a written plea agreement which contained a stipulated guidelines range of 46 to 57 months' imprisonment. The plea agreement, however, "also provided that either party could seek a sentence outside of the stipulated guidelines range." Accordingly, the defendant argued for a below-guidelines sentence of time served, which would have been approximately 26 months in prison, while the government argued that an above-guidelines sentence was necessary. The district court ultimately imposed an above-guidelines sentence of 84 months' imprisonment.

On appeal, the defendant argued that the government

breached the plea agreement by advocating for an above-guidelines sentence. In rejecting that contention, the Second Circuit explained that the defendant's plea agreement expressly allowed both sides to advocate for sentences outside of the stipulated guidelines range, and observed that "the government and sealed defendant both availed themselves of this provision in arguing, respectively, for sentences above and below the stipulated guidelines range." Accordingly, the Second Circuit held that the defendant "offer[ed] no persuasive explanation of how the plea agreement could be breached by conduct it expressly permitted."

The Second Circuit reached the same conclusion in two earlier summary orders: *United States v. Parrish*, 755 F. App'x 59, 62 (2d Cir. 2018), and *United States v. Martin*, No. 20-3673, 2022 WL 701712, at *2 (2d Cir. Mar. 9, 2022). In both of those decisions, the Second Circuit similarly found no error in the government's advocacy for an above-guidelines sentence where the plain language of the respective plea agreements allowed the government to seek an upward variance based on the Section 3553(a) factors.

The Second Circuit's decisions in *Sealed Defendant One*, *Parrish*, and *Martin* lead me to conclude that the government did not breach the plea agreement in this case. As noted in Mr. Habib's plea agreement, it expressly states that both parties are allowed to advocate for sentences outside of

the stipulated guidelines range of 168 to 210 months based on the Section 3553(a) factors. At the same time, nothing in the plea agreement suggests that either party would limit its sentencing advocacy to seeking a sentence within the stipulated guidelines range or otherwise limit the information that it would present to me for sentencing purposes.

Mr. Habib himself has taken advantage of the plea agreement's provision allowing advocacy for a variance, arguing that under the Section 3553(a) factors, the Court should impose a below-guidelines sentence and supplying me with evidence and information in support of that position. In his lead sentencing submission, Mr. Habib asked for a sentence of the mandatory minimum of ten years' imprisonment, and in his post-hearing submission, he asked for a sentence at the low end of the guidelines or below. So, too, has the government, arguing that the Section 3553(a) factors indicate that the appropriate sentence is at least 300 months' imprisonment.

Under the express terms of Mr. Habib's plea agreement, both parties' respective arguments for a variance are permitted, and, therefore, the government's sentencing advocacy in this case could not have defeated Mr. Habib's reasonable expectations in entering into the plea agreement. Accordingly, I conclude that neither the government nor Mr. Habib breached the plea agreement through their respective advocacy for a variance.

To the extent that Mr. Habib argues that the nature of the government's sentencing arguments render the plea agreement void for lack of consideration, I reject those arguments as well. In particular, Mr. Habib's motion suggests that the government's sentencing arguments involving the Kansas City shipment and Mr. Habib's subsequent involvement in narcotics trafficking violate the government's promise not to further prosecute him for narcotics activities between February 2022 and November 2022. But as noted, the plea agreement clarifies that "nothing in this agreement limits the right of the parties . . . to present to the Probation Office or the Court any facts relevant to sentencing." The government was, therefore, well within its rights to present evidence of Mr. Habib's involvement in other episodes of narcotics trafficking as information relevant to sentencing under the Section 3553(a).

And even setting aside the fact that the express terms of the plea agreement authorize the government's advocacy for an upward variance, the plea agreement is supported by several additional pieces of consideration, including a reciprocal appellate waiver, a stipulated guidelines range which contemplated a drug weight that did not include the additional drug trafficking activity, and a promise by the government not to request any departures from or adjustments to the stipulated guidelines range absent certain limited exceptions.

The nature of the remedy that Mr. Habib requests for

the government's alleged breach of the plea agreement further demonstrates why his motion must be denied. As the Second Circuit has held, "it is well established that the remedy for a breached plea agreement is either to permit the plea to be withdrawn or to order specific performance of the agreement." *United States v. Palladino*, 347 F.3d 29, 34 (2d Cir. 2003) (cleaned up).

Mr. Habib has not sought to withdraw his plea and has, instead, asked for the remedy of specific performance. Specifically, Mr. Habib requests an order directing the government to advocate for a within-guidelines sentence.

(Continued on next page)

THE COURT: That remedy, however, would conflict with the multiple provisions of the plea agreement I just mentioned, which expressly prevent the government to advocate for an above-guidelines sentence. So even if I were to find that the government had breached the plea agreement, which again I do not find, I would not, as a matter of specific performance, order the government to limit itself to arguing for a sentence within the stipulated guidelines range.

Finally, I note, at the conference held on October 7, 2024, I raised a separate question as to whether the language in the government's original sentencing submission that referred to a potential guidelines enhancement violated a provision of the plea agreement, stating that neither party could advocate for an adjustment to the stipulated guidelines range absent certain narrow circumstances that are not relevant for purposes of this discussion. With the government's consent, I then ordered the sentencing submission to be stricken. I also directed the government to refile a sentencing submission that made clear that the government was not seeking any adjustment to the stipulated guidelines range, which it did on December 24, 2024. The government also expressly retracted any implication that it was seeking an adjustment to the guidelines range at the October 7 conference, as well as at the earlier conference held on August 21, 2024.

Following these clarifications, Mr. Habib, in his

reply brief filed on November 11, 2024, waived any further challenge based on the government's promise, under the plea agreement, not to advocate for an adjustment to the guidelines. In light of Mr. Habib's waiver and the measures already taken to ensure the government's compliance with the plea agreement, there is no need to address this aspect of the plea agreement further.

For those reasons, I will deny Mr. Habib's motion to enforce the plea agreement and consider both parties' sentencing arguments on their merits.

We have talked a lot about the guidelines. I'll turn more to sentencing guidelines now.

Although I am not required to follow the U.S. Sentencing Guidelines, I still must consider the applicable guidelines in imposing Mr. Habib's sentence. So to do that, it is necessary for me to accurately calculate the guidelines sentencing range.

I just talked about the plea agreement in this case. That plea agreement arrived at an offense level of 35 and a criminal history category of I, resulting in a guidelines range of 168 to 210 months' imprisonment, and the probation department appears to have arrived at the same guidelines calculation.

Is that right? Is that what probation arrived at as well? In other words, there is no difference between how

probation calculated the guidelines and what is contained in the plea agreement. Is that right?

MR. SHAHABIAN: That's correct, your Honor.

MR. REIZENSTEIN: We also agree.

THE COURT: Mr. Shahabian, does the government move for the third acceptance point, pursuant to Section 3E1.1(b)?

MR. SHAHABIAN: Yes, your Honor.

THE COURT: I grant that motion.

Does either party have any objection to the guidelines calculation in the presentence investigation report?

MR. SHAHABIAN: No, your Honor.

MR. REIZENSTEIN: No, Judge.

THE COURT: So I will adopt that calculation, and I'll explain what that entails. The applicable guidelines is at Section 2D1.1. Because the Mr. Habib's offense involved at least 150 kilograms of cocaine, but not more than 450 kilograms of cocaine, the base offense level is 36 under Section 2D1.1(a)(5) and (c)(2). That is based on the amount of cocaine seized by law enforcement in connection with the New Jersey shipment, which was approximately 400 kilograms. As I explained earlier, I find that Mr. Habib played an active role in coordinating that shipment.

Because Mr. Habib made a credible threat to use violence and/or directed the use of violence in connection with this offense, two levels are increased pursuant to Section

2D1.1(b)(2). That is because of my findings earlier; in particular, that Mr. Habib took part in actions, along with Frank and Mr. Alkhalil, to threaten CS-1 in connection with the purported drug debt that CS-1 was accused of owing. Because of Mr. Habib's timely acceptance of responsibility, I reduced the offense level by three points under Section 3E1.1.

That results in an offense level of 35.

I find that Mr. Habib has no criminal history, so he is in category I.

At offense level 35 and criminal history category I, the resulting guidelines range is 168 to 210 months' imprisonment, and the guidelines fine range, after determining Mr. Habib's ability to pay, is $40,000 to $10 million.

As we have also discussed at length today, the plea agreement appears to provide that neither party would be seeking a departure from the stipulated range, and, of course, I'm talking about a departure separate from a variance, which, obviously, both parties are advocating for.

Mr. Reizenstein, does the defense seek a departure?

MR. REIZENSTEIN: I just want to make sure I'm using correct terminology. Departure meaning from the guideline range, as opposed to under 3553(a)?

THE COURT: You're correct.

MR. REIZENSTEIN: We have negotiated not to do that, and we stand by our word on that. We are not seeking that.

THE COURT: So the defense is not seeking a departure but will be arguing for a variance.

MR. REIZENSTEIN: Yes, sir. Sometimes I mix that up and get it backwards, so I just wanted to make sure I was right on point here. Thank you.

THE COURT: It's good to be clear.

Mr. Shahabian.

MR. SHAHABIAN: The government is not seeking a departure, your Honor.

THE COURT: I have also considered whether there is an appropriate basis for a departure.

While I recognize that I have the authority to depart, I do not find any grounds for warranting an upward or downward departure from the guidelines range in this case, and I therefore decline to depart.

We are at 12:10 p.m. now. What I was thinking was, I would hear from the parties as to sentencing and maybe then take a break for lunch and return around 2 p.m. to impose sentence.

Would that work for both parties, or are there conflicts that either of you have?

MR. SHAHABIAN: If it's possible to push back the reconvening to 3 p.m., that would work better for my schedule, but otherwise --

THE COURT: Mr. Reizenstein, do you have a flight to

get out?

MR. REIZENSTEIN: It's not a flight issue. I would try to want to do it earlier with the understanding that I understand your court personnel -- it's a personal issue. I prefer to explain it off the record.

THE COURT: No worries. I would be happy to keep going, although my concern is, I don't know how much argument I am going to have from the parties as to sentencing.

MR. REIZENSTEIN: On behalf of the defense, maybe just a five-minute summary of where we have been, where we are at, five, 10 minutes.

THE COURT: Why don't we go forward with that now and then we will take a break and resume around 1.

Mr. Shahabian, do you expect to have --

MR. SHAHABIAN: It's not going to be long, your Honor.

THE COURT: Let me hear from Mr. Shahabian first then.

MR. SHAHABIAN: Yes, your Honor. I know the Court is intimately familiar with the facts of this case, so I'll also try to be brief.

The government is seeking an above-guidelines sentence of 25 years for Mr. Habib, primarily for a few reasons.

One, the nature and circumstances of the offense are incredibly serious. This is massive amounts of drug trafficking. As the Court knows from the sentencings of Mr. Virk and Mr. Cheema, the conspiracy, as a whole, setting

aside just Mr. Habib for a second, involved trafficking ton quantities of methamphetamine and cocaine across the United States.

Mr. Habib is being held responsible for the 400 kilograms of cocaine seized in New Jersey, itself a massive load of narcotics from just one series of transactions. But as the Court recounted, he was involved in narcotics trafficking on a broader scale, referring to his program on the east coast, working with Mr. Cheema and other coconspirators not involved in the New Jersey shipments to continue to ship narcotics, methamphetamine, cocaine up until his arrest. So this is not a minuscule amount of drug trafficking. It's a massive international shipment in order to get narcotics through the United States and into Canada for distribution, where they wreak havoc on communities both here and across the border.

The sentence recommendation we are providing the Court is also driven by the defendant's characteristics and his role in the offense. It is clear that he is a high-level member in the Wolfpack Alliance and that both his coconspirators and others treated him as such. The Court referenced the chats between Mr. Cheema and Mr. Virk where they talk about Mr. Habib's role in the Wolfpack, and I think the chain goes on there to talk about how they really have to be careful because these are serious guys, and I think that's obvious, given the kinds of violence and threats the Court recounted today,

international hitmen, murders, threats of violence, polygraphs.

This is narcotics trafficking and criminal organizations at the highest levels, and it's clear Mr. Habib was in touch with those people. He was texting with Robby Alkhalil while Mr. Alkhalil was in a Canadian jail awaiting trial for murder. Mr. Alkhalil escaped during the course of the conspiracy.

And Mr. Habib continued to stay in touch with who was then Canada's number-one most wanted. He was acting as a trusted lieutenant of Mr. Alkhalil throughout the time frame of the conspiracy, both with respect to the narcotics trafficking, with respect to collecting on drug debts, like the threats to CS-1 the Court described, as well as being trusted to try to carry out more sensitive missions for the Wolfpack, like smuggling two hitmen, one of whom was himself, Canada's number-two most wanted, one of whom was already on house arrest for attempted murder, out of Canada, and into to the United States. This is shocking conduct. It is operating at the highest levels of a sophisticated international criminal organization that is known for violence, known for disregard of law enforcement, and known for using whatever methods they deemed fit to advance their criminal objectives.

We are also seeking an above-guidelines sentence to promote respect for the law, which is warranted here, given the defendant's attempts to minimize his conduct, even while

pleading guilty, shift blame for his actions to others, like CS-1, and attempt to tailor his narrative to this Court to what he thought the government could prove at the time, which is, as we were just discussing in connection with the plea enforcement motion, changed with additional evidence obtained from the phone that we extracted after his plea.

This is not a game. The point of pleading guilty and taking responsibility is to take responsibility for your actions, and the defendant's actions show a disregard for the truth, a disregard for this Court, a disregard for the administration of justice, and I think, as demonstrated at length in the *Fatico* hearing, that kind of treatment also warrants additional punishment, both with respect to this defendant and to promote respect for the law.

The government is also seeking an above-guidelines sentence due to deterrence. This is not the defendant's first narcotics conviction. He has convictions in Canada for narcotics trafficking, for firearms possession. He continues to engage in sophisticated, large-scale criminal conduct. He is threatening people in connection with his drug activities. And a significant sentence is needed to both deter him for general deterrence to show that these kinds of activities are going to be punished appropriately, and to protect the public from future crimes of the defendant.

For all of those reasons, unless the Court has any

specific questions -- one reason I forgot to mention, which is unwarranted sentencing disparities. The Court has already sentenced Mr. Virk to 16 and a half years, I believe, and Mr. Cheema to 17 -- I want to get the numbers right here.

THE COURT: I believe Mr. Cheema was 210 months, is that right?

MR. REIZENSTEIN: 216, I believe, your Honor.

THE COURT: You're right. Mr. Virk was 210 months. Mr. Cheema was 216 months.

MR. SHAHABIAN: Thank you, Mr. Reizenstein.

Yes. Those sentences also bear on the appropriate sentence for Mr. Habib to avoid unwarranted disparities between them.

The government's assessment of Mr. Habib's role and his conduct is that he is more culpable than Mr. Cheema or Mr. Virk, given his high-level connections in the Wolfpack, given his -- the deference they seem to show him in discussing him separately, given his actions with respect to the international hitmen.

However, the government initially sought an above-guidelines sentence of 30 years for Mr. Habib, an above-guidelines sentence of 25 years for Mr. Cheema. When the Court went below that recommendation for Mr. Cheema to the sentence that we just discussed, the government revised its recommendation in accordance, to 25 years, to reflect the

relative culpability assessment we are making.

THE COURT: For Mr. Cheema, he seemed to be more directly involved in encouraging violence. Do you disagree with that? In other words, why are you asking for essentially five years more?

MR. SHAHABIAN: I don't disagree with the fact that there was direct evidence of Mr. Cheema's participation in arranging violence, the shootings in the Toronto area that he arranged from the MDC after his arrest. We don't have that kind of evidence for Mr. Habib. But the evidence we do have shows that he played a higher role in the organization that, as an organization, engages in violence.

So, for example, the hitman Lahrkamp was wanted after assassinating a rival drug trafficker in Thailand. Unlike Mr. Burgos, who was part of this conduct, but I think, as the government conceded down the necessarily appear to have been aware at the time of the identity of these people and that they were wanted international hitmen, Mr. Habib not only knew that, he was celebrating that fact with the CS, crowing about how they were -- how Mr. Lahrkamp was able to kill the rival in Thailand and that it was a reprisal for a previous murder of a Wolfpack-affiliated member years earlier. Those are the text messages about, it was 10 years, he thought it was safe, but the thing about chess is, there is no clock.

While the government doesn't have evidence to show

that Mr. Habib directed Mr. Lahrkamp or participated in the actual arranging of the hit in Thailand, his post-hit role in attempting to assist Mr. Lahrkamp evade Canadian law enforcement, as well as another Wolfpack-aligned hitman, his role in communicating with Mr. Alkhalil, while doing that, demonstrates high-level involvement of a criminal organization that regularly turns to violence to enforce its way and his knowing efforts to advance that organization. While we don't have direct evidence of tying him to specific acts of violence before they happened, we assess his culpability as higher than Mr. Cheema, who appears to have had a lower role in the organization relative to Mr. Habib.

THE COURT: And more narrowly, just talking about the New Jersey shipment, again, at least it seems to me, that Mr. Habib had a clearly more significant role than Mr. Burgos. But how would you compare Mr. Habib in terms of culpability as to that shipment to Mr. Cheema and Mr. Virk?

Maybe for now you can put aside the conveying of threats to CS-1, just in terms of the shipment.

MR. SHAHABIAN: Yes, your Honor.

I would say Mr. Cheema and Mr. Virk had more hands-on roles in coordinating the logistics of the transportation. As the Court knows, both Mr. Virk and Mr. Cheema own or are participants in trucking companies, Mr. Virk in California and Mr. Cheema in Toronto, and that was sort of what they brought

to the table in the narcotics trafficking scheme, which is using their connections in the trucking industry to transport these large quantities of narcotics.

Mr. Habib's role was not as the person coordinating the trucking aspects of the shipments, but at sort of a more -- I hesitate to use the word managerial, but the person connecting all of the relevant pieces, making sure Mr. Burgos is in the warehouse counting the boxes as they come in, connecting with the CS to make sure he was aware of the timing of when the trucks were arriving, whether it was Mr. Virk's trucks, Mr. Cheema's trucks, Joker's trucks from Canada. He is at more of a logistics-coordination role than the hands-on trucking role.

THE COURT: The presentence report did not mention any prior convictions, but are you aware of any criminal history in Canada? If so, does that come into play at all?

MR. SHAHABIAN: Yes, your Honor. We discussed it in the sentencing submission. I don't have a lot of details. It's a rap sheet from Canada that shows convictions for narcotics trafficking and firearms possession. I don't think it bears overemphasis in the Court's factor, but the fact that he has no US criminal convictions. This is not his first narcotics conviction, and I think it certainly bears on specific deterrence and his personal characteristics in being a repeat player in the narcotics world.

THE COURT: Anything you wish to say about the recommended conditions of supervised release in this case?

MR. SHAHABIAN: No, your Honor.

THE COURT: Thank you.

Mr. Reizenstein.

MR. REIZENSTEIN: Thank you.

May it please the Court, with regard to the allegations of Wolfpack and what we have called the Canadian hitman scheme, there is a case that was cited by a judge in the Western District of New York. That case is *United States v. Ruth*, 578 F.Supp. 3d at 392. The case that that judge cited was *United States v. Sellers*, 512 F.App'x 319, (4th Cir. 2013). And I quote: We cannot simply assume every act committed by a convicted criminal, no matter how hideous, is connected and relevant to the offense of conviction. To do so would turn relevant conduct analysis into a impermissible conduit for punishing uncharged and unproven conduct and would circumvent the criminal process.

I think somewhat that's what's going on here.

Now, I believe the firearm conviction they referenced was when Mr. Habib was 17 years old, I believe, but I am not sure. And I believe the narcotics conviction they reference, he received nine months for.

So I don't know that we have a good way of comparing and contrasting how Canada treats its individuals. I don't

know if that characterizes as a trafficking amount.

The only other case I will cite to the Court is, I came upon a Justice Sotomayor brief opinion in a case where there was a denial of certiorari, and that case is *McClinton v. United States* at 143 S.Ct. 2400 in 2023. And I quote. "while the ultimate sentencing decision is discretionary, the guidelines are the framework for sentencing and anchor the district court's discretion.

And in that case, as it came to the Court, there was an upward departure, I believe, from five to six years for the final sentence of 19 years because the judge took into account the murder of an individual.

So that's where I'll start the rest of my presentation, if I can do it from here. It helps me.

THE COURT: Sure.

MR. REIZENSTEIN: I know in my sentencing presentation, in one of the briefs, I had mentioned, I think, a case out of the Southern District in which someone had been murdered and it was a 20-year sentence.

The government said this is a serious and massive amount of drugs and trafficking. We don't disagree. But Mr. Cheema's amount that he was held responsible, I believe, was 1,299 kilos of methamphetamine, 364 kilos of cocaine. For that he received a 216-month sentence. And Mr. Virk was held responsible for 476 kilos of cocaine, 1,086 kilos of

methamphetamine, which I believe was characterized by the government as a conservative estimate. He was arrested and they found guns, ghost guns, cash, and somewhere along the lines I think there was a kilo of opium.

Mr. Habib has pled to a guideline range that was generated by between 150 and 450 kilos of drugs that arrived here.

Under the 3553(a) factors in this case, I think, and I argue to the Court, that Mr. Cheema's sentence, who has been, for the most part, considered equal in responsibility with my client, 216 months should generate the ceiling in this case. And that's before getting to the violence that Mr. Cheema was accused of being involved in while incarcerated. And it was, quite frankly, to me shocking that at one point the government was arguing for 25 years for an individual who is accused of trying to arrange to hurt or kill somebody and 30 years for my client, when that was just not there in this case.

In the comparison under 3553(a), everything speaks to what Congress has intended and guided courts to a guidelines sentence.

Let me pause for one moment and say, we have provided the Court with a variance request that was mostly based on two things: Mr. Habib's health and the deplorable conditions at MDC. I don't think I need to go further into that. We detailed it and I think laid it out as good as could be. My

experience is, that carries some weight with some members of the judiciary, less so with others. You'll do what you see fit with it.

THE COURT: I will consider it.

MR. REIZENSTEIN: And we know you will. Thank you for that.

We are left with now arguing, as I said, that the main point under 3553(a), I think, establishes for this Court's consideration a ceiling of what Mr. Cheema has received.

I must take issue with the government continuing to claim that we tailored our argument based on, essentially, what we thought they knew or we thought we could get away with.

The Court has made its findings in the *Fatico* hearing, but I know that every argument I made on behalf of my client didn't come out of thin air. When we talked about his role in the threats to the confidential informant, for which the guidelines have already accounted for it, when we talked about his role in standing up for and vouching for the confidential informant that, quote, got us into this mess, that was based on evidence we received from the government. We didn't pull that out of thin air. We took his words that he used when speaking to people and said, this is a reasonable interpretation, and it's just plain language of the words when he talks to the confidential informant and says, you got us into this mess. I vouched for you. People in Mexico are threatening my family.

That's not tailoring evidence on what we think they know. That's an argument based on evidence that we have asked to you consider, and you have made your findings. I think it's highly unfair to take it out on Mr. Habib because I made arguments on his behalf with regard to what the evidence showed.

Deterrence, the government argues. I can't think of anybody who would look at a sentence that this Court would issue and say, well, someone got 18 years. Gee, I think I can do that. It's not like they had 25. If they had 25, I wouldn't do it. Eighteen years, it's a significant portion of a human being's life, significant portion of a human being's life. And nobody would argue that that's an easy sentence or a sentence that would promote disrespect for the law for somebody in this case.

Then the question remains is, if that is a significant amount of time for a significant amount of drugs that the guidelines have calculated for, is there a reason for the Court to go above the guidelines? And I would argue to you that what we talked about with the Canadian hitmen, I presented to you in the *Fatico* hearing Mr. Habib's statement that the people that died in Thailand initially that apparently generated that event, that reprisal, were, I think he characterized them as his brother, and, therefore, he was not weeping for the fact that these other people were killed in retribution. Retribution is a very difficult concept, but we see it every

day in our lives carried out through the international community, and I don't think it's appropriate to hold Mr. Habib responsible for the fact that he did not mourn for the fact people in Thailand were killed, that he felt it was retribution for what occurred to a brother of his, and that he then got involved in this scheme to help these people get over the border.

Additionally, I just pointed out to the Court, I believe in one pleading, that there is a book about the Canadian Wolfpack. He is not mentioned in it. He has never denied knowing these people.

And I go back to my original quote to the Court, that there just has to be a point where we do cutoff as to what is relevant conduct and what he should be sentenced for. If the Court were to sentence him within the guidelines of this case, and reject our request for a lower sentence, then I think that that would be what Congress intended, what is fair, and I don't think that the government has essentially met its burden to show the Court a reason to go above the guidelines under 3553(a) when, I would argue, that -- and Congress doesn't say which one of those factors is more important, but I think, my own personal opinion and my argument is trying to have a lack of disparity between defendants, especially when you have such a wide range here before you, when nobody has said that Mr. Burgos was at the same level of Mr. Virk and Mr. Cheema.

So I think you see the range here of these individuals. I think, again, based on Mr. Cheema's conduct and the Court's noting of violence, which the government conceded, and we appreciate that, that that 18-year sentence should really be the point the Court considers whether or not to work its way down.

We have asked, and I am going to ask now, that when the Court reconvenes that Mr. Habib can address the Court, and then we will be prepared for sentence.

I would just note this. When he does address the Court, you are going to hear his voice. It's altered and it's raspy and it's difficult. That's occurred through the years that I have met with him at MDC, based on what we have provided in the medical documentation, their inability to treat him for H. pylori, which is some sort of bacteria in the stomach that causes reflux that's affected his vocal cords and his speaking. His health has been damaged by his incarceration, and there hasn't been much that we can do about it, and that would be evidence before the Court.

May I pause one moment?

THE COURT: You may.

MR. REIZENSTEIN: And the other point is, what he has on his voice cords is also a polyp.

He has reviewed with me what he is going to say. I had no part in constructing it. But I did plan to say to the

Court this, and he didn't know it, and I think after you hear from him you will find it's appropriate.

The measure of a man is not how many times he is knocked down, but how many times he gets back up. There is no doubt that Michael Habib has accepted responsibility for him and his actions that have knocked him down. And I think and I hope the Court will be impressed when you hear from him about how he intends to try and get back up.

With that said, I have concluded my presentation and will return when instructed to do so.

One last thing. I did say I had three other documents. They are a certificate from MDC Brooklyn that Michael Habib has completed the Century Glass Origami, June 3, 2024; the certificate of completion that Michael Habib has completed the My Healthy Relationship Workbook February 14, 2025; and the certificate of achievement from the United States Department of Justice Federal Bureau of Prisons that Michael Habib has done the Start Now My Foundation unit. That's December 2024.

Two very final points. We are asking the Court for a recommendation for RDAP and The Life Connections program.

As the Court is aware, he's a Canadian citizen, and you will see in court there are people on his behalf, including his wife and family, that came from Canada. If the Court would consider a recommendation to Fort Dix, they have family there,

and it would assist his loved ones who are visiting him and the financial stress that places because they will have a place to stay. I don't recall if the PSR says this, but it is important. His mom is 71. She has cancer. His dad is 86, and he is old and has physical conditions. If they are able to visit, having family in the Fort Dix area would be of assistance too.

THE COURT: I'm sorry. What was the first request that you had?

MR. REIZENSTEIN: It was recommendations for RDAP, the program. I am familiar with RDAP. The second one, Life Connections, I'm not so familiar with, but Mr. Habib is. I think the PSR certainly supports the RDAP recommendation based on his early drug use.

Thank you, Judge.

THE COURT: Thank you.

Mr. Shahabian, your schedule this afternoon -- I was thinking of coming back at 1:15, which would probably put us relatively close to 2:00 by the time we wrap up, hopefully a little bit before that. Does that work on your end?

MR. SHAHABIAN: With the Court's indulgence, AUSA Burnett and I may trade off to make our schedules work, but one of us will be here.

THE COURT: Sounds good. Why don't we take roughly a half-hour break now. It's 12:40. We will resume at 1:15.

I will hear from Mr. Habib, if he still wishes to speak, and then impose sentence.

Does that work for everyone?

MR. SHAHABIAN: Yes, your Honor.

MR. REIZENSTEIN: It does for the defendant.

THE COURT: Thank you.

(Luncheon recess)

AFTERNOON SESSION

1:15 p.m.

(In open court; all parties present)

THE COURT: Welcome back, everyone.

You may all be seated.

Yes, Mr. Reizenstein.

MR. REIZENSTEIN: I forgot to say one thing.

THE COURT: Go ahead.

MR. REIZENSTEIN: And it's one sentence.

In considering the sentence, and I've raised this, please consider that out of all the defendants in the case, my client is the one who pled to the ten-year minimum mandatory, the others were reduced. And I just wanted to remind the Court of that.

THE COURT: Yes.

MR. REIZENSTEIN: That's it.

THE COURT: And anything further from you, Mr. Reizensten?

MR. REIZENSTEIN: No, sir.

THE COURT: I want to give you the opportunity for anything else you wish to add.

MR. REIZENSTEIN: Thank you very much, but no.

THE COURT: No.

And does Mr. Habib still wish to make his statement?

MR. REIZENSTEIN: Yes, he does.

THE COURT: Make sure the mic is close to him, please, Mr. Reizensten.

THE DEFENDANT: Can you hear me here?

THE COURT: I can.

THE DEFENDANT: Thank you.

So, to the judge, thank you for letting me speak today. Thank you for reading and considering all my motions. Thank you for giving me the option to withdraw my plea twice. I've read many cases with you as a judge and a prosecutor, and I truly believe you have the hardest job of the room. I respect the countless house and hard work and dedication it took you to get you to where you are today.

To my lawyer, I thank you for keeping me and my family up to date with everything and helping me in my case. Thank you for educating and sharing so many cases with me.

To my family, I don't have enough words to explain how sorry I am for letting you all down and putting you all through this. I'm extremely sorry for neglecting my duty to be a good partner, a father, and an example to my daughter, and a good reflection my family.

To the United States, I'm sorry to all the citizens of the United States whose communities could have been impacted if these drugs ended up in the hands of these people. I'm aware of the destruction and impact drugs have on all communities, especially once being a drug addict myself. I'm sorry to the

hard-working taxpayers of the United States whose tax money will be used to house me in the prison system.

What I've been doing since my arrest. I've read 75 books, I've participated in as many courses and programs that are available to me. I taught a public speaking course to inmates on my unit. I've held group meetings with other inmates, younger and older, who are addicts and alcoholics to talk about healthy life choices, healthy routines, and healthy lifestyles. I worked as a shower orderly cleaning the showers and a laundry orderly cleaning all the showers in the unit and cleaning the laundry for the other inmates in my unit. I also recently started working in the kitchen.

What I plan to do during my time of incarceration. I plan to earn another degree. I plan to complete the RDAP program, life connections, and parenting program, and also psychology programs, and whatever else is available to me. I plan to maintain a job as well, along with workout and read as much as possible.

When I'm released I plan to start an outreach program for high school kids in troubled communities and also go to AA meetings. I plan to work a full-time job, I plan to spend as much time as possible with my family. I'm going to have to catch up on golfing, and I'm also going to owe my wife a few kids by then.

To the informer, I hope in the future I get a chance

to apologize to him. I hope he forgives me. I forgive him. I hope we can still be friends. We both made this stupid mistake getting involved together. I wasn't just his friend, I was a family friend. I was a friend to his brother-in-law and I was a friend with his mother also. Her and her friends also used to visit me often in Florida and even stay with me. When I met the brother-in-law, he was having a serious drug program in NYC. He moved to Florida to stay with me and my family where I helped him get sober. After a few months, I also helped him open a business in Florida. The CSI's mother has reached out to me several times since my arrest and even attempted to visit me at MDC. She even wrote me two nice character letters for me at sentencing. She also wanted to come today but I was told by my lawyer and family it probably wasn't a good idea.

My reflection on what I've taken in through of all this, I've lost precious time that I'll never get back with my daughter, Myla, and the rest of my family.

All of my siblings got married, every single one of them. My brother got married and had a baby boy, my sister got married, and my sister-in-law got married and had a baby girl. I lost one of my best friends, Usher Bloom, to an overdose who also wrote me a letter. I wonder every day if I was out, would he still be here.

My parents are both elderly. My mother is 71 this year and my father is going to be 87. My mother was just

diagnosed with cancer and my father is also facing health challenges. They probably won't be here by the time I get out.

There's a mirror in my cell, and every time I walk in or out of my cell or wash my hands or brush my teeth, I'm disgusted and I'm disappointed with myself, and the only other thought that comes to my mind is when is this nightmare going to end. I don't underestimate or undermine the law in the United States. I have a lot of American family members who actually work for the American government, and I know they are the best of the best. And fully support law enforcement and I proudly donate to the Wounded Warriors Foundation of the United States and Canada for many years, as well as Tunnel to Towers.

My father always told me never to cut corners because you cut yourself short, and nothing good is easy, and what's easies isn't always good. You have to work hard for it. I love to work hard. He also told me not to break the law because if you're doing something to break the law, you have to be lucky every day. Law enforcement only has to be lucky one day.

I'm a human being. Nobody is perfect. Everybody makes mistakes in life, no matter your age or profession, there's always room for self-improvement. I have made a few bad decisions in my life, this probably be the biggest and the worst, but I am not a bad person. I have made a bad mistake. I truly have learned my lessen.

Thank you for letting me speak.

THE COURT: Thank you.

Is there any reason why sentence should not be imposed at this point?

SPEAKER1: No, your Honor.

MR. REIZENSTEIN: No reason.

THE COURT: Just give me a moment, please.

(Pause)

THE COURT: I will start by explaining the factors I have considered in arriving at Mr. Habib's sentence.

First, as required, I have considered the advisory guidelines range, which, again, is 168 to 210 months' imprisonment.

Under the Supreme Court's decision in *Booker*, and the cases that have followed it, that guidelines range is only one factor I must consider in deciding the appropriate sentence. I also am required to consider the other factors set forth in 18 U.S.C. Section 3553(a). These factors include: The nature and circumstances of the offense and the history and characteristics of the defendant; the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; the need for the sentence to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant

with needed education or vocational training, medical care, or other correctional treatment in the most effective manner. I also must consider the kinds of sentences available, the guidelines range, any pertinent policy statement, the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, and the need to provide restitution to any victims of the offense, although there is not restitution in this case.

Also, under Section 3553(a), I must impose a sentence that is sufficient but no greater than necessary to comply with the purposes of sentencing.

Before I go through the Section 3553(a) factors, I will mention the parties' sentencing requests.

In his lead sentencing submission, Mr. Habib asked for a sentence at the mandatory minimum of ten years in prison, and in his post-*Fatico* hearing submission, he asked for a sentence either below the guidelines or at the low end of the guidelines.

The government now argues for a sentence of at least 300 months in prison. The probation department recommends a sentence of 180 months of incarceration.

I will start with Mr. Habib's offense conduct, which unquestionably was extremely serious and dangerous. In doing so, I will consider the nature and circumstances of the offense, the seriousness of the offense, and the need to justly

punish that conduct.

Mr. Habib was an active, and critical, participant in an operation that sent a massive quantity of cocaine -- upwards of 400 kilograms -- to a warehouse in New Jersey in March 2022. As proven at the *Fatico* hearing, and based on my factual findings announced this morning, Mr. Habib's role well exceeded merely introducing someone who sought to buy drugs to potential sellers, as the defense's lead submission at points suggests.

In March 2022, Mr. Habib and his co-conspirators exchanged messages over the encrypted application Signal to coordinate the New Jersey shipment. On a chat called "NJ to Home," they exchanged photographs of large boxes which apparently contained the narcotics, and discussed the number of boxes in the shipment. Mr. Habib gave directions about what should happen with certain of those boxes, and Mr. Habib exchanged messages with the confidential source, whom I will continue to call "CS-1," and with another participant, in which Mr. Habib asked about the estimate arrival of the person driving the narcotics to New Jersey.

Mr. Habib later added codefendant Christopher Burgos to this chat, who reported that one of the boxes had arrived damaged and noted other issues with the shipment. Mr. Habib also sent messages to others about a schedule for the arrival of the drugs, and gave directions to CS-1 about certain trucks that were needed to handle the shipment.

These communications make clear that Mr. Habib played a central and active role in the delivery of that very large amount of deadly drugs to Newark, New Jersey. The drugs arrived between March 18 and March 21, 2022. At that time, law enforcement seized a total of about 400 kilograms of cocaine that had been sent to the warehouse. The investigation then entailed replacing the seized cocaine with sham drugs and, on March 21, law enforcement surveilled members of the conspiracy load the sham cocaine onto a truck for delivery elsewhere. Law enforcement later stopped that truck and seized the sham drugs.

Upon learning of the seizure of the New Jersey shipment, and also following law enforcement's seizure of 96 kilograms of cocaine and 86 kilograms of methamphetamine in the vicinity of Kansas City, Mr. Habib was involved in conveying threats to CS-1 in efforts to collect on the purported debt that CS-1 owed after those seizures.

For example, in March 2022, Mr. Habib sent CS-1 a screenshot of messages that he had received from Rabih "Robby" Alkhalil, the leader of the Canadian drug trafficking organization called the Wolfpack Alliance. In those messages, Mr. Alkhalil expressed his frustration with CS-1 about the debt. Then in early May 2022, Mr. Habib requested from another individual, Jacob Ross, CS-1's home address and the job address of CS-1's wife. Ross responded by sending Mr. Habib a photograph of their driver's licenses.

The following day, Mr. Habib sent the CS-1 a screenshot in which another individual, who went by Frank, had sent CS-1's wife's photograph to Mr. Habib. Frank wrote, "It's been 3 months and he's not a man of his word I suggest you get outta there we're going to grab her." Mr. Habib then sent that to CS-1 with the warning, "Ignoring isn't going to fix this shit."

Mr. Habib also sent CS-1 another screenshot in which Frank messaged the names and addresses for CS-1 and CS-1's wife. The screenshot also reflected Frank and Mr. Habib discussing another address for CS-1, Frank stating that he has a close eye on the girl driving the Volkswagen, and Mr. Habib saying that they live in a gated community.

On top of this, Mr. Habib messaged CS-1 that he is "a big boy," that he knew what he was getting into, that it's CS-1's "fuck up," and that CS-1 is going to pay his bill and fix it. Mr. Habib conveyed that he tried to buy time for CS-1 but Frank had found his address and that "Jefe," meaning Mr. Alkhalil, was back and "tripping."

Mr. Habib continued to message CS-1 about the drug debt in late May, June, and July 2022, expressing frustration with CS-1 for the delay in paying the debt and for making him look bad. And in mid July 2022, Mr. Habib sent a screenshot to CS-1 of a message in which Mr. Alkhalil referred to CS-1 and wrote: "He's lying to you" "Sick of this back and forth" and

"Kill him or grab him or something."

These messages not only reinforce the central role that Mr. Habib played in the New Jersey shipment -- as well as the Kansas City shipment for that matter, which will be relevant when I discuss some of the other Section 3553(a) factors -- but they also reflect Mr. Habib playing a key role in helping Mr. Alkhalil and Frank coercing CS-1 to repay the purported drug debt.

Now, some of the communications may suggest that Mr. Habib was reluctant to use violence against CS-1 or CS-1's wife, but Mr. Habib was also proactively seeking out personal information about CS-1 and his wife and discussed that information with Frank. And of course, he passed along to CS-1 threatening messages from Frank and Mr. Alkhalil.

Fortunately, as I mentioned, the 400 kilograms of cocaine sent to Newark were intercepted by law enforcement. But the transportation of such a massive quantity of cocaine -- almost a half a ton -- is exceedingly serious. The street value of that amount of cocaine is enormous.

And to state the obvious, cocaine is a deadly drug that causes serious and potentially deadly health effects. The government points to extremely troubling statistics. Empirical data from the Drug Enforcement Administration suggests that overdose deaths involving cocaine have skyrocketed since 2010. In 2010, there were 4,183 overdose deaths from drug poisoning

involving cocaine. In 2018, that number rose to 14,666. Had all that cocaine made its way onto the streets, many people would have been put at risk.

I also have considered the need to avoid unwarranted sentence disparates among defendants with similar records who have been found guilty of similar conduct. And of course, the most direct comparators here would be Mr. Habib's three codefendants in this case.

On December 16, 2024, I sentenced Mr. Burgos to 54 months' imprisonment, followed by three years of supervised release. Mr. Burgos, however, had a far less culpable role in the offense. Mr. Burgos's role was in the receipt of the 400 kilograms of cocaine at the Newark warehouse, as he arranged for the offloading of the cocaine before the drugs were to be transported out on trucks. And while Mr. Burgos had involvement in trying to help the two hitmen in Canada flee, there was an absence of evidence that he knew who those two individuals in fact were.

On July 14, 2024, I sentenced Mr. Virk to 210 months in prison, followed by four years of supervised release. Mr. Virk, like Mr. Cheema for that matter, had a more direct role in forwarding the shipments than Mr. Habib. Mr. Habib largely was involved by connecting various participants in the offense. Obviously, a very important role.

Also unlike Mr. Habib, Mr. Virk was arrested with an

unregistered ghost gun, a magazine with 20 rounds of ammunition, $8,000 in cash, and a kilogram of opium. A search of Mr. Virk's residence then recovered two more ghost guns, multiple magazines, ammunition, and about $479,000 in cash.

In addition to the extremely serious conduct of possessing these ghost guns and ammunition, Mr. Virk's possession of close to $500,000 in cash suggested that he was profiting considerably from distributing narcotics.

On December 19, 2024, I sentenced Mr. Cheema to 216 months' imprisonment, followed by four years of supervised release. Mr. Cheema was responsible for a larger quantity of drugs as part of his offense conduct than Mr. Habib was. And Mr. Cheema was involved in directing and facilitating very serious acts of violence and threats of violence against individuals who owed a drug debt in Canada, which was a significant aggravating consideration at his sentencing. Plus, much of Mr. Cheema's conduct in directing this violence and these threats, occurred post-arrest and I believe even post-guilty plea, which was an aggravating consideration as well.

And in considering unwarranted sentencing disparities, I have taken into account the judiciary sentencing information contained in the presentence investigation report. That information reveals that over the past five fiscal years, excluding defendants who received a substantial assistance

departure under Section 5K1.1, there were 268 defendants who, like Mr. Habib, had a primary guideline of Section 2D1.1 with powder cocaine as the primary drug, a final offense level of 35, and a criminal history category of one. All 268 of those defendants received a sentence of imprisonment in whole or part, and the average length of imprisonment for those defendants was 125 months, while the median length of imprisonment was 128 months.

Now, of course, I know nothing about how many of the defendants in these cells had comparable aggravating factors as Mr. Habib, or, for that matter, comparable mitigating factors.

As to deterrence, the need to promote respect for the law, and the need to protect the public from future crimes of Mr. Habib, on one hand, this is Mr. Habib's first conviction in the United States. It appears he may have had a conviction when he was very young in Canada, but I have very limited details of that offense, so I will not be considering it today.

But even in the absence of a criminal history in the United States, this was far from a one-time incident by Mr. Habib that reflected a momentary lapse of judgment. Mr. Habib's conduct involved many acts to coordinate the massive drug shipments to the warehouse in New Jersey in March 2022. And after that shipment was seized, he continued to participate in the conspiracy by engaging in extensive efforts over several months to collect the purported drug debt

owed by CS-1. And again, this included Mr. Habib engaging in discussions with several individuals, including two who expressed a desire to cause harm to CS-1 or CS-1's wife, and then conveying the same to CS-1.

In addition, as I found earlier today, the evidence at the *Fatico* hearing established Mr. Habib's involvement in a number of other instances of drug trafficking activity. He played a role in the seized shipment of narcotics to the Kansas City area just before the New Jersey shipment, as well as various other drug trafficking activity that occurred in October and November 2022.

For the Kansas City shipment, this included trying to coordinate with others the exchange of addresses for pickup and dropoff of drugs. And in October and November 2022, Mr. Habib participated in group chats and exchanged messages regarding additional narcotics trafficking activity, including setting up a meeting to coordinate narcotics trafficking and asking for a cut of drug trafficking proceeds.

And I also note that Mr. Habib's drug trafficking activities continued until pretty much right up until his arrest in this case. Mr. Habib's last drug-related message occurred on November 14, 2022, and he was arrested in Florida two days later on November 16, 2022. This strongly suggests that had Mr. Habib not been incapacitated by virtue of his arrest in this case, his involvement in drug trafficking would

have continued.

In addition, as indicated by my discussion of the threats to CS-1, Mr. Habib was associated with the Wolfpack Alliance, a Canadian drug trafficking organization. I have no information to establish that he held a leadership role in that organization or even was necessarily a member of it, but it does seem clear that he had close associations with the Wolf Pack Alliance.

Mr. Virk and Mr. Cheema discussed Mr. Habib being with the Wolfpack, and a screenshot showed Mr. Habib telling someone that Mr. Habib had been told to welcome that person into the Wolfpack. And of course, Mr. Habib had communications with Mr. Akhalil in connection with efforts to coerce CS-1 to pay the purported drug debt.

Moreover, in April and May 2022, Mr. Habib participated in a scheme to smuggle two wanted hitmen out of Canada into the United States. Mr. Habib reached out to CS-1 to procure passports for those individuals and provided details about the type of passports needed. Mr. Habib also coordinated the anticipated transportation of these men upon crossing the border, with the original plan apparently being to pick them up in Seattle and driving them to Los Angeles. After that initial plan was not successful, Mr. Habib communicated with CS-1 about coordinating transportation for the hitmen from Montreal to New York City, and then onwards to Los Angeles.

Ultimately, of course, this did not happen because the plane carrying the two men crashed in Ontario, killing them. This prompted Mr. Habib to notify CS-1 of the crash and telling CS-1 that they should leave the group chat in which they discussed their smuggling efforts.

All of this demonstrates an extremely strong need for deterrence, to promote respect for the law, and to protect the public from further crimes by Mr. Habib. I emphasize that with regard to the conduct I just mentioned, specifically Mr. Habib's involvement in the Kansas City shipment and other drug activity, his association in the Wolfpack Alliance, and his efforts to smuggle the hitmen, I am considering this conduct for the Section 3553(a) factors I just mentioned; namely, to achieve adequate deterrence, promote respect for the law, and protect the public from future crimes of Mr. Habib. I am not considering that conduct as part of the nature and circumstances of the offense or the need to reflect the seriousness of the offense, and to provide just punishment for that offense.

There also is a need for general deterrence. The distribution of illegal narcotics on our streets causes immeasurable harm to our communities and families. And as I mentioned, the harm caused by cocaine is particularly devastating. The illegal distribution of cocaine must be deterred.

I also have considered Mr. Habib's history and characteristics. There are certainly mitigating circumstances in this case. According to the presentence investigation report, Mr. Habib had a difficult upbringing as a child, lacking much direction at points in his life from his parents. His father reportedly was abusive towards him and his mother at times. Mr. Habib's parents eventually separated when he was seven years old. There was a period when Mr. Habib and his brother were living with their father but eventually moved out on account of his abuse. Mr. Habib also encountered issues with his mother's partner at the time, leading to a period when he was homeless or even sleeping on couches.

I have read the many letters in support of Mr. Habib, many from family members and from other loved ones and friends. Mr. Habib appears to be a loving and devoted father to his daughter. Mr. Habib wrote about his constant loving engagement with his daughter, as did many other people.

His fiancée also describes him as very caring and selfless person. He worked as a foreman at his brother's roofing and home exterior company, and his brother praises Mr. Habib's hard work ethic.

Other family members, friends, and business associates, as well as people who trained physically with Mr. Habib, such as in boxing or martial arts, wrote much the same in their letters. They discussed Mr. Habib's character,

integrity, reliability, kindness, love for his daughter and fiancée, and dedication to work and teaching.

One friend spoke about Mr. Habib's support when the friend was struggling with addiction.  Another friend, who also discussed Mr. Habib helping him to stop using drugs, related a story when Mr. Habib saved his life on a scuba dive trip.

And Mr. Habib has performed humanitarian work in South Africa with his fiancée and daughter, digging wells and providing clothing to the less fortunate.  A man named Emmanuel Lazzaro Saitoti wrote to me about the work Mr. Habib did in Tanzania to put together a cultural village for the Maasai Tribe, and that village appears to be doing extremely well and providing work for many people there.

I also considered the mitigation report from Ms. Guevara, which provided more information about Mr. Habib's childhood and background, much of which I just mentioned.  She also discussed Mr. Habib's relationship with his daughter and his partner.  The report also discussed Mr. Habib's medical conditions and the circumstances in the MDC.

I have considered those conditions at the MDC as well during Mr. Habib's incarceration.  There have been staffing shortages, periods of extended lockdown.  In addition, Mr. Reizenstein represents that there have been delays in Mr. Habib receipt of medical treatment.  And when he spoke with me today, I certainly heard the impact of some medical

condition on his voice.

I have also considered Mr. Habib's medical condition. He has long suffered from a stomach bacterium infection and, as I just indicated, experiences discomfort in his throat, which has led to the prescription of various medications.

I also note that as of May 24, 2024, the date of the final presentence report, Mr. Habib had not received any disciplinary sanctions while at the MDC. He also has taken a number of courses covering parenting, resumes, effective communication, and CDL.

I also have taken into account the likelihood that Mr. Habib will be in removal or deportation proceedings after he concludes his imprisonment.

And also I have read Mr. Habib's letter to me and I've heard him speak to me, of course, here today in court. In that letter and his words today, Mr. Habib expressed apologies for his conduct, a determination to rehabilitate, and a desire to put this criminal activity behind him. And I did get the impression today of true remorse for his actions and for his impact on his loved ones.

To that point, I have considered the impact of a lengthy period of incarceration on Mr. Habib's family, especially his daughter, who it appears from his fiancée's letter may not be aware of his situation, or at least she wasn't aware of her father's situation as of Mr. Habib's

fiancée's letter of September 11, 2023. Mr. Habib's letter also discussed many milestones for his daughter that he has already missed on account of his incarceration, and sadly he will continue to miss many more.

In the end, though, a lengthy term of imprisonment is appropriate given the serious nature of Mr. Habib's crime and all the other aggravating circumstances I just walked through. I will say that if not for these mitigating circumstances, I very well may have imposed a sentence closer to what the government is recommending, but these mitigating factors have convinced me to go lower than the government's recommendation.

I also note that I will impose a term of supervised release. Because the offense of conviction requires a minimum five-year term of supervised release, supervised release should be imposed under guidelines Section 5D1.1(c), even though there appears to be a likelihood of deportation.

And regardless of whether supervised release is mandatory, there is no assurance that Mr. Habib will in fact be removed, when that will occur, and whether he would be in immigration detention pending removal. And given the offense conduct here and the great danger to society posed by distributing narcotics, I find that a period of post-incarceration supervision is appropriate.

I will now state the sentence I intend to impose.

Mr. Habib, will you please stand.

Mr. Habib, it is the judgment of this Court that you're remanded to the custody of the Bureau of Prisons for a period of 210 months' imprisonment, to be followed by a five-year term of supervised release. I conclude that this sentence is sufficient but not greater than necessary to achieve the purposes of sentencing for the reasons that I just went through.

You may be seated if you wish, Mr. Habib --

THE DEFENDANT: Thank you.

THE COURT: -- while I read the conditions of your supervised release that you must comply with and other details of your sentence.

The standard conditions of supervised release shall apply. Those are listed on pages 36 and 37 of the presentence report.

Mr. Reizensten or Mr. Habib, would you like me to read those out loud for you?

MR. REIZENSTEIN: Judge, I apologize. Are you saying all of the conditions --

THE COURT: The standard conditions.

MR. REIZENSTEIN: I don't know that it's necessary because it will be in the future and I know it's written down, so I don't know that we'll remember it. And I know it's written down and he'll have a copy of it.

THE COURT: Yes.

MR. REIZENSTEIN: So, if we can, we would waive that.

THE COURT: The standard conditions will be contained in the judgment. They're also contained in the presentence report.

If anybody wants me to read them, I'm happy to do so, but I assume that the attorneys and Mr. Habib have read them since everyone has confirmed that they read the presentence report.

In addition, you will be subject to the following mandatory conditions: You must not commit another federal, state, or local crime; you must not legally possess a controlled substance, you must refrain from any unlawful use of a controlled substance, and you must submit to one drug test within 15 days of imprisonment, and at least two periodic drug tests thereafter as determined by the Court; and you must cooperate in the collection of DNA as directed by the probation officer.

I will also impose certain special conditions of supervised release, and I will explain them now. I find that each of the following conditions are reasonably related to the statutory purposes of supervision, including the nature and circumstances of the offense and the history and characteristics of the defendant, the need for the sentence imposed to afford adequate deterrence, the need for the sentence to protect the public, and the rehabilitative and

medical care needs of the defendant. I also find the conditions I will announce impose no greater deprivation of liberty than reasonably necessary to accomplish the relevant sentencing objectives that apply to each, and further, that the conditions are consistent with any pertinent policy statements of the Sentencing Commission.

Given your lack of legal immigration status in the United States, I order that you must obey the immigration laws and comply with the directives of immigration authorities. I find that this condition is reasonably related to your history and characteristics, specifically your immigration status, and the need to promote respect for the law, given the instant criminal activity which occurred while Mr. Habib was in the United States, I believe, on a temporary visa.

I will impose a search condition, as recommended by the probation department. There are multiple grounds that support this condition. The offense involved a conspiracy to transport a massive quantity of cocaine to a warehouse in Newark, New Jersey, with Mr. Habib coordinating those shipments with others. That cocaine was intended to be briefly stored in the warehouse before it would be loaded onto a truck for further transportation. Mr. Habib had many discussions with his coconspirators over Signal, therefore using electronic devices about this shipment.

Under this condition, you must submit your person and

any property, residence, vehicle, papers, computer, other electronic communication, data storage devices, cloud storage or media, and effects to a search by any United States Probation Officer, and if needed, with the assistance of any law enforcement. The search is to be conducted when there is a reasonable suspicion concerning violation of a condition of supervision or unlawful conduct by you as the person being supervised. Failure to submit to a search may be grounds for revocation of release. You shall warn any other occupants that the premises may be subject to searches pursuant to this condition. Any search shall be conducted at a reasonable time and in a reasonable manner.

I find that this search condition is reasonably related to the nature and circumstances of the offense, and Mr. Habib's characteristics and history, as well as the need for deterrence and to protect the public.

Paragraphs 97 through 105 of the presentence investigation report discuss a lengthy history of substance abuse by Mr. Habib, including taking unprescribed Suboxone while at the MDC, his daily consumption of molly and ecstasy for multiple years in his early 20s, and his use of various other drugs in his teens.

The report also reports that Mr. Habib regularly consumed alcohol, starting at the age of 12. And Mr. Habib's letter to me similarly mentions his struggle with addiction.

For that reasons, I will impose a condition requiring outpatient drug and alcohol treatment. Under this condition, you will participate in an outpatient treatment program approved by the U.S. Probation Office, which program may include testing to determine whether you have reverted to using drugs or alcohol.

You must contribute to the costs of services rendered based on your ability to pay and the availability of third-party payments.

I authorize the release of available drug treatment evaluations and reports, including the presentence investigation report, to the substance abuse disorder treatment provider.

I find that this drug treatment condition is reasonably related to your history and characteristics, as well as to the need to address your rehabilitative and medical care care needs.

I may have mentioned this, but it allows for effective supervision, you shall be supervised in the district of your residence during your supervised release.

There is no restitution in this case.

At your guilty plea hearing, you admitted the forfeiture allegation in the indictment, and I will enter the consent preliminary order of forfeiture and money judgment that we discussed earlier.

I order, pursuant to Title 21, United States Code, Section 853, that you forfeit to the United States your right, title, and interest in the following specific property: $8,000 in U.S. currency seized by Bhurpinder Singh Virk; Virk's vehicle at the time of Mr. Virk's arrest; $479,900 in U.S. currency seized from Mr. Virk's residence in Fresno, California; one Louis Vuitton bag seized from Mr. Virk's vehicle at the time of his arrest; and a 2020 Mercedes-Benz AMZG GT63 with Vehicle Identification Number WDD7X8JB5LA014070 that was seized at the time of Mr. Virk's arrest.

I am not going to impose a fine because I find you will not have the ability to pay it, but I do impose a mandatory special assessment of $100.

In the judgment I will recommend that Mr. Habib be designated to FCI Fort Dix. I also will recommend that he be considered by the Bureau of Prisons for the residential drug abuse program, or RDAP, and also for Life Connections. Ultimately, those decisions will be at the discretion of the Bureau of Prisons, but I will include that in my judgment.

Aside from the issues that we have already discussed, does either counsel know of any legal reason why that sentence should not be imposed as stated?

MR. SHAHABIAN: No, your Honor.

MR. REIZENSTEIN: No reason.

THE COURT: I order that the sentence that I have

described to be imposed as stated. I find that the sentence is sufficient but not greater than necessary to satisfy the purposes of sentencing set forth in 18 U.S. Code Section 3553(a)(2).

Mr. Shahabian, I believe the third superceding indictment was the only one charging Mr. Habib; is that right or are there open counts?

MR. SHAHABIAN: I believe that's right, but if there are any open counts, the government moves to dismiss them.

THE COURT: If there are any open counts as to Mr. Habib, those are dismissed.

Mr. Habib, I advise you that you have the right to appeal from the judgment imposing this sentence to whatever extent you have not waived it.

If you are unable to pay the cost of an appeal, you may apply for leave to appeal *in forma pauperis*. If that application were granted, you would be permitted to appeal without paying any fees. The notice of appeal must be filed within 14 days of the judgment of conviction.

Is there anything else we should take up then this afternoon?

MR. SHAHABIAN: No, your Honor.

MR. REIZENSTEIN: May we have one moment?

THE COURT: Of course.

MR. REIZENSTEIN: Thank you.

(Counsel confer)

MR. REIZENSTEIN: Judge, thank you.

Nothing further on behalf of the defense. And personally, thank you for accommodating me both on my ability to be here and my recent illness, all parties accommodated me and I appreciate it.

THE COURT: I hope everything going okay.

MR. REIZENSTEIN: It did. Thank you.

THE COURT: That's good. Well, you look well.

MR. REIZENSTEIN: Thanks.

THE COURT: I hope everyone stays well.

Mr. Habib, I do wish you the best. I know this is an extremely long sentence. You're also a young man, and I hope you'll have a very long life ahead of you when this is over and you're able to spend that time with your loved ones who, as I mentioned, it was very clear to me how much they love you in your letters, so I do wish you the best.

THE DEFENDANT: Thank you for your consideration.

THE COURT: We're adjourned.

Have a good evening.

(Adjourned)